**Trenk, DiPasquale,**
**Della Fera & Sodono, P.C.**
347 Mount Pleasant Avenue, Suite 300
West Orange, New Jersey 07052
(973) 243-8600
-and-
45 Rockefeller Plaza, Suite 2000
New York, New York 10111
(212) 899-5245
Joseph J. DiPasquale
jdipasquale@trenklawfirm.com
Irena M. Goldstein
igoldstein@trenklawfirm.com

*Proposed Counsel for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| GRACIOUS HOME LLC, *et al.*, | Case No. 16-13500 (MKV) |
| Debtors.[1] | (Joint Administration Pending) |

**AFFIDAVIT OF ROBERT MORRISON**
**PURSUANT TO BANKRUPTCY RULE 1007-2 OF THE LOCAL**
**BANKRUPTCY RULES FOR THE SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK      )
                                          ) ss.:
COUNTY OF NEW YORK  )

**ROBERT MORRISON**, being duly sworn, deposes and says:

---

[1] The Debtors in these chapter 11 cases, and as indicated, the last four digits of their tax identification numbers are: Gracious Home Holdings LLC (3251); Gracious Home Payroll LLC (3681) and Gracious Home LLC; GH East Side LLC; GH West Side LLC; GH Chelsea LLC and Gracious (IP) LLC). The latter five entities are disregarded for tax purposes and do not have their own tax identification numbers. The address of the Debtors' corporate headquarters is 1201 Third Avenue, New York, New York 10021.

1

1.       I am the Chief Executive Officer ("CEO") of the above-captioned debtors and debtors-in-possession (the "Debtors" or "Gracious Home").  I am authorized to submit this Affidavit in support of the Debtors' chapter 11 petitions and the first day motions described herein. I am familiar with the Debtors' day-to-day operations,  businesses and financial affairs.

2.       I became CEO upon the resignation of the Debtors' prior CEO, Dorothy H. Mattison.  Prior to my appointment as CEO, I served as Chief Operating Officer of the Debtors for the past three years and have 40 years of experience in the retail industry.

3.       On December 14, 2016 (the "Petition Date"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), as well as certain motions and other papers (collectively, the "First Day Motions").

4.       The First Day Motions are intended to enable the Debtors to operate effectively and efficiently within these chapter 11 cases, as well as to avoid certain adverse consequences that might otherwise result from the commencement of these cases. Among other things, the First Day Motions are designed to meet the Debtors' goals of: (i) continuing, and in some aspects, re-starting their operations in chapter 11 with as little disruption and loss of productivity as possible; (ii) maintaining, and in some aspects, rebuilding the confidence and support of their customers, employees, vendors and service providers during the Debtors' reorganization process; and (iii) establishing procedures for the smooth and efficient administration of these chapter 11 cases.  I have reviewed the First Day Motions, and it is my belief that the relief sought therein is necessary to: (a) avoid immediate and

irreparable harm to the Debtors' businesses, and (b) maximize and preserve the value of the Debtors' chapter 11 estates.

5. In my capacity as an officer of the Debtors, I am familiar with the Debtors' day-to-day operations, financial affairs, business affairs and books and records.  Except as otherwise indicated, all facts set forth in this Affidavit are based upon: (i) my personal knowledge; (ii) my review of relevant documents; (iii) information supplied to me by other members of the Debtors' management team or professionals retained by the Debtors; or (iv) my opinions based on my experience and knowledge of the Debtors' operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

6. Parts I through III of this Affidavit provide an overview of the Debtors' businesses, capital structure, and the circumstances giving rise to the commencement of these chapter 11 cases.   Part IV summarizes the relief requested in each of the First Day Motions. Part V lists the schedules of information requested by Local Bankruptcy Rule 1007-2.

## I.

## THE DEBTORS' BUSINESSES

### Background

7. Founded in 1963, the Debtors began as a small neighborhood hardware store on Manhattan's Upper East Side.  Today, the Debtors operate a housewares and home furnishings business at various leased retail store and warehouse locations and an internet-based business (currently off-line), all under the name "*Gracious Home*."

8. Gracious Home has also offered a wide range of customized products and services, including personal shopping, corporate and bridal gifts, decorative hardware, lighting and plumbing, key making, knife sharpening, lamp re-wiring, vacuum repairs and custom window treatments.   Having built their reputation and clientele on quality of service, the

stores cater not only to the sophisticated, higher-end, metropolitan consumer, but also architects, contractors, interior designers, electricians, plumbers, carpenters and developers.

9.      As explained below, forced by their secured lender, the Debtors have been liquidating their inventory at below-market prices during the approximately previous 5 months. There is a core business worth salvaging, however, and the Debtors seek relief from this Court in order to preserve that enterprise.  The breathing room afforded by Bankruptcy Code's chapter 11 is the only manner by which the Debtors' unsecured creditors, including their long-valued suppliers, have a chance at recovering on their claims.

### Organizational Structure

10.      The Debtors are all private limited liability companies organized under the laws of the State of Delaware.  Gracious Home LLC ("GHLLC") is the operating entity and the Borrower under the loan agreement with Signature Bank, a national banking association ("Signature Bank"), and stands as the primary obligor for most of the Debtors' accounts payable. Gracious Home Holdings LLC ("GH Holdings") owns 100% of GHLLC and Gracious (IP) LLC ("GHIP").  GHIP owns the Debtors' intellectual property.  GHLLC owns 100% of Gracious Home Payroll LLC ("GH Payroll"), GH East Side LLC ("GHES"), GH West Side LLC ("GHWS") and GH Chelsea LLC ("CH Chelsea") all of which are guarantors under the loan with Signature Bank.

11.      GH Holdings is owned by non-debtors Americas Retail Flagship Fund LLC ("ARFF") (49% holder) and Gracious Partners LLC ("Gracious Partners") (51% holder), both Delaware limited liability companies.  A corporate organization chart is annexed hereto as **Exhibit A**.

12.      ARFF acquired its interest in GH Holdings from the bankruptcy estates of the Gracious Home (The Weck Corporation) predecessor corporate entities.  Such entities had

sought protection from this Court on August 13, 2010. ARFF's acquisition was effective December 3, 2010. Thereafter, in June 2015, Gracious Partners acquired its 51% interest in GH Holdings.

**Retail Locations**

13.     Gracious Home has primarily sold its products through its retail "brick and mortar" stores. Gracious Home is in the process of consolidating its locations, but as of the Petition Date, its retail locations are located at:

    (a)     1992 Broadway, New York, NY 10023;

    (b)     1210-1220 Third Avenue, New York, NY;

    (c)     1201 Third Avenue, New York, NY 10021; and

    (d)     45 West 25th Street, New York, NY 10010.

For the fiscal year ending December 31, 2015, the retail stores accounted for approximately ninety-two percent (92%) of the Debtors' revenues.[2]

14.     <u>Custom Orders Business</u>. Prior to their liquidity crisis, Gracious Home had developed an extensive and loyal following of commercial and trade customers, including architects, interior designers, contractors, electricians, plumbers, carpenters and developers working in and around New York City in connection with hotel and custom home development. Gracious Home's professionals offered expert product advice, installation information, operating tutorials, detailed price estimates, special delivery services and other services as requested by the customer. Gracious Home provided "staging" services for wealthy homeowners and television news shows. These services are what differentiate Gracious Home from many of

---

[2] In addition to the forgoing, GHLLC is lessor of certain commercial warehouse space located at 30-30 60th Street, Woodside, Queens, New York, 11377 which served as a central warehouse, storage and distribution center for all store locations and the internet sales. The Debtors' former corporate headquarters were located at 158 W. 27th St., New York, NY 10021. The Debtors vacated and returned the premises to the landlord.

its competitors.   In addition, Gracious Home had a profitable sector selling light bulbs to homeowners as well as superintendents of large condominium and cooperative apartment buildings.

15.   <u>Internet</u>.   The Debtors also sold their products directly to their consumers through their internet site, located at www.gracioushome.com.   The majority of the online business was done outside the New York metropolitan area with online growth in 2015 of 42%. The Debtors' website allowed the Debtors significant access to their customers, which the Debtors  track in a database populated with information from approximately 265,000 customers. The Debtors' website provided customers the opportunity to sign up to obtain exclusive email-only offers, obtain internet-only promotions, and provides information about the Debtors' product lines and retail store locations.

16.   For year-end 2015, the Debtors' website produced total sales of approximately $4,231,000 which accounted for approximately seven percent (7%) of the Debtors' revenues. The website revenue was increasing nicely in 2016.  For the first six months of 2016, website sales were up 41.5% over that same period in 2015.   After Signature Bank started imposing reserves and prevented the Debtors from purchasing new inventory as described further below, website sales dropped dramatically in comparison to that same period in 2015:  In July 2016, they were 8.6% higher than July 2015, and in September and October 2016, they were -11.6% and -38.3% as compared to sales in September and October 2015.

17.   At that point, the Debtors had no choice but to take down the website. The Debtors believe that, with the appropriate investment, they will be able to, and should, re-start their online business**.**

### Employees and Labor Matters

18.    The Debtors currently employ approximately 111 non-union employees, comprised of 91 full time employees, 19 regular part time employees and one temporary full time employee.  On December 13, 2016, the Debtors served notices under the Federal and New York States Worker Adjustment and Retraining Notification Acts ("WARN Acts") on its employees.  The Debtors hope to retain a percentage of their employees upon reorganizing into a smaller organization.  Prior to this time, the Debtors had enjoyed favorable relationships with their highly qualified and enthusiastic personnel.

### Properties and Assets

19.    The Debtors' primary assets include inventory, contract rights, intellectual property rights, and accounts receivable for goods sold.  As indicated, the Debtors lease, and do not own, their headquarters, warehouse and store locations.

### Branded Products and Sourcing

20.    The Debtors sell and distribute certain Gracious Home-branded products, including bed linens, towels, sleeping pillows and decorative pillows, mattress pads, comforters, plates and dishes, giftware, candles and cleaning products.  These branded products are sourced  from  external manufacturers and distributed through the Debtors.

### II.

### CAPITAL STRUCTURE

### Secured Debt

21.    As of the Petition Date, the Debtors' sole significant secured creditor was Signature Bank pursuant to a Loan and Security Agreement, dated as of February 10, 2015,

between GHLLC and Signature Bank (the "Loan and Security Agreement"). A copy of the Loan and Security Agreement is annexed hereto as **Exhibit B**.

22.    Pursuant to the Loan and Security Agreement, Signature Bank provided two facilities to GHLLC: (a) a Discretionary Revolving Loan facility; and (b) a Letter of Credit facility. Under the Loan and Security Agreement, GHLLC could borrow up to $6.5 million (plus discretionary over-advances) under a Revolving Credit Note at an interest rate of prime plus the "Applicable Margin" (1.00%). Permitted uses of the proceeds of the Revolving Loans include satisfying GHLLC's existing debt, paying the fees and expenses relating to the closing of the transactions under the Loan and Security Agreement, and for working capital purposes. GHLLC used the proceeds of the Revolving Credit Note to repay $3,255,764.60 that it owed to JPMorgan Chase Bank, N.A. as of February 2015.

23.    In addition, Signature Bank agreed to issue standby letters of creditor for a fee of 2.5 percent times the average daily "Stated Amount" plus additional fees and charges. Upon the declaration of an Event of Default under the Loan and Security Agreement, an additional Default Rate of 2% was charged with respect to amounts outstanding under the Revolving Credit Note and the Letter of Credit facility.

24.    Pursuant to a Guarantee Agreement, dated February 10, 2015, GHLLC's obligations under the Loan and Security Agreement are guaranteed by ARFF, and Debtors GH Holdings, GH Payroll, GHIP, GHES, GHWS and GH Chelsea (the "Guarantors"). A copy of the Guarantee Agreement is annexed hereto as **Exhibit C**.

25.    Under a General Security Agreement, executed by the Guarantors, dated February 10, 2015, and under the Loan and Security Agreement, the Guarantors' and GHLLC's obligations to Signature Bank are secured by first priority liens and security interests on certain

assets and property of the Guarantors and GHLLC, including accounts, inventory, contract rights, chattel paper, documents, general intangibles, money, cash, cash equivalents held directly or indirectly by Signature Bank, books and records and commercial tort claims (collectively, the "Prepetition Collateral").[3]   A copy of the General Security Agreement is annexed hereto as **Exhibit D**.  In addition, GHLLC pledged its membership interests in GH Payroll, GHES, GHWS and GH Chelsea to Signature Bank pursuant to a Pledge Agreement, between GHLLC and Signature Bank, also dated as of February 10, 2015.

26.    As stated more fully below, Signature Bank has declared an Event of Default under the Loan and Security Agreement.  Thereafter, the Debtors and Signature Bank entered into a Forbearance Agreement and Amendment to Loan and Security Agreement, dated as of November 7, 2016 (the "Forbearance Agreement").   A copy of the Forbearance Agreement is annexed hereto as **Exhibit E.**

27.    GHLLC was also party to certain capitalized leases with respect to forklifts and trucks used to move and ship its inventory.  Pre-petition, GHLLC returned possession of such forklifts and trucks.  GHLLC is also in the possession of certain copiers leased from Canon. GHLLC is in the process of returning extra equipment not required in its current operations.

### Unsecured Debt

28.    Historically, the Debtors have enjoyed outstanding relationships with their suppliers.   In 2016, the Debtors purchased their merchandise from approximately 1,000 suppliers. The Debtors purchase most of their merchandise in the United States, the majority from domestic sources and the balance from importers.  The Debtors have no material long-term contracts obligating them to purchase a minimum level of merchandise.   The Debtors are,

---

[3] Nothing herein is intended to constitute an admission as to the validity and extent of Signature Bank's liens or preclude or waive the rights of any statutory committee to investigate or challenge the validity or extent of Signature Bank's lien rights or its prepetition actions.

however, a member of the True Value cooperative which is a retailer-owned buying group.  True Value uses its buying power to purchase goods from third-parties, *e.g.* General Electric lighting and assorted hardware, for its cooperative members at lower prices than if the members sourced the goods themselves.  Another advantage to being a member of the cooperative is that there are no minimum purchase requirements.

29.     The Debtors owe their trade vendors approximately $6 million as of the Petition Date.  These claims are for the delivery of goods and services to the Debtors.  In addition, monthly rental obligations for various of the Debtors' leases are outstanding as of the Petition Date in the approximate amount of $3.5 million.  As set forth above, the Debtors intend to consolidate their enterprise and will be reducing their brick and mortar presence in New York City.

30.     On May 2, 2016, GHLLC issued convertible promissory notes (the "CP Notes") to Cozier and Gracious Partners in the amounts of $250,000 and $70,000, respectively.  Pursuant to the Note Purchase Agreement, dated as of May 2, 2016, GHLLC agreed to convert the CP Notes into equity securities of GHLLC upon a qualifying equity financing.  Forms of the Note Purchase Agreements are annexed hereto as **Exhibit F**.  Such equity financing did not occur; as a result the CP Notes remain general unsecured obligations of GHLLC.

### Recent Financial Information

31.     The Debtors total sales in calendar year 2015 were approximately $54,031,000.00.  Current sales projections for the year ended December 31, 2016 are approximately $43 million.

32.     The Debtors have suffered substantial net earnings losses for the past several years.  The loss in calendar year 2015 was approximately $2 million.  The loss in calendar year

The loss for calendar year 2016 is projected to be approximately $4 million, exclusive of restructuring-related charges.

## III.

## EVENTS LEADING TO THE CHAPTER 11 CASES

33.     Several recent internal and external factors have severely impacted the Debtors, and, in particular their retail businesses, ultimately prompting the near-term liquidity pressures that precipitated the decision to commence these chapter 11 cases.

### Market Conditions

34.     The Debtors operate in the highly competitive retail industry, specifically in the home sector.  Due to their extensive merchandise assortment, the Debtors compete against many different types and sizes of retailers operating in several different retail distribution channels. The Debtors, along with their competitors, are influenced by a number of factors affecting retail sales of home goods on a national level, including but not limited to, general economic conditions (including the housing market), the overall macroeconomic environment and related changes in the retailing environment, consumer preferences and spending habits.  It is well known that the Debtors are not the only retailer to struggle in the current economic climate, the most difficult downturn experienced in both New York City and the United States in many decades. In fact, over the last several years, retailers such as Aeropostale, Sports Authority, Radio Shack, Dots, and Gottschalks have all sought relief under chapter 11.

35.     In addition, the Debtors faced increased competition from Bed Bath & Beyond, Lowes, and even CVS for certain of its non-specialty house wares, *e.g.* light bulbs, which had been a major staple of the Debtors' business historically.  Moreover, customers now have the

option of purchasing goods at a lower cost on-line, with many retailers absorbing shipping costs. All of the forgoing compressed the margins that the Debtors could earn from their products.

## Operational Issues

36.     The Debtors hoped to turnaround their businesses after Gracious Partners acquired the majority interest in GH Holdings and brought fresh new ideas and strategy to the business in or about November 2015.  The Debtors began investing heavily in their on-line business and marketing which resulted in positive growth in both its on-line and brick and mortar stores.

37.     Unfortunately, even though their revenues continued to increase, the Debtors' expenses outmatched their revenues resulting in a liquidity crisis that rendered the Debtors unable to pay certain of their debts as they came due.  In this regard, the Debtors' management sought to reduce the rents for their stores and headquarters, which were the primary factors depressing the Debtors' earnings.  The landlords refused to reduce the rents, or even assist in finding tenants to sublet some of the spaces.  Without significant new capital and/or rent reductions, the Debtors' liquidity continued to suffer.

## Signature Bank Actions

38.     On May 10, 2016, Signature Bank sent a letter to GHLLC stating that certain "Specified Events of Default" had occurred under the Loan and Security Agreement because GHLLC had allegedly violated certain EBITDA and fixed ratio covenants and had failed to provide certain financial statements.  In such letter, Signature Bank reserved its right to cease lending to GHLLC and advised GHLLC that all obligations then owed under the Loan and Security Agreement would bear interest at the default rate.

39.     On Friday June 3, 2016, Signature Bank advised GHLLC that it would increase its reserves to the borrowing base under the Loan and Security Agreement "by at least $25,000

per week" commencing the following Monday, June 6.  Finally, on July 14, 2016, Signature Bank, alleging that it had not made any progress towards execution of a forbearance agreement and that GHLLC had not "undertaken any material steps to stem" its financial losses (exasperated by the $25,000 per week reserve to the borrowing base), advised GHLLC that it would no longer make further advances to GHLLC, although it did continue to make such advances on a more limited basis.

40.     By letter dated August 15, 2016, Signature Bank advised GHLLC that it was increasing the reserve to the borrowing base to $50,000 per week.  Finally, on November 1, 2016, Signature Bank accelerated the amounts owing under the Loan and Security Agreement and demanded payment of $1,648,553.89 in principal amount outstanding in connection with the revolving facility and $475,000 in respect of letters of credit, plus interest fees, costs and expenses.  The Signature Bank letters are annexed hereto as **Exhibits G-K.**

41.     As set forth above, prior to the reserve increases, the Debtors had been current on their rent.  After the increase, the Debtors had to delay payment of rent and other expenses.  The Debtors were forced to liquidate inventory at below market prices and cancel $1.5 million of special orders.  The special order business had always been a lucrative because it created lasting relationships between the Debtors' professionals and their customers.

42.     The Debtors began soliciting offers to refinance the Signature Bank indebtedness beginning in March 2016 and was close to closing with two separate entities.  Those entities had hired liquidators to value the Debtors' inventory on a going concern basis.  Unbeknownst to the Debtors, Gordon Brothers, at Signature Bank's request and in the name of the Debtors, was also soliciting bids for the Debtors' inventory.  This confusion in the market over the Debtors' future did not help the Debtors efforts to refinance Signature Bank's debt.

13

43.     Because the Debtors were unable to re-finance the Signature Bank facility, the Debtors had no alternative but to enter into the Forbearance Agreement.  (The Debtors are assessing whether Signature Bank complied with its obligations under the Forbearance Agreement and, therefore, whether it is effective.)  At the time that the parties entered into the Forbearance Agreement (November 7, 2016), there was $1,327,852.51 principal amount of revolving loans outstanding, $475,000 owing under outstanding letters of credit and the Debtors' inventory had a value of approximately $5 million.

44.     Under the Forbearance Agreement, GHLLC was forced to retain a chief restructuring officer ("CRO") satisfactory to Signature Bank, who "had exclusive authority to retain and oversee a person to liquidate the assets of Borrower in accordance with the Budget and on terms and conditions acceptable to Lender."   The CRO, Michael M. Rubin of mRm & Associates, retained Gordon Brothers who has been selling the Debtors' inventory at below-market prices.

45.     Since the Debtor entered into the Forbearance Agreement, Signature Bank has taken control of the Debtors' accounts, and RAS Consulting Services LLC ("RAS"), Signature Bank's consultant, has refused to approve payments to landlords, suppliers for new inventory, employees, and has only approved payments that are in line with Signature Bank's goal of liquidating the Debtors.  In this regard, Signature Bank has refused, through RAS emails, to fund severance payments and has even identified employees for termination.

46.     Moreover, on the Petition Date, notwithstanding its oversecured position as set forth below, Signature Bank swept $500,000 from the Debtors' bank accounts, knowing that the Debtor has to fund payroll and November sales tax the following week.

## Signature Bank is Oversecured

47.     As of the Petition Date, Signature Bank is owed on account of the revolving loans and letters of credit approximately $465,692.   The Debtors' inventory has a value of approximately $2 million, which is only part of Signature Bank's Prepetition Collateral (which includes the Debtors' intellectual property and cash of approximately $847,000).  In addition to the inventory, American Express and Unified Merchant Services, the conduit process servicer for MasterCard, Visa and Discovery, are holding $534,000 and $100,000 of the Debtors' funds, respectively, which with the other cash held by the Debtors is Signature Bank's cash collateral. As a result, Signature Bank is significantly oversecured.

## The Future of Gracious Homes

48.     The Debtors, with the assistance of their investment banker, B. Riley & Co., LLC, believe that there is a viable business remaining, albeit on a smaller scale, and require funds to continue selling its existing inventory while using the breathing room afforded by the Bankruptcy Code to formulate a plan of reorganization.

49.     The Debtors, with the assistance of their investment banker, B. Riley & Co., LLC, have engaged in discussions with both third parties and insiders to raise funds sufficient to re-pay amounts outstanding to Signature Bank and allow the Debtors to reorganize.   Exigent circumstances required the Debtors to seek chapter 11 protection before such discussions could be completed. Nevertheless, the Debtors intend to continue the active negotiations in an attempt to complete an asset purchase agreement and/or a plan of reorganization, and debtor-in-possession financing on terms that are satisfactory and in the best interests of the Debtors and their constituencies.

50.    The Debtors believe that they have a strong business plan, but if they are unable to access adequate liquidity immediately, it is highly likely that the Debtors will be unable to sustain their businesses, and, as a result, will be forced to cease operations and liquidate their assets in a manner that is detrimental to their estates and unsecured creditors.

## Use of Cash Collateral

51.    The Debtors have an immediate need for the use of cash collateral in light of the immediate and irreparable harm that will be suffered by the Debtors' estates if they do not have access to the cash necessary to continue selling their inventory at their current locations. Without access to the cash collateral, the Debtors will have to shut down their operations completely, which will substantially hamper their ability to reorganize as a going concern to the detriment of the Debtors' unsecured creditors and employees.

52.    The Debtors use funds deposited in their bank accounts to fund their day-to-day operations.  As of the Petition Date, the Debtors had approximately $847,926.74 of cash on hand which comprises cash collateral.   In addition, the debtors currently forecast receipt of $1.9 million of additional cash over the next 45 days, which is proceeds of Signature Bank's collateral.

53.    The interim use of cash collateral proposed herein is intended to provide sufficient working capital while the Debtors operate in chapter 11.  The Debtors seek the use of the cash collateral, including cash on hand, as well proceeds from the postpetition sale of prepetition collateral.  The Debtor's use of cash collateral will be governed (subject to permitted expenditure variances) by a cash collateral budget (in the form attached as Annex 1 to the Interim Order, the "Budget") and will be used mainly to preserve and maintain the value of the Debtors' assets for the benefit of the Debtors' estates and creditors.  The Budget shows the Debtors' cash flow

forecasts for the next 45 days.  The Debtors can maintain their streamlined operations under the

Budget while they explore their restructuring alternatives.

## IV.

## SUMMARY OF FIRST DAY MOTIONS

54.     The Debtors intend to seek relief from the Court as soon as possible after the

Petition Date through each of the motions described below:

| **TITLE** | **PURPOSE OF MOTION** |
|---|---|
| Motion for Order (I) Directing Joint Administration of Chapter 11 Cases Pursuant to Bankruptcy Rule 1015(b) and (II) Waiving Requirements of Bankruptcy Code Section 342(c) (1) and Bankruptcy Rule 2002(n) | Authorization to have cases jointly administered and procedurally consolidated. |
| Motion for Order Pursuant to Bankruptcy Code Sections 105(a), 341 and 521, Bankruptcy Rule 1007(a)(3), 1007(c), and 9006(b) and Local Bankruptcy Rule 1007-1 (I) Granting Additional Time to File Schedules and Statements of Financial Affairs, (II) Granting Additional Time to File Reports of Financial Information Required under Bankruptcy Rule 2015.3, and (III) Authorizing Debtors to file Consolidating Monthly Operating Reports | A 30-day extension of the time required to file schedules and statements of financial affairs is requested. |
| Motion for order pursuant to sections 105(a), 342(a), and 521(a)(1) of the bankruptcy code, bankruptcy rules 1007(a) and 2002(a), (f), and (l) and local bankruptcy rule 1007-1 for (i) waiver of requirement to file list of creditors and equity security holders and (ii) authority to establish procedures for notifying creditors of the commencement of the debtors' chapter 11 cases | Authorization for waiver of requirement for filing a list of creditors. |
| Motion for an Order Pursuant to Section 102 and 105 of the Bankruptcy Code, Bankruptcy Rules 1015, 2002, 9007 and 9036, and Local Bankruptcy Rule 2002 Authorizing the Establishment of Certain Notice, Case Management and Administrative Procedures | Authorization to establish certain notice and case management procedures is requested. |

| | |
|---|---|
| Motion for an Order Pursuant to Sections 105(a), 345(b), and 363(c) of the Bankruptcy Code Authorizing the Debtors to (I) Continue Using Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Waive Requirements of Section 345(b) of the Bankruptcy Code | Authorization to use the Debtors' existing bank accounts and cash management system is requested. |
| Motion for Order Pursuant to Bankruptcy Code Sections 105(a) and 366(I) Approving Debtors' Proposed Form of Adequate Assurance of Payment (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service | Ensure continued uninterrupted utility service. |
| Motion for Order Pursuant to Sections 105(a), 362(d), 363(b) and 503(b) of the Bankruptcy Code (i) Authorizing the Debtors to (a) Continue Their Workers' Compensation Program and Their Insurance Programs; (b) Pay All Obligations in Respect Thereof; and (ii) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations | Authorization to continue workers' compensation programs and insurance programs, and pay all obligations in respect thereof, is requested. |
| Motion for an Order Pursuant to Sections 105(a), 363, and 503(b)(1) of the Bankruptcy Code and Bankruptcy Rule 6004 Authorizing the Debtors to Honor Certain Prepetition Customer Programs | Authorization to honor certain existing prepetition customer programs is requested. |
| Debtors' Motion, Pursuant to Sections 105(a), 363(b), 506(a), 507(a)(8), 541, 1107(a) and 1108 of the Bankruptcy Code, (i) for Authorization to Pay Prepetition Sales and Use Taxes and (ii) to Schedule a Final Hearing | Authorization to pay all prepetition sales and use taxes is requested. |
| Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105(a) and 331, Bankruptcy Rule, and Local Bankruptcy Rule 2016-1 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals | Authorization to establish procedures for compensation of professionals. |
| Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Entry of Interim and Final Orders (I) Authorizing (A) Payment of Prepetition Wages, Salaries, Employee | Authorization to pay prepetition wage claims and continue existing employee benefit programs is requested. |

18

| | |
|---|---|
| Benefits, and Other Compensation, (B) Maintenance of Employee Benefit Programs and Payment of Related Administrative Obligations, and (C) Payment of Prepetition Claims of Independent Contractors and (II) Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations | |
| Debtors' Emergency Motion, Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code, Rule 4001(b) of the Federal Rules of Bankruptcy Procedure and Local Rule 4001-2 for (I) Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Party and (c) Granting Related Relief and (ii) Scheduling a Final Hearing | Authorization to use cash collateral. |

## V.

## INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2

55.     Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors, which is set forth below.

56.     In accordance with Local Bankruptcy Rule 1007-2(a)(3), and to the best of my knowledge, information, and belief, no prepetition committee has been formed in these chapter 11 cases. In accordance with Local Bankruptcy Rule 1007-2(a)(4), Schedule 1 hereto is a list of the names, addresses, and, where available, telephone numbers of the creditors holding the 20 largest unsecured claims (excluding insiders, unless otherwise noted) against the Debtors. Such list includes the amount of the claim, the nature of the claim and, if appropriate, an indication of whether such claim is contingent, unliquidated, disputed, or partially secured, subject, however, to the reservations of rights stated on Schedule 1 regarding, among other things, the actual validity of any such claims.

57.     In accordance with Local Bankruptcy Rule 1007-2(a)(5), Schedule 2 is a list of the names and addresses of the creditors holding the five largest secured claims against the Debtors, as well as the names and addresses for the holders of record of such secured claims.  Such list includes the amount of the claim, an estimate of the value of the collateral, and whether the claim or lien is disputed, subject, however, to the reservations of rights stated on Schedule 2.

58.     In accordance with Local Bankruptcy Rule 1007-2(a)(6), Schedule 3 hereto provides a summary of the Debtor's assets and liabilities.

59.     In accordance with Local Bankruptcy Rule 1007-2(a)(7), Schedule 4 hereto provides a list of the number and classes of shares of stock, debentures or other securities of the debtor that are publicly held, and the number of holders thereof, listing separately those held by each of the Debtor's officers and directors and the amounts so held.

60.     In accordance with Local Bankruptcy Rule 1007-2(a)(8), Schedule 5 hereto is a list of the Debtors' property not in the Debtors' possession, including property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

61.     In accordance with Local Bankruptcy Rule 1007-2(a)(9), Schedule 6 hereto is a list of the premises owned, leased, or held under other arrangement, from which the Debtors operate their business.

62.     In accordance with Local Bankruptcy Rule 1007-2(a)(10), Schedule 7 hereto provides the location of the Debtors' substantial assets, the location of its books and records, and the value of any assets held by the Debtors outside the territorial limits of the United States.

63.     In accordance with Local Bankruptcy Rule 1007-2(a)(1l), Schedule 8 hereto is a list of litigation commenced against the Debtors.

64.     In accordance with Local Bankruptcy Rule 1007-2(a)(12), Schedule 9 hereto contains the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.  The Debtors intend to continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

65.     In accordance with Local Bankruptcy Rule 1007-2(b)(1), Schedule 10 hereto is the estimated amount of the payroll to employees of the Debtors (exclusive of officers, directors and stockholders) for the 30-day period following the commencement of the Debtors' chapter 11 case.

66.     In accordance with Local Bankruptcy Rule 1007-2(b)(2), Schedule 11 hereto contains the amounts to be paid to the Debtors' officers, directors, and stockholders for services for the 30-day period following the commencement of the Debtors' chapter 11 cases.

67.     In accordance with Local Bankruptcy Rule 1007-2(b)(3), Schedule 12 hereto contains the estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the commencement of the Debtors' chapter 11 cases.

68.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Accordingly, I respectfully request that the Court grant all of relief requested in the First Day Motions and such other and further relief as may be just and appropriate.

By: _____
ROBERT MORRISON, CEO

State of New York
County of New York

Sworn to before me this
12th day of December, 2016

/s/ _____
Notary Public, State of New York

MARCIN TROJAN
NOTARY
NO. 01TR6326808
QUALIFIED IN
KINGS COUNTY
COMM. EXP.
06/22/2019
PUBLIC
STATE OF NEW YORK

**SCHEDULE 1**

**CONSOLIDATED LIST OF CREDITORS
HOLDING 20 LARGEST UNSECURED CLAIMS AGAINTS THE DEBTORS[4]**

The following is a list of creditors holding the twenty (20) largest unsecured claims against the Debtors. This list has been prepared from the unaudited books and records of the Debtors. The list reflects amounts from the Debtors' books and records as of December 14, 2016. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in the Debtor's chapter 11 case. This list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101 except as otherwise noted, or (2) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the twenty (20) largest unsecured claims. The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. Moreover, nothing herein shall affect the Debtors' right to challenge the amount or characterization of any claim at a later date.

| Name of Creditor | Complete Mailing Address of Creditor Including Zip Code | Nature of Claim (trade debt, bank loan, government contract, etc.) | Indicate if Claim is contingent, unliquidated disputed or subject to set-off[5] | Amount of Claim (If secured also state value of security) |
|---|---|---|---|---|
| Lincoln Metrocenter Partners | c/o MillenniumPartners 1995 Broadway, 3rd Floor New York, NY 10023 | Rent | | $1,504,993.89 |
| Rockrose Development Corp | 387 Park Avenue, 7th Floor New York, NY 10010 | Rent | | $637,686.25 |
| Townsend House Corp | 176 E 71st Street New York, NY 10021 | Rent | | $600,262.42 |
| True Value Company | 8600 W. Bryn Mawr Avenue Chicago, IL 60631-3505 | Trade Debt | | $481,782.00 |
| Capstone Printing Corp | 99 Hudson Street, 5th Floor New York, NY 10013 | Expense | | $288,078.10 |

---

[4] The Debtors will continue to update this information and will provide a complete List of Creditors as soon as practicable.

[5] The claims listed herein are currently under investigation and, as a result, unless otherwise indicated herein, remain contingent, unliquidated, disputed or subject to set off.

| Name of Creditor | Complete Mailing Address of Creditor Including Zip Code | Nature of Claim (trade debt, bank loan, government contract, etc.) | Indicate if Claim is contingent, unliquidated disputed or subject to set-off | Amount of Claim (If secured also state value of security) |
|---|---|---|---|---|
| 179 E 70th Street Corp | Douglas Elliman Property Mgmnt 179 East 70th Street New York, NY 10021 | Rent | | $261,861.00 |
| Bonafide Estates Inc. | 630 Fifth Avenue, Ste 3165 New York, NY 10111 | Rent | | $261,195.50 |
| Bradford Swett Management LLC | 1536 Third Avenue,3rd Fl New York, NY 10028-2110 | Rent | | $256,842.07 |
| Miele Appliances Inc. | 9 Independence Way Princeton, NJ 08540 | Trade Debt | | $187,934.56 |
| United Parcel Service | 55 Glenlake Parkway Atlanta, GA 30328 | Expense | | $181,929.65 |
| Scandia Down LLC | 2929 Airport Road La Crosse, WI 54603-1259 | Trade Debt | | $169,882.00 |
| Nest Fragrances | 3 East 54th Street, 5th Fl New York, NY 10022 | Trade Debt | | $140,151.00 |
| Visual Comfort & Co | 22008 N. Berwick Drive Houston, TX 77095 | Trade Debt | | $119,502.00 |
| Down Decor | 1 Kovach Drive Cincinnati, OH 45215 | Trade Debt | | $115,523.00 |
| Satco Products Inc | 110 Heartland Blvd Brentwood, NY 11717 | Trade Debt | | $105,241.00 |
| Sferra Bros | 15 Mayfield Avenue Edison, NJ 08837-3820 | Trade Debt | | $104,852.85 |

| Name of Creditor | Complete Mailing Address of Creditor Including Zip Code | Nature of Claim (trade debt, bank loan, government contract, etc.) | Indicate if Claim is contingent, unliquidated disputed or subject to set-off | Amount of Claim (If secured also state value of security) |
|---|---|---|---|---|
| Demandware Inc. | 5 Wall Street Burlington, MA 01803 | Expense | | $102,806.18 |
| Klestadt Winters Jureller Southard & Stevens | 200 West 41st St, 17th Floor New York, NY 10036-7203 | Professional Fees | Disputed | $102,341.00 |
| John Matouk & Co Inc. | 925 Airport Road New Bedford, MA 02740 | Trade Debt | | $79,066.00 |
| A.F. Supply Corp | 1000 South 2nd Avenue Harrison, NJ 07029 | Trade Debt | | $77,877.92 |

**SCHEDULE 2**

**LIST OF CREDITORS HOLDING TOP 5 SECURED CLAIMS**

The following is a condensed list of creditors holding the 5 largest secured claims against the Debtors. This list has been prepared in accordance with Local Bankruptcy Rule 1007-2(a)(5). The information herein shall not constitute an admission of liability by, nor is binding on, the Debtors.

| **Name of Creditor** | **Mailing Address** | **Description of Collateral** | **Estimate of the Value of the Collateral Securing the Claim** | **Amount of Claim** | **Disputed** |
|---|---|---|---|---|---|
| Signature Bank | 565 Fifth Avenue New York, NY 10017 | Substantially all of the assets of Gracious Home LLC, Gracious Home Holdings LLC, Gracious Home Payroll LLC, Gracious (IP) LLC, GH East Side LLC, GH West LLC & GH Chelsea LLC | $2,465,692.00 (Inventory, Cash and Appraisals to be sought if necessary on additional collateral) | $465,692 | |
| | | | | | |
| | | | | | |

<div style="color:red; border:1px solid red;">
Combined ARFF &
GHH Balances based
on unadjusted ARFF
B/S and excludes
$200K receivable
from ARFF for Sales
Tax audit liability.
</div>

## SCHEDULE 3
## DEBTORS' BALANCE SHEET
## (as of 10/31/2016 unaudited)

ASSETS

CURRENT ASSETS:

| | MTH October 31, 2016 | MTH October 31, 2015 | Variance |
|---|---|---|---|
| Cash | 49,460 | 437,610 | (388,151) |
| Accounts receivable, net | (125,855) | 275,966 | (401,821) |
| Credit card receivables | 223,677 | 691,759 | (468,082) |
| Other receivable | 73,495 | 51,459 | 22,035 |
| Inventories, net | 4,443,819 | 8,069,577 | (3,625,758) |
| Prepaid expenses and other current assets | 495,110 | 333,156 | 161,954 |
| Total Current Assets | 5,159,706 | 9,859,528 | (4,699,822) |
| PROPERTY AND EQUIPMENT, NET | 3,053,520 | 3,162,755 | (109,236) |
| OTHER ASSETS: | | | |
| Security Deposits | 832,064 | 801,314 | 30,750 |
| Restricted Cash / Letters of Credit | 8,250 | 542,000 | (533,750) |
| Advance to member | - | - | - |
| Deferred financing costs, net | 338,601 | 338,601 | - |
| Goodwill | 2,201,650 | 2,201,650 | - |
| | 3,380,565 | 3,883,565 | (503,000) |
| | | | - |
| Total Assets | 11,593,791 | 16,905,849 | (5,312,057) |

LIABILITIES AND OWNERS' EQUITY (DEFICIENCY)

CURRENT LIABILITIES:

| | | | |
|---|---|---|---|
| Current maturities of long-term debt | - | - | |
| Current portion of obligations under capital lease | 9,078 | 32,193 | (23,115) |
| Accounts payable | 11,786,164 | 5,838,964 | 5,947,200 |
| Due to related party | - | - | - |
| Advances from members | - | - | - |
| Accrued expenses and other current liabilities | 3,281,872 | 3,355,301 | (73,430) |
| Deferred landlord reimbursement - ST | 38,644 | 38,644 | - |
| Total Current Liabilities | 15,115,758 | 9,265,102 | 5,850,65 |

LONG TERM LIABILITIES:

| | | | |
|---|---|---|---|
| Long-term debt, less current maturities | 1,954,406 | 4,059,614 | (2,105,208) |
| Obligations under capital leases, less current portion | 14,619 | 6,261 | 8,357 |
| Deferred landlord reimbursement - LT | 212,542 | 212,542 | - |
| Deferred rent | 3,997,639 | 3,811,850 | 185,789 |
| Total Long-term Liabilities | 6,179,206 | 8,090,268 | (1,911,062) |

COMMITMENTS

| | | | |
|---|---|---|---|
| MEMBERS' EQUITY | (9,701,173) | (449,522) | (9,251,651) |
| Total Liabilities and Owners' Equity (Deficiency) | 11,593,791 | 16,905,848 | (5,312,057) |

## SCHEDULE 4

## NUMBER AND CLASSES OF SHARES OF STOCK, DEBENTURES OR OTHER SECURITIES OF THE DEBTORS THAT ARE PUBLICLY HELD; THE NUMBER OF HOLDERS THEREOF

## N/A

## STOCK, DEBENTURES OR OTHER SECURITIES OF THE DEBTORS HELD BY EACH OF THE DEBTORS' OFFICERS AND DIRECTORS, AND THE AMOUNTS SO HELD

## N/A

## SCHEDULE 5

### DEBTORS' PROPERTY NOT IN DEBTORS' POSSESSION

| Type of Property | Value of Property | Person or Entity in Possession | Address and Telephone Number |
|---|---|---|---|
| Cash | $534,000 | American Express | P.O. Box 3316 Boston, MA 02241-3316 |
| Cash | $100,000 | Unified Merchant Services | P.O. Box 6600 Hagerstown, MD 21740 |

## SCHEDULE 6

## PREMISES OWNED, LEASED, OR HELD UNDER OTHER ARRANGEMENT FROM WHICH THE DEBTORS OPERATE THEIR BUSINESSES

### Owned Real Property

| Location of Property |
| :---: |
| **N/A** |

### Leased Real Property[6]

| Location of Property | Lessor | Lessee |
| :---: | :---: | :---: |
| 1992 Broadway<br>New York, NY 10023 | Lincoln Metrocenter Partners LP c/o Millennium Property Management | GH West Side |
| 1220 Third Avenue<br>New York, NY 10021 | Townsend House | GH East Side |
| 1210 Third Avenue<br>New York, NY 10021 | 179 E. 70 St., c/o Douglas Eliman, property manager | GH East Side |
| 1201 Third Avenue<br>New York, NY 10021 | 201 East 69 LLC | GH East Side |
| 45 West 25th Street<br>New York, NY 10021 | Bonafide Estates, LLC<br>Hanover Estates LLC | GH Chelsea LLC |
| 158 West 27th Street, 12th Floor<br>New York, NY 10001 | George Comfort & Sons/158 W. 27th | Gracious Home LLC (vacated) |
| 30-30 60th Street<br>Woodside Queens, NY 11377 | 30-30 5th Street. LLC | Gracious Home LLC |

---

[6] The Debtors are in the midst of consolidating their leasehold interests. The landlords are in various stages of eviction proceedings. The Debtors are in negotiations with certain of their landlords.

## SCHEDULE 7

## LOCATION OF DEBTORS' ASSETS, BOOKS AND RECORDS

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets and the location of their books and records.

| Location of Debtors' Substantial Assets | | | |
|---|---|---|---|
| 1992 Broadway | New York | NY | 10023 |
| 1210 -1210 Third Avenue | New York | NY | 10021 |
| 1201 Third Avenue | New York | NY | 10021 |
| 45 West 25th Street | New York | NY | 10010 |
| 30-30 60th Street | Woodside, Queens | NY | 11377 |

| Location of Debtors' Books and Records | | | |
|---|---|---|---|
| 1201 Third Avenue | New York | NY | 10021 |

**SCHEDULE 8**

**SIGNIFICANT LITIGATION COMMENCED AGAINST
THE DEBTORS PRIOR TO THE PETITION DATE**

| Case Caption | Court & Index Number |
|---|---|
| American Express Travel Related Services Company, Inc. v. Gracious Home Holdings LLC d/b/a Gracious Home | **Court:** Supreme Court of the State of New York, County of New York<br><br>**Index Number:** 655968/2016 |
| 33-30 6th Street LLC v. Gracious Home LLC | **Court:** Civil Court of the State of New York, County of Queens<br><br>**Index Number:** 070965/2016 |
| Hanover Estates LLC v. GH Chelsea LLC d/b/a Gracious Home et al | **Court:  Civil Court of the City of New York, County of New York**<br><br>**Index Number: 83426/2016** |
| 201 East 69 LLC v. GH East Side LLC | **Court:  Civil Court of the City of New York, County of New York**<br><br>**Index Number: 80421/2016** |

## SCHEDULE 9

## DEBTORS' EXISTING SENIOR MANAGEMENT

| Name/Position | Summary of Responsibilities and Experience |
|---|---|
| Robert Morrison/CEO | **Responsibilities:** Leads overall company operations.<br><br>**Experience:** 3 years of experience at Gracious Home and 40 years in the retail industry. |
| Patrick Klosterman /Head of Finance | **Responsibilities:** finance and human resources.<br><br>**Experience:** 1 year at Gracious Home and 10 years combined retail and financial management. |
| Jenna McCormick Everhart/Director of Human Resources | **Responsibilities:** Responsible for human resources.<br><br>**Experience:** 3 years at Gracious Home |

**SCHEDULE 10**

**ESTIMATED AMOUNT OF WEEKLY PAYROLL TO EMPLOYEES EXCLUSIVE OF OFFICERS, DIRECTORS, AND SHAREHOLDERS FOR THE 30-DAY PERIOD FOLLOWING THE PETITION DATE**

| **Week** | **Estimated Gross Payroll**[7] |
|---|---|
| Week ending December 21, 2016 | $85,000 |
| Week ending December 28, 2016 | $65,000 |
| Week ending January 4, 2017 | $55,000 |
| Week ending January 11, 2017 | $40,000 |
| Week ending January 18, 2017 | $35,000 |

---

[7] Salaries are paid bi-weekly on Fridays.

## SCHEDULE 11

### ESTIMATED AMOUNT OF WEEKLY PAYROLL TO OFFICERS, DIRECTORS, MEMBERS AND SHAREHOLDERS FOR THE 30-DAY PERIOD FOLLOWING THE PETITION DATE

| Week | Payments to Officers, Directors, Members and Stockholders |
|------|-----------------------------------------------------------|
| Week ending December 21, 2016 | $5,769.23 |
| Week ending December 28, 2016 | $5,769.23 |
| Week ending January 4, 2017 | $5,769.23 |
| Week ending January 11, 2017 | $5,769.23 |
| Week ending January 18, 2017 | $5,769.23 |

## SCHEDULE 12

## DEBTOR'S ESTIMATED CASH DISBURSEMENTS AND RECEIPTS FOR THE 45-DAY PERIOD FOLLOWING THE PETITION DATE

| | |
|---|---|
| Cash Receipts | $1,900,000 |
| Cash Disbursements | $2,300,000 |
| Net Cash Gain (Loss) | ($400,000) |
| Unpaid Obligations | Assumes payment on current basis |
| Outstanding Receivables | $827,161 |

4821-8263-4814, v. 1

# EXHIBIT A



# EXHIBIT B

[Execution Version]

## LOAN AND SECURITY AGREEMENT

Dated as of February 10, 2015

### GRACIOUS HOME LLC

as Borrower

### SIGNATURE BANK

as Lender

[Execution Version]

**TABLE OF CONTENTS**

Page

Section 1.   DEFINITIONS; RULES OF CONSTRUCTION ..................................................1
   1.1.   Definitions ..........................................................................................1
   1.2.   Accounting Terms ...............................................................................1
   1.3.   Uniform Commercial Code .................................................................1
   1.4.   Certain Matters of Construction .........................................................1
Section 2.   CREDIT FACILITIES ......................................................................................2
   2.1.   Discretionary Revolving Loans ...........................................................2
   2.2.   Letter of Credit Facility. ....................................................................3
Section 3.   INTEREST, FEES AND CHARGES ..................................................................4
   3.1.   Interest ...............................................................................................4
   3.2.   Fees ....................................................................................................4
   3.3.   Computation of Interest, Fees, Yield Protection ................................5
   3.4.   Reimbursement Obligations ...............................................................5
   3.5.   Increased Costs; Capital Adequacy ....................................................6
   3.6.   Maximum Interest ..............................................................................6
Section 4.   LOAN ADMINISTRATION .............................................................................7
   4.1.   Manner of Borrowing and Funding Revolving Loans .........................7
   4.2.   One Obligation ...................................................................................7
   4.3.   Effect of Termination .........................................................................7
Section 5.   PAYMENTS ....................................................................................................8
   5.1.   General Payment Provisions ...............................................................8
   5.2.   Repayment of Revolving Loans ..........................................................8
   5.3.   Payment of Other Obligations ...........................................................8
   5.4.   Marshaling; Payments Set Aside ........................................................8
   5.5.   Application of Payments .....................................................................8
   5.6.   Dominion Account and Credit Card Notifications ...............................8
   5.7.   Account Stated ...................................................................................9
   5.8.   Taxes ..................................................................................................9
Section 6.   CONDITIONS PRECEDENT ......................................................................... 10
   6.1.   Conditions Precedent to Initial Loans .............................................. 10
   6.2.   Conditions Precedent to All Credit Extensions ................................ 11
Section 7.   COLLATERAL ............................................................................................. 12
   7.1.   Grant of Security Interest ................................................................. 12
   7.2.   Lien on Deposit Accounts; Cash Collateral ...................................... 12
   7.3.   Other Collateral ............................................................................... 12
   7.4.   Limitations ....................................................................................... 13
   7.5.   Further Assurances ........................................................................... 13
Section 8.   COLLATERAL ADMINISTRATION .............................................................. 13
   8.1.   Borrowing Base Certificates ............................................................ 13
   8.2.   Administration of Accounts .............................................................. 13
   8.3.   Administration of Inventory ............................................................. 14
   8.4.   Administration of Equipment ........................................................... 14
   8.5.   Administration of Deposit Accounts ................................................. 15
   8.6.   General Provisions ........................................................................... 15

|  |  |  |
|---|---|---|
| 8.7. | Power of Attorney | 16 |
| Section 9. | REPRESENTATIONS AND WARRANTIES | 17 |
| 9.1. | General Representations and Warranties | 17 |
| 9.2. | Complete Disclosure | 21 |
| Section 10. | COVENANTS AND CONTINUING AGREEMENTS | 21 |
| 10.1. | Affirmative Covenants | 21 |
| 10.2. | Negative Covenants | 24 |
| Section 11. | EVENTS OF DEFAULT; REMEDIES ON DEFAULT | 28 |
| 11.1. | Events of Default | 28 |
| 11.2. | Remedies upon Default | 30 |
| 11.3. | License | 31 |
| 11.4. | Setoff | 31 |
| 11.5. | Remedies Cumulative; No Waiver | 31 |
| Section 12. | BENEFIT OF AGREEMENT; ASSIGNMENTS | 32 |
| 12.1. | Successors and Assigns | 32 |
| Section 13. | MISCELLANEOUS | 32 |
| 13.1. | Consents, Amendments and Waivers | 32 |
| 13.2. | Indemnity | 32 |
| 13.3. | Notices and Communications | 32 |
| 13.4. | Performance of Borrower's Obligations | 33 |
| 13.5. | Credit Inquiries | 33 |
| 13.6. | Severability | 33 |
| 13.7. | Cumulative Effect; Conflict of Terms | 33 |
| 13.8. | Counterparts; Execution | 33 |
| 13.9. | Entire Agreement | 33 |
| 13.10. | No Advisory or Fiduciary Responsibility | 33 |
| 13.11. | Confidentiality | 34 |
| 13.12. | GOVERNING LAW | 34 |
| 13.13. | Consent to Forum | 34 |
| 13.14. | Waivers by Borrower | 35 |
| 13.15. | Patriot Act Notice | 35 |
| 13.16. | NO ORAL AGREEMENT | 35 |

## LIST OF EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A | Definitions |
| Schedule 5.6 | Credit Card Issuers and Credit Card Processors |
| Schedule 8.5 | Deposit Accounts |
| Schedule 8.6.1 | Business Locations |
| Schedule 9.1.4 | Names and Capital Structure |
| Schedule 9..1.7 | Financial Statements |
| Schedule 9.1.9 | Taxes |
| Schedule 9.1.10 | Brokers |
| Schedule 9.1.11 | Patents, Trademarks, Copyrights and Licenses |
| Schedule 9.1.13 | Compliance With Laws |
| Schedule 9.1.14 | Environmental Matters |
| Schedule 9.1.15 | Restrictive Agreements |
| Schedule 9.1.16 | Litigation |
| Schedule 9.1.18 | Pension Plans |
| Schedule 9.1.20 | Labor Contracts |
| Schedule 10.2.1 | Permitted Debt |
| Schedule 10.2.2 | Existing Liens |
| Schedule 10.2.20 | Conduct of Business |
| Schedule 10.2.21 | Existing Affiliate Transactions |

[Execution Version]

## LOAN AND SECURITY AGREEMENT

**THIS LOAN AND SECURITY AGREEMENT** is dated as of February 10, 2015, among **GRACIOUS HOME LLC**, a Delaware limited liability company (the "Borrower") and **SIGNATURE BANK**, a national banking association ("Lender").

### R E C I T A L S:

Borrower has requested that Lender provide a credit facility to Borrower. Lender is willing to provide the credit facility on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, for valuable consideration hereby acknowledged, the parties agree as follows:

**SECTION 1.    DEFINITIONS; RULES OF CONSTRUCTION**

1.1.    **Definitions**. Except as otherwise defined herein, initially capitalized terms used herein shall have the meanings ascribed to such terms on Exhibit A annexed hereto.

1.2.    **Accounting Terms**. Under the Loan Documents (except as otherwise specified therein), all accounting terms shall be interpreted, all accounting determinations shall be made, and all financial statements shall be prepared, in accordance with GAAP applied on a basis consistent with the most recent reviewed financial statements of Borrower delivered to Lender before the Closing Date and using the same inventory valuation method as used in such financial statements, except for any change required or permitted by GAAP if Borrower's certified public accountants concur in such change, the change is disclosed to Lender, and all relevant provisions of the Loan Documents are amended in a manner satisfactory to Lender to take into account the effects of the change.

1.3.    **Uniform Commercial Code**. As used herein, the following terms are defined in accordance with the UCC in effect in the State of New York from time to time: "Chattel Paper," "Commercial Tort Claim," "Deposit Account," "Document," "Equipment," "General Intangibles," "Goods," "Instrument," "Investment Property," "Letter-of-Credit Right" and "Supporting Obligation."

1.4.    **Certain Matters of Construction**. The terms "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. Any pronoun used shall be deemed to cover all genders. In the computation of periods of time from a specified date to a later specified date, "from" means "from and including," and "to" and "until" each mean "to but excluding." The terms "including" and "include" shall mean "including, without limitation" and, for purposes of each Loan Document, the parties agree that the rule of *ejusdem generis* shall not be applicable to limit any provision. Section titles appear as a matter of convenience only and shall not affect the interpretation of any Loan Document. All references to (a) laws include all related regulations, interpretations, supplements, amendments and successor provisions; (b) any document, instrument or agreement include any amendments, waivers and other modifications, extensions or renewals (to the extent permitted by the Loan Documents); (c) any section mean, unless the context otherwise requires, a section of this Agreement; (d) any exhibits or schedules mean, unless the context otherwise requires, exhibits and schedules attached hereto, which are hereby incorporated by reference; (e) any Person include successors and assigns; (f) time of day mean time of day at Lender's notice address under **Section 13.3.1**; or (g) discretion of Lender mean the sole and absolute discretion of

such Person. All references to Value, Borrowing Base components, Loans, Letters of Credit, Obligations and other amounts herein shall be denominated in Dollars, unless expressly provided otherwise, and all determinations (including calculations of Borrowing Base and financial covenants) made from time to time under the Loan Documents shall be made in light of the circumstances existing at such time. Borrowing Base calculations shall be consistent with historical methods of valuation and calculation, and otherwise satisfactory to Lender in its reasonable discretion (and not necessarily calculated in accordance with GAAP). Borrower shall have the burden of establishing any alleged negligence, misconduct or lack of good faith by Lender under any Loan Documents. No provision of any Loan Documents shall be construed against any party by reason of such party having, or being deemed to have, drafted the provision. Reference to Borrower's "knowledge" or similar concept means actual knowledge of a Senior Officer, or knowledge that a Senior Officer would have obtained if he or she had engaged in good faith and diligent performance of his or her duties, including reasonably specific inquiries of employees or agents and a good faith attempt to ascertain the matter.

**SECTION 2.    CREDIT FACILITIES**

2.1.    <u>**Discretionary Revolving Loans.**</u>

2.1.1.    <u>Revolving Loans</u>. From time to time through the Termination Date, upon Borrower's request, Lender may, in Lender's sole discretion, make Revolving Loans to Borrower. The Revolving Loans may be repaid and reborrowed as provided herein. In no event shall Lender have any obligation to honor a request for a Revolving Loan if the Revolver Usage at such time plus the requested Loan would exceed the Borrowing Base.

2.1.2.    <u>Note</u>. Loans and interest accruing thereon shall be evidenced by the records of the Lender. At the request of Lender, Borrower shall deliver a promissory note to Lender, evidencing the Revolving Loans.

2.1.3.    <u>Use of Proceeds</u>. The proceeds of Revolving Loans shall be used by Borrower solely (a) to satisfy existing Debt; (b) to pay fees and transaction expenses associated with the closing of this credit facility; (c) to pay Obligations in accordance with this Agreement; and (d) for lawful corporate purposes of Borrower, including working capital.

2.1.4.    <u>Termination of This Agreement</u>. This Agreement shall remain in effect until the Revolver Termination Date, unless sooner terminated in accordance with this Agreement. All Obligations shall be immediately due and payable on termination of this Agreement.

2.1.5.    <u>Overadvances</u>. If Revolver Usage exceeds the Borrowing Base (such excess, an "<u>Over-Formula Amount</u>") at any time, the excess amount shall be payable by Borrower on demand by Lender, but all such Revolving Loans shall nevertheless constitute Obligations secured by the Collateral and entitled to all benefits of the Loan Documents. Any funding of an Over-Formula Loan or sufferance of an Over-Formula Amount shall not constitute a waiver by Lender of the Event of Default caused thereby. In no event shall Borrower or other Obligor be deemed a beneficiary of this Section nor authorized to enforce any of its terms.

2.2.   **Letter of Credit Facility.**

2.2.1.   <u>Issuance of Letters of Credit</u>.   Lender, in Lender's sole discretion, may issue Letters of Credit from time to time until 30 days prior to the Revolver Termination Date (or until the Termination Date, if earlier), on the terms set forth herein, including the following:

(a)      Borrower acknowledges that Lender's issuance of any Letter of Credit is conditioned upon Lender's receipt of a LC Application with respect to the requested Letter of Credit, as well as such other instruments and agreements as Lender may customarily require for issuance of a letter of credit of similar type and amount. Lender shall have no obligation to issue any Letter of Credit unless Lender receives a LC Request and LC Application at least three Business Days prior to the requested date of issuance.

(b)      Letters of Credit may be requested by Borrower to support obligations incurred in the Ordinary Course of Business, or as otherwise approved by Lender.  Increase, renewal or extension of a Letter of Credit shall be treated as issuance of a new Letter of Credit, except that Lender may require a new LC Application in its discretion.

(c)      Borrower assumes all risks of the acts, omissions or misuses of any Letter of Credit by the beneficiary.  In connection with issuance of any Letter of Credit, Lender shall not be responsible for the existence, character, quality, quantity, condition, packing, value or delivery of any goods purported to be represented by any Documents; any differences or variation in the character, quality, quantity, condition, packing, value or delivery of any goods from that expressed in any Documents; the form, validity, sufficiency, accuracy, genuineness or legal effect of any Documents or of any endorsements thereon; the time, place, manner or order in which shipment of goods is made; partial or incomplete shipment of, or failure to ship, any goods referred to in a Letter of Credit or Documents; any deviation from instructions, delay, default or fraud by any shipper or other Person in connection with any goods, shipment or delivery; any breach of contract between a shipper or vendor and Borrower; errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex, telecopy, e-mail, telephone or otherwise; errors in interpretation of technical terms; the misapplication by a beneficiary of any Letter of Credit or the proceeds thereof; or any consequences arising from causes beyond the control of Lender or Lender, including any act or omission of a Governmental Authority.  The rights and remedies of Lender under the Loan Documents shall be cumulative.  Lender shall be fully subrogated to the rights and remedies of each beneficiary whose claims against Borrower are discharged with proceeds of any Letter of Credit.

(d)      In connection with its administration of and enforcement of rights or remedies under any Letters of Credit or LC Documents, Lender shall be entitled to act, and shall be fully protected in acting, upon any certification, documentation or communication in whatever form believed by Lender, in good faith, to be genuine and correct and to have been signed, sent or made by a proper Person.  Lender may consult with and employ legal counsel, accountants and other experts to advise it concerning its obligations, rights and remedies, and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by such experts.  Lender may employ agents and attorneys-in-fact in connection with any matter relating to Letters of Credit or LC Documents, and shall not be liable for the negligence or misconduct of agents and attorneys-in-fact selected with reasonable care.

2.2.2.   <u>Reimbursement</u>.  If Lender honors any request for payment under a Letter of Credit, Borrower shall pay to Lender, on the same day ("<u>Reimbursement Date</u>"), the amount paid by Lender under such Letter of Credit, together with interest at the interest rate for Revolving Loans from the Reimbursement Date until payment by Borrower.  The obligation of Borrower to reimburse Lender for any payment made under a Letter of Credit shall be absolute, unconditional, irrevocable, and shall be paid without regard to any lack of validity or enforceability of any Letter of Credit or the existence of any claim, setoff, defense or other right that Borrower may have at any time against the beneficiary. Whether or not Borrower submits a Notice of Borrowing, Borrower shall be deemed to have requested a Borrowing of Revolving Loans in an amount necessary to pay all amounts due Lender on any Reimbursement Date.

2.2.3.   <u>Cash Collateral</u>.  Subject to **Section 2.1.5**, if at any time (a) an Event of Default exists and is continuing, (b) this Agreement has been terminated or (c) the Revolver Termination Date is scheduled to occur within 20 Business Days, then Borrower shall, at Lender's request, Cash Collateralize all outstanding Letters of Credit.  If Borrower fails to provide any Cash Collateral as required hereunder, Lenders may advance, as Revolving Loans, the amount of Cash Collateral required.

**SECTION 3.**   **INTEREST, FEES AND CHARGES**

3.1.   <u>Interest.</u>

3.1.1.   <u>Rates and Payment of Interest.</u>

(a)   The Obligations shall bear interest at the Prime Rate in effect from time to time, plus the Applicable Margin.

(b)   During an Event of Default, Obligations shall bear interest at the Default Rate (whether before or after any judgment).  Borrower acknowledges that the cost and expense to Lender due to an Event of Default are difficult to ascertain and that the Default Rate is fair and reasonable compensation for this.

(c)   Interest shall accrue from the date a Revolving Loan is advanced or an Obligation is incurred or payable, until paid in full by Borrower.  If a Revolving Loan is repaid on the same day made, one day's interest shall accrue.  Interest accrued on the Revolving Loans shall be due and payable in arrears, (i) on the first day of each month; (ii) on any date of prepayment, with respect to the principal amount of Revolving Loans being prepaid; and (iii) on the effective date of termination of this Agreement.  Interest accrued on any other Obligations shall be due and payable as provided in the Loan Documents and, if no payment date is specified, shall be due and payable **on demand**.

3.2.   <u>Fees.</u>

3.2.1.   <u>LC Facility Fees</u>.  Borrower shall pay to Lender (a) a fee equal to 2.50% per annum times the average daily Stated Amount of standby Letters of Credit, which fee shall be payable quarterly in arrears, on the last day of each calendar quarter (but in no event less than $100); and (b) all customary charges associated with the issuance, amending, negotiating, payment, processing, transfer and administration of Letters of Credit, which charges shall be paid as and when incurred.  During an Event of Default, the fee payable under clause (a) shall be increased by 2% per annum.

3.2.2.  <u>Unused Line Fee</u>.  Borrowers shall pay to Lender, a fee equal to 0.50% per annum times the amount by which the Maximum Revolving Credit exceeds the average daily balance of Revolving Loans and Stated Amount of Letters of Credit during any month.  Such fee shall be payable in arrears, on the first day of each month and on the Termination Date.

3.2.3.  <u>Collateral Monitoring Fee</u>.  Borrower shall pay to Lender a collateral monitoring fee in the amount of $1,000 per month.  Such fee shall be payable in advance for each month, on the Closing Date and on the first day of each month thereafter.  Upon Full Payment, such fee for the month in which Full Payment occurs shall be pro-rated and the portion of such fee allocable to the period following the date on which Full Payment occurs shall be refunded to Borrower.

3.2.4.  <u>Closing Fee</u>.  Borrowers shall pay to Lender a closing fee of $32,500, which shall be paid concurrently with the funding of the initial Revolving Loans hereunder.

3.2.5.  <u>Early Termination Fee</u>.  In the event that the Termination Date occurs, for any reason, prior to the Revolver Termination Date, Borrower shall pay to the Lender an early termination fee (the "Early Termination Fee") in an amount equal to the following:: (i) one percent (1.0%) of the Maximum Revolving Credit if the Termination Date shall occur at any time on or before the first anniversary of the Closing Date; and (ii) one half of one percent (0.50%) of the Maximum Revolving Credit if the Termination Date shall occur at any time after the first anniversary of the Closing Date but on or prior to the second anniversary of the Closing Date.  There shall be no Early Termination Fee  if the Termination Date shall occur at any time after the second anniversary of the Closing Date.  The Borrower agrees and acknowledges that Lender will have suffered damages on account of the early termination of this Agreement and that, in view of the difficulty in ascertaining the amount of such damages, the Early Termination Fee constitutes reasonable compensation and liquidated damages to compensate Lender on account thereof.

3.3.  **Computation of Interest, Fees, Yield Protection**.  All interest, as well as fees and other charges calculated on a per annum basis, shall be computed for the actual days elapsed, based on a year of 360 days.  Each determination by Lender of any interest, fees or interest rate hereunder shall be final, conclusive and binding for all purposes, absent manifest error.  All fees shall be fully earned when due and shall not be subject to rebate, refund or proration.  All fees payable under **Section 3.2** are compensation for services and are not, and shall not be deemed to be, interest or any other charge for the use, forbearance or detention of money.  A certificate as to amounts payable by Borrower under **Section 3.4** or **5.8**, submitted to Borrower by Lender shall be final, conclusive and binding for all purposes, absent manifest error, and Borrower shall pay such amounts to the appropriate party within 10 Business Days following receipt of the certificate.

3.4.  **Reimbursement Obligations**.  Borrower shall pay all Extraordinary Expenses promptly upon request.  Borrower shall also reimburse Lender for all documented out-of-pocket legal, accounting, appraisal, consulting, and other fees, costs and expenses actually incurred by it in connection with (a) negotiation and preparation of any Loan Documents, including any amendment or other modification thereof, to the extent that legal fees, costs and expenses incurred in connection therewith are reasonable; (b) administration of and actions relating to any Collateral, Loan Documents and transactions contemplated thereby, including any actions taken to perfect or maintain priority of Lender's Liens on any Collateral, to maintain any insurance required hereunder or to verify Collateral; and (c) each inspection, audit or appraisal with respect to any Obligor or Collateral, whether prepared by

Lender's personnel or a third party.  All amounts payable by Borrower under this Section shall be due **on demand**.

3.5.     **Increased Costs; Capital Adequacy.**

3.5.1.   Increased Costs Generally.  If any Change in Law shall:

(a)     impose, modify or deem applicable any reserve, liquidity, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, Lender;

(b)     subject any Recipient to Taxes (other than (i) Indemnified Taxes, (ii) Taxes described in clauses (b), (c) or (d) of the definition of Excluded Taxes, or (iii) Connection Income Taxes) with respect to any Loan, Letter of Credit, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(c)     impose on Lender, or interbank market any other condition, cost or expense affecting any Loan, Letter of Credit, participation in LC Obligations or Loan Document;

and the result thereof shall be to increase the cost to Lender of making or maintaining any Loan, or converting to or continuing any interest option for a Loan, or to increase the cost to Lender of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by Lender hereunder (whether of principal, interest or any other amount) then, upon request of Lender, Borrower will pay to Lender such additional amount or amounts, as certified by Lender (including the calculation thereof), as will compensate Lender, for such additional costs incurred or reduction suffered.

3.5.2.   Capital Requirements.  If Lender determines that a Change in Law affecting Lender or any Lending Office of Lender's holding company, if any, regarding capital or liquidity requirements has the effect of reducing the rate of return on Lender's, or holding company's capital as a consequence of this Agreement, or, Loans or Letters of Credit to a level below that which Lender or holding company could have achieved but for such Change in Law (taking into consideration its policies with respect to capital adequacy), then from time to time Borrower will pay to Lender such additional amounts, as certified by Lender (including the calculation thereof), as will compensate it or its holding company for the reduction suffered.

3.5.3.   Compensation.  Failure or delay on the part of Lender to demand compensation pursuant to this Section shall not constitute a waiver of its right to demand such compensation, but Borrower shall not be required to compensate Lender for any increased costs or reductions suffered more than nine months (plus any period of retroactivity of the Change in Law giving rise to the demand) prior to the date that Lender notifies Borrower of the applicable Change in Law and of Lender's intention to claim compensation therefor.

3.6.     **Maximum Interest.**  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by Applicable Law ("maximum rate").  If Lender shall receive interest in an amount that exceeds the maximum rate, the excess interest shall be applied to the principal of the Obligations or, if it exceeds such unpaid principal, promptly refunded to Borrower.  In determining whether the interest contracted for, charged or received by Lender exceeds the maximum

rate, such Person may, to the extent permitted by Applicable Law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest; (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

## SECTION 4.    LOAN ADMINISTRATION

### 4.1.    <u>Manner of Borrowing and Funding Revolving Loans.</u>

#### 4.1.1.    <u>Notice of Borrowing.</u>

(a)    Whenever Borrower desires funding of Revolving Loans, Borrower shall give Lender a Notice of Borrowing. Such notice must be received by Lender by 11:00 a.m. on the requested funding date. Notices received after such time shall be deemed received on the next Business Day. Each Notice of Borrowing shall be irrevocable and shall specify (A) the amount of the Borrowing, and (B) the requested funding date (which must be a Business Day).

(b)    Unless payment is otherwise timely made by Borrower, the becoming due of any Obligations (whether principal, interest, fees or other charges, including Extraordinary Expenses, LC Obligations, Cash Collateral and Bank Product Obligations) shall be deemed to be a request for a Revolving Loan on the due date, in the amount due. The proceeds of such Loan shall be disbursed as direct payment of the relevant Obligation. In addition, Lender may, at its option, charge such amount against any operating, investment or other account of Borrower maintained with Lender or any of its Affiliates.

(c)    If Borrower maintains a disbursement account with Lender or any of its Affiliates, then presentation for payment in the account of a Payment Item when there are insufficient funds to cover it shall be deemed to be a request for a Revolving Loan on the presentation date, in the amount of the Payment Item. Proceeds of the Loan may be disbursed directly to the account.

#### 4.1.2.    <u>Notices.</u>    Borrower may request Revolving Loans, select interest rates and transfer funds based on telephonic or e-mailed instructions to Lender. Borrower shall confirm each such request by prompt delivery to Lender of a Notice of Borrowing, if applicable, but if it differs materially from the action taken by Lender, the records of Lender shall govern. Lender shall not have any liability for any loss suffered by Borrower as a result of Lender acting upon its understanding of telephonic or e-mailed instructions from a person believed in good faith by Lender to be a person authorized to give such instructions on Borrower's behalf.

### 4.2.    <u>One Obligation.</u>    The Loans, LC Obligations and other Obligations constitute one general obligation of Borrower and are secured by Lender's Lien on all Collateral.

### 4.3.    <u>Effect of Termination.</u>    On the Termination Date, the Obligations shall be immediately due and payable, and Lender may terminate its Bank Products. Until Full Payment of the Obligations, all undertakings of Borrower contained in the Loan Documents shall continue, and Lender shall retain its Liens in the Collateral and all of its rights and remedies under the Loan Documents. Lender shall not be required to terminate its Liens unless it receives a customary payoff letter, satisfactory to Lender, containing Cash Collateral provisions for LC Obligations to the extent Letters of Credit remain outstanding after the Termination Date, and indemnification provisions with respect to the continuing indemnities by Borrower under the Loan Documents, including without limitation, protecting Lender

from dishonor or return of any Payment Item previously applied to the Obligations. **Sections 3.4, 3.5, 5.5, 5.8, 12, 13.2**, this Section, and each indemnity or waiver given by an Obligor or Lender in any Loan Document, shall survive Full Payment of the Obligations.

## SECTION 5.   PAYMENTS

5.1.   **General Payment Provisions.**  All payments of Obligations shall be made in Dollars, without offset, counterclaim or defense of any kind, free and clear of (and without deduction for) any Taxes, and in immediately available funds, not later than 12:00 noon on the due date. Any payment after such time shall be deemed made on the next Business Day. Borrower agrees that Lender shall have the continuing, exclusive right to apply and reapply payments and proceeds of Collateral against the Obligations, in such manner as Lender deems advisable.

5.2.   **Repayment of Revolving Loans.**  Revolving Loans shall be due and payable in full on the Revolver Termination Date, unless payment is sooner required hereunder. Revolving Loans may be prepaid from time to time, without penalty or premium. Subject to **Section 2.1.5**, if an Over-Formula Amount exists at any time, Borrower shall, on the sooner of Lender's demand or the first Business Day after Borrower has knowledge thereof, repay Revolving Loans or Cash Collateralize Letters of Credit in an amount sufficient to reduce Revolver Usage to the Borrowing Base. Borrower shall also apply Net Proceeds of any Permitted Asset Disposition to repay Revolving Loans.

5.3.   **Payment of Other Obligations.**  Obligations other than Loans, including LC Obligations and Extraordinary Expenses, shall be paid by Borrower as provided in the Loan Documents or, if no payment date is specified, **on demand**.

5.4.   **Marshaling; Payments Set Aside.**  Lender shall not be under any obligation to marshal any assets in favor of any Obligor or against any Obligations. If any payment by or on behalf of Borrower is made to Lender, or if Lender exercises a right of setoff, and any of such payment or setoff is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by Lender in its discretion) to be repaid to a trustee, receiver or any other Person, then the Obligation originally intended to be satisfied, and all Liens, rights and remedies relating thereto, shall be revived and continued in full force and effect as if such payment or setoff had not occurred.

5.5.   **Application of Payments.**  Payments made by Borrower hereunder shall be applied as determined by Lender in its discretion.

5.6.   **Dominion Account and Credit Card Notifications**.

(a)     The balance of good and available funds in the main Dominion Account as of the end of a Business Day shall be applied to the Obligations at the beginning of the next Business Day. Notwithstanding the foregoing, solely for the purposes of computing interest hereunder, good and available funds transferred from the Dominion Account shall be deemed to be applied to the Obligations one (1) Business Day after the receipt thereof. If a credit balance results from such application, it shall not accrue interest in favor of Borrower and shall be made available to Borrower as long as no Default or Event of Default exists.

(b)     (i)     On or prior to the Closing Date, Borrower shall have delivered to Lender copies of Credit Card Notifications, in form and substance satisfactory to Lender, which have been

executed by Borrower and Borrower's Credit Card Issuers and Credit Card Processors, as applicable, as listed on Schedule 5.6;

(ii)      Borrower shall cause, including pursuant to the Credit Card Notifications, all proceeds of Credit Card Receivables to be directed to and deposited when received into the Dominion Account.

5.7.    **Account Stated**.  Lender shall maintain, in accordance with its customary practices, loan account(s) evidencing the Debt of Borrower hereunder.  Any failure of Lender to record anything in a loan account, or any error in doing so, shall not limit or otherwise affect the obligation of Borrower to pay any amount owing hereunder.  Entries made in a loan account shall constitute presumptive evidence of the information contained therein.  If any information contained in a loan account is provided to or inspected by any Person, the information shall be conclusive and binding on such Person for all purposes absent manifest error, except to the extent such Person notifies Lender in writing within 60 days after receipt or inspection that specific information is subject to dispute.

5.8.    **Taxes**

5.8.1.    Payments Free of Taxes; Obligation to Withhold; Tax Payment.  All payments by Obligors of Obligations shall be free and clear of and without reduction for any Taxes.  If Applicable Law requires any Obligor or Lender to withhold or deduct any Tax (including backup withholding or withholding Tax), Lender shall pay the amount withheld or deducted to the relevant Governmental Authority.  If the withholding or deduction is made on account of Indemnified Taxes or Other Taxes, the sum payable by Borrower shall be increased so that Lender receives an amount equal to the sum it would have received if no such withholding or deduction (including deductions applicable to additional sums payable under this Section) had been made.  Without limiting the foregoing, Borrower shall timely pay all Other Taxes to the relevant Governmental Authorities.

5.8.2.    Payment of Other Taxes.  Without limiting the foregoing, Borrower shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at Lender's option, timely reimburse Lender for payment of, any Other Taxes.

5.8.3.    Tax Indemnification.

(a)      Borrower shall indemnify and hold harmless each Recipient against any Indemnified Taxes (including those imposed or asserted on or attributable to amounts payable under this Section) payable or paid by a Recipient or required to be withheld or deducted from a payment to a Recipient, and any penalties, interest and reasonable third party expenses actually incurred by a Recipient arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Government Authority.  Borrower shall indemnify and hold harmless Lender against any amount that Borrower fails for any reason to pay indefeasibly to Lender as required pursuant to this Section.  Borrower shall make payment within 10 days after demand for any amount or liability payable under this Section.  A certificate as to the amount of such payment or liability delivered to Borrower by Lender shall be conclusive absent manifest error.

5.8.4.    Evidence of Payments.  If Lender or an Obligor pays any Taxes pursuant to this Section, then upon request, Lender or Borrower shall deliver to Borrower or Lender, respectively, a copy of a receipt issued by the appropriate Governmental Authority evidencing the payment, a copy of any

return required by Applicable Law to report the payment, or other evidence of payment reasonably satisfactory to the requesting party.

## SECTION 6.    CONDITIONS PRECEDENT

6.1.    **Conditions Precedent to Initial Loans.** In addition to the conditions set forth in **Section 6.2**, Lender may, in its discretion, decline to fund any requested Revolving Loan, issue any Letter of Credit, or otherwise extend credit to Borrower hereunder, until the date ("Closing Date") that each of the following conditions has been satisfied:

(a)    Each Loan Document shall have been duly executed and delivered to Lender by each of the signatories thereto, and each Obligor shall be in compliance with all terms thereof.

(b)    Lender shall have received acknowledgments of all filings or recordations necessary to perfect its Liens in the Collateral, as well as UCC and Lien searches and other evidence satisfactory to Lender that such Liens are the only Liens upon the Collateral, except Permitted Liens.

(c)    Lender shall have received duly executed agreements establishing each Dominion Account and related lockbox, in form and substance, and with financial institutions, satisfactory to Lender.

(d)    Lender shall have received certificates, in form and substance reasonably satisfactory to it, from a knowledgeable Senior Officer of Borrower certifying that, after giving effect to the initial Loans and transactions hereunder, (i) Borrower is Solvent; (ii) no Default or Event of Default exists; (iii) the representations and warranties set forth in **Section 9** are true and correct, except with respect to any representation or warranty qualified by materiality, in which event such representation and warranty shall be true and correct in all material respects; and (iv) Borrower has complied with all agreements and conditions to be satisfied by it under the Loan Documents.

(e)    Lender shall have received a certificate of a duly authorized officer of each Obligor, certifying (i) that attached copies of such Obligor's Organic Documents are true and complete, and in full force and effect, without amendment except as shown; (ii) that an attached copy of resolutions authorizing execution and delivery of the Loan Documents is true and complete, and that such resolutions are in full force and effect, were duly adopted, have not been amended, modified or revoked, and constitute all resolutions adopted with respect to this credit facility; and (iii) to the title, name and signature of each Person authorized to sign the Loan Documents.  Lender may conclusively rely on this certificate until it is otherwise notified by the applicable Obligor in writing.

(f)    Lender shall have received copies of the charter documents of each Obligor, certified by the Secretary of State or other appropriate official of such Obligor's jurisdiction of organization.  Lender shall have received good standing certificates for each Obligor, issued by the Secretary of State or other appropriate official of such Obligor's jurisdiction of organization and each jurisdiction where such Obligor's conduct of business or ownership of Property necessitates qualification.

(g)    Lender shall have received copies of policies or certificates of insurance for the insurance policies carried by Borrower, all in compliance with the Loan Documents.

(h)    Lender shall have completed its business, financial and legal due diligence of Obligors, including an Inventory appraisal and a roll-forward of its previous field examination, with results satisfactory to Lender.  Except as set forth in Schedule 9.1.7, no material adverse change in the financial condition of any Obligor or in the quality or value of any Collateral shall have occurred since December 31, 2013.

(i)    Lender shall have received the Borrower's interim financial statement for the period ended December 31, 2014, and such financial statement shall be satisfactory to Lender in all respects.

(j)    Lender shall have received Borrower's month-by-month projections for Fiscal Year 2015 demonstrating satisfactory liquidity in a sensitized case scenario satisfactory to Lender, quarterly financial projections for 2016 and 2017 and annual projects for Fiscal Year 2018.

(k)    Borrower shall have paid all fees and expenses to be paid to Lender on the Closing Date.

(l)    Lender shall have received a Borrowing Base Certificate prepared as of February 6, 2015.  Upon giving effect to the initial funding of Loans and issuance of Letters of Credit, and payment by Borrower of fees and expenses incurred herewith as well as any payable more than thirty (30) days past due, Availability shall be at least $1,000,000.

6.2.    **Conditions Precedent to All Credit Extensions**.  Lender may, in its discretion, decline to fund any Loans, arrange for issuance of any Letters of Credit or grant any other accommodation to or for the benefit of Borrower, unless the following conditions are satisfied:

(a)    No Default or Event of Default shall exist at the time of, or result from, such funding, issuance or grant;

(b)    The representations and warranties of each Obligor in the Loan Documents shall be true and correct on the date of, and upon giving effect to, such funding, issuance or grant (except for representations and warranties that expressly relate to an earlier date), except with respect to any representation or warranty qualified by materiality, in which event such representation and warranty shall be true and correct in all material respects;

(c)    All conditions precedent in any other Loan Document shall be satisfied;

(d)    No event shall have occurred or circumstance exist that has or could reasonably be expected to have a Material Adverse Effect; and

(e)    With respect to issuance of a Letter of Credit, the LC Conditions shall be satisfied.

Each request (or deemed request) by Borrower for funding of a Loan, issuance of a Letter of Credit or grant of an accommodation shall constitute a representation by Borrower that the foregoing conditions are satisfied on the date of such request and on the date of such funding, issuance or grant.  As an additional condition to any funding, issuance or grant, Lender shall have received such other information, documents, instruments and agreements as it deems reasonably appropriate in connection therewith.

3561927.11                                        (11)

**SECTION 7.    COLLATERAL**

7.1.    **Grant of Security Interest.**    To secure the prompt payment and performance of its Obligations, Borrower hereby grants to Lender a continuing security interest in and Lien upon all Property of Borrower, including all of the following Property, whether now owned or hereafter acquired, and wherever located:

(a) all Accounts; (b) all Chattel Paper, including electronic chattel paper; (c) all Commercial Tort Claims, including those shown on **Schedule 9.1.16**; (d) all Deposit Accounts; (e) all Documents; (f) all General Intangibles, including Intellectual Property and Credit Card Receivables; (g) all Goods, including Inventory, Equipment and fixtures; (h) all Instruments; (i) all Investment Property; (j) all Letter-of-Credit Rights; (k) all Supporting Obligations; (l) all monies, whether or not in the possession or under the control of Lender, Lender, or a bailee or Affiliate of Lender, including any Cash Collateral; (m) all accessions to, substitutions for, and all replacements, products, and cash and non-cash proceeds of the foregoing, including proceeds of and unearned premiums with respect to insurance policies, and claims against any Person for loss, damage or destruction of any Collateral; and (n) all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs and computer records) pertaining to the foregoing.

7.2.    **Lien on Deposit Accounts; Cash Collateral.**

7.2.1.    Deposit Accounts.    To further secure the prompt payment and performance of its Obligations, Borrower hereby grants to Lender a continuing security interest in and Lien upon all amounts credited to any Deposit Account of Borrower, including sums in any blocked, lockbox, sweep or collection account. Borrower hereby authorizes and directs each bank or other depository to deliver to Lender, upon request, all balances in any Deposit Account maintained for Borrower, without inquiry into the authority or right of Lender to make such request.

7.2.2.    Cash Collateral.    Cash Collateral may be invested, at Lender's discretion (and with the consent of and as directed by Borrower, as long as no Event of Default exists), but Lender shall have no duty to do so, regardless of any agreement or course of dealing with Borrower, and shall have no responsibility for any investment or loss. As security for its Obligations, Borrower hereby grants to Lender a security interest in and Lien upon all Cash Collateral held from time to time and all proceeds thereof, whether held in a Cash Collateral Account or otherwise. Lender may apply Cash Collateral to the payment of such Obligations as they become due, in such order as Lender may elect. Each Cash Collateral Account and all Cash Collateral shall be under the sole dominion and control of Lender, and no Borrower or other Person shall have any right to any Cash Collateral, until Full Payment of the Obligations.

7.3.    **Other Collateral.**

7.3.1.    Commercial Tort Claims.    Borrower shall promptly notify Lender in writing if Borrower has a Commercial Tort Claim (other than, as long as no Default or Event of Default exists, a Commercial Tort Claim for less than $50,000), shall promptly amend **Schedule 9.1.16** to include such claim, and shall take such actions as Lender deems appropriate to subject such claim to a duly perfected, first priority Lien in favor of Lender in accordance with, inter alia, UCC 9-108.

7.3.2.    Certain After-Acquired Collateral.    Borrower shall promptly notify Lender in writing if, after the Closing Date, Borrower obtains any interest in any Collateral consisting of

Deposit Accounts, Chattel Paper, Documents, Instruments, Intellectual Property, Investment Property or Letter-of-Credit Rights and, upon Lender's request, shall promptly take such actions as Lender deems appropriate to effect Lender's duly perfected, first priority Lien upon such Collateral, including obtaining any appropriate possession, control agreement or Lien Waiver. If any Collateral is in the possession of a third party, at Lender's request, Borrower shall obtain an acknowledgment that such third party holds the Collateral for the benefit of Lender.

7.4.     **Limitations.** The Lien on Collateral granted hereunder is given as security only and shall not subject Lender to, or in any way modify, any obligation or liability of Borrower relating to any Collateral. In no event shall the grant of any Lien under any Loan Document secure an Excluded Swap Obligation of the granting Obligor.

7.5.     **Further Assurances.** Promptly upon request, Borrower shall deliver such instruments and agreements, and shall take such actions, as Lender deems reasonably appropriate under Applicable Law to evidence or perfect its Lien on any Collateral, or otherwise to give effect to the intent of this Agreement. Borrower authorizes Lender to file any financing statement that describes the Collateral as "all assets" or "all personal property" of Borrower, or words to similar effect, and ratifies any action taken by Lender before the Closing Date to effect or perfect its Lien on any Collateral.

**SECTION 8.     COLLATERAL ADMINISTRATION**

8.1.     **Borrowing Base Certificates.** On or before Tuesday of each week, Borrower shall deliver to Lender a Borrowing Base Certificate prepared as of the close of business of the last Business Day of the immediately preceding week, and at such other times as Lender may reasonably request. All calculations of Availability in any Borrowing Base Certificate shall originally be made by Borrower and certified by a Senior Officer, provided that Lender may from time to time review and adjust any such calculation (a) to reflect its reasonable estimate of declines in value of any Collateral, due to collections received in the Dominion Account or otherwise; (b) to adjust advance rates to reflect changes in dilution, quality, mix and other factors affecting Collateral; and (c) to the extent the calculation is not made in accordance with this Agreement or does not accurately reflect the Reserves.

8.2.     **Administration of Accounts.**

8.2.1.     Records and Schedules of Accounts. Borrower shall keep accurate and complete records of its Accounts, including all payments and collections thereon, and shall submit to Lender sales, collection, reconciliation and other reports in form satisfactory to Lender, on such periodic basis as Lender may reasonably request.

8.2.2.     Taxes. If an Account of Borrower includes a charge for any Taxes, Lender is authorized, in its discretion, to pay the amount thereof to the proper taxing authority for the account of Borrower and to charge Borrower therefor; provided, however, that Lender shall not be liable for any Taxes that may be due from Borrower or with respect to any Collateral.

8.2.3.     Account Verification. Whether or not a Default or Event of Default exists, Lender shall have the right at any time, in the name of Borrower or, when a Default or Event of Default exists, in the name of Lender, or any designee of Lender or Borrower, to verify the validity or amount of any Accounts of Borrower by mail, telephone or otherwise. Borrower shall cooperate fully with Lender in an effort to facilitate and promptly conclude any such verification process.

8.2.4.   <u>Maintenance of Dominion Account</u>.   Borrower shall maintain Dominion Accounts pursuant to lockbox or other arrangements reasonably acceptable to Lender. Borrower shall obtain an agreement (in form and substance reasonably satisfactory to Lender) from each lockbox servicer and Dominion Account bank, establishing Lender's control over and Lien in the lockbox or Dominion Account, requiring immediate deposit of all remittances received in the lockbox to a Dominion Account, and waiving offset rights of such servicer or bank, except for customary administrative charges. If a Dominion Account is not maintained with Signature Bank, Lender may require immediate transfer of all funds in such account to a Dominion Account maintained with Signature Bank. Lender assumes no responsibility to Borrower for any lockbox arrangement or Dominion Account, including any claim of accord and satisfaction or release with respect to any Payment Items accepted by any bank.

8.2.5.   <u>Proceeds of Collateral</u>.   Borrower shall request in writing and otherwise take all necessary steps to ensure that all payments on Accounts or otherwise relating to Collateral are made directly to a Dominion Account (or a lockbox relating to a Dominion Account). If Borrower or any Subsidiary receives cash or Payment Items with respect to any Collateral, it shall hold same in trust for Lender and promptly (not later than the next Business Day) deposit same into a Dominion Account.

8.3.   **Administration of Inventory.**

8.3.1.   <u>Records and Reports of Inventory</u>.   Borrower shall keep accurate and complete records of its Inventory, including costs and monthly withdrawals and additions, and shall submit to Lender monthly inventory and reconciliation reports in form reasonably satisfactory to Lender, within twenty (20) days of months end. Borrower shall conduct a physical inventory at least once per calendar year (and on a more frequent basis if requested by Lender when an Event of Default exists) and periodic cycle counts consistent with historical practices, and shall provide to Lender a report based on each such inventory and count promptly upon completion thereof, together with such supporting information as Lender may reasonably request. Lender may participate in and observe each physical count.

8.3.2.   <u>Returns of Inventory</u>.   Borrower shall not return any Inventory to a supplier, vendor or other Person, whether for cash, credit or otherwise, unless (a) such return is in the Ordinary Course of Business; (b) no Default, Event of Default or Overadvance exists or would result therefrom; (c) Lender is promptly notified if the aggregate Value of all Inventory returned in any month exceeds $100,000; and (d) any payment received by Borrower for a return is promptly remitted to Lender for application to the Obligations.

8.3.3.   <u>Acquisition, Sale and Maintenance of Inventory</u>.   Borrower shall not accept any Inventory on consignment or approval. Borrower shall not sell any Inventory on consignment or approval or any other basis under which the customer may return or require Borrower to repurchase such Inventory. Borrower shall use, store and maintain all Inventory with reasonable care and caution, in accordance with applicable standards of any insurance and in conformity with all Applicable Law, and shall make current rent payments (within applicable grace periods provided for in leases) at all locations where any Collateral is located.

8.4.   **Administration of Equipment.**

8.4.1.   <u>Records and Schedules of Equipment</u>.   Borrower shall keep accurate and complete records of its Equipment, including kind, quality, quantity, cost, acquisitions and dispositions thereof, and shall submit to Lender, on such periodic basis as Lender may request, but not more frequently than quarterly, a current schedule thereof, in form reasonably satisfactory to Lender.

Promptly upon request, Borrower shall deliver to Lender evidence of their ownership or interests in any Equipment.

8.4.2.    Disposition of Equipment.  Borrower shall not sell, lease or otherwise dispose of any Equipment, without the prior written consent of Lender, other than (a) a Permitted Asset Disposition; and (b) replacement of Equipment that is worn, damaged or obsolete with Equipment of like function and value, if the replacement Equipment is acquired substantially contemporaneously with such disposition and is free of Liens other than Permitted Liens.

8.4.3.    Condition of Equipment.  Equipment is in good operating condition and repair, and all necessary replacements and repairs have been made so that the value and operating efficiency of the Equipment is preserved at all times, reasonable wear and tear excepted. Borrower shall ensure that the Equipment is mechanically and structurally sound, and capable of performing the functions for which it was designed, in accordance with manufacturer specifications. Borrower shall not permit any Equipment to become affixed to real Property unless any landlord or mortgagee delivers a Lien Waiver.

8.5.    **Administration of Deposit Accounts**.  **Schedule 8.5** sets forth all Deposit Accounts maintained by Borrower, including all Dominion Accounts.  Borrower shall take all actions necessary to establish Lender's control of each such Deposit Account (other than an account exclusively used for, payroll, payroll taxes, employee benefits or sales tax).  Borrower shall be the sole account holder of each Deposit Account and shall not allow any other Person (other than Lender) to have control over a Deposit Account or any Property deposited therein.  Borrower shall promptly notify Lender of any opening or closing of a Deposit Account and, with the consent of Lender, will amend **Schedule 8.5** to reflect same.

8.6.    **General Provisions.**

8.6.1.    Location of Collateral.  All tangible items of Collateral, other than Inventory in transit, shall at all times be kept by Borrower at the business locations set forth in **Schedule 8.6.1**, except that Borrower may (a) make sales or other dispositions of Collateral in accordance with **Section 10.2.6**; and (b) move Collateral to another location in the United States, other than a location set forth in Schedule 8.6.1. upon 10 Business Days prior written notice to Lender.

8.6.2.    Insurance of Collateral; Condemnation Proceeds.

(a)    Borrower shall maintain insurance with respect to the Collateral, covering casualty, hazard, theft, malicious mischief, flood and other risks, in amounts, with endorsements and with insurers (with a Best's Financial Strength Rating of at least A-), reasonably satisfactory to Lender. All proceeds under each policy shall be payable to Lender.  Prior to the Closing Date and thereafter within thirty days prior to expiration of the current policy period of each policy, Borrower shall deliver to Lender the originals or certified copies of its insurance policies.  Unless Lender shall agree otherwise, each policy shall include satisfactory endorsements (i) showing Lender as the lender loss payee; (ii) requiring 30 days prior written notice to Lender in the event of cancellation of the policy for any reason whatsoever; and (iii) specifying that the interest of Lender shall not be impaired or invalidated by any act or neglect of Borrower or the owner of the Property, nor by the occupation of the premises for purposes more hazardous than are permitted by the policy.  If Borrower fails to provide and pay for any insurance, Lender may, at its option, but shall not be required to, procure the insurance and charge Borrower therefor.  Borrower agrees to deliver to Lender, promptly as rendered, copies of all reports made to insurance companies.  While no Event of Default exists, Borrower may settle, adjust or

compromise any insurance claim, as long as the proceeds are delivered to Lender or retained by Borrower if permitted hereunder. If an Event of Default exists and is continuing, only Lender shall be authorized to settle, adjust and compromise such claims.

      (b)    Any proceeds of insurance (other than proceeds from workers' compensation or D&O insurance) and any awards arising from condemnation of any Collateral shall be paid to Lender and shall be applied to payment of the Revolving Loans, and then to other Obligations.

      8.6.3.  <u>Protection of Collateral</u>. All documented third party expenses actually incurred by Lender in connection with protecting, storing, warehousing, insuring, handling, maintaining and shipping any Collateral, all Taxes payable with respect to any Collateral (including any sale thereof), and all other payments required to be made by Lender to any Person to realize upon any Collateral, shall be borne and paid by Borrower. Lender shall not be liable or responsible in any way for the safekeeping of any Collateral, for any loss or damage thereto (except for reasonable care in its custody while Collateral is in Lender's actual possession), for any diminution in the value thereof, or for any act or default of any warehouseman, carrier, forwarding agency or other Person whatsoever, but the same shall be at Borrower's sole risk.

      8.6.4.  <u>Defense of Title</u>. Borrower shall defend its title to Collateral and Lender's Liens therein against all Persons, claims and demands, except Permitted Liens.

      8.7.  **Power of Attorney**. Borrower hereby irrevocably constitutes and appoints Lender (and all Persons designated by Lender) as Borrower's true and lawful attorney (and agent-in-fact) for the purposes provided in this Section. Lender, or Lender's designee, may, without notice and in either its or Borrower's name, but at the cost and expense of Borrower:

      (a)    Endorse Borrower's name on any Payment Item or other proceeds of Collateral (including proceeds of insurance) that come into Lender's possession or control; and

      (b)    During an Event of Default, (i) notify any Account Debtors of the assignment of their Accounts, demand and enforce payment of Accounts by legal proceedings or otherwise, and generally exercise any rights and remedies with respect to Accounts; (ii) settle, adjust, modify, compromise, discharge or release any Accounts or other Collateral, or any legal proceedings brought to collect Accounts or Collateral; (iii) sell or assign any Accounts and other Collateral upon such terms, for such amounts and at such times as Lender deems advisable; (iv) collect, liquidate and receive balances in Deposit Accounts or investment accounts, and take control, in any manner, of proceeds of Collateral; (v) prepare, file and sign Borrower's name to a proof of claim if Borrower fails to file a proof of claim more than thirty (30) days prior to the bar date for the filing of a proof of claim, or other document in a bankruptcy of an Account Debtor, or to any notice, assignment or satisfaction of Lien or similar document; (vi) receive, open and dispose of mail addressed to Borrower, and notify postal authorities to deliver any such mail to an address designated by Lender; (vii) endorse any Chattel Paper, Document, Instrument, bill of lading, or other document or agreement relating to any Accounts, Inventory or other Collateral; (viii) use Borrower's stationery and sign its name to verifications of Accounts and notices to Account Debtors; (ix) use information contained in any data processing, electronic or information systems relating to Collateral; (x) make and adjust claims under insurance policies; (xi) take any action as may be necessary or appropriate to obtain payment under any letter of credit, banker's acceptance or other instrument for which Borrower is a beneficiary; and (xii) take all other actions as Lender deems appropriate to fulfill Borrower's obligations under the Loan Documents.

**SECTION 9.       REPRESENTATIONS AND WARRANTIES**

9.1.      **General Representations and Warranties**.   To induce Lender to enter into this Agreement and to make available the discretionary Loans and Letters of Credit, Borrower represents and warrants that:

9.1.1.   Organization and Qualification.   Borrower and any Subsidiary is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.   Borrower and each Subsidiary is duly qualified, authorized to do business and in good standing as a foreign corporation in each jurisdiction where failure to be so qualified could reasonably be expected to have a Material Adverse Effect.

9.1.2.   Power and Authority.   Each Obligor is duly authorized to execute, deliver and perform its Loan Documents.   The execution, delivery and performance of the Loan Documents have been duly authorized by all necessary action, and do not (a) require any consent or approval of any holders of Equity Interests of any Obligor, except those already obtained; (b) contravene the Organic Documents of any Obligor; (c) violate or cause a default under any Applicable Law or Material Contract; or (d) result in or require imposition of a Lien (other than Permitted Liens) on any Obligor's Property.

9.1.3.   Enforceability.   Each Loan Document is a legal, valid and binding obligation of each Obligor party thereto, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally.

9.1.4.   Capital Structure.   **Schedule 9.1.4** shows, for Borrower and any Subsidiary, its name, jurisdiction of organization, authorized and issued Equity Interests, holders of its Equity Interests, and agreements binding on such holders with respect to such Equity Interests.   Except as disclosed on **Schedule 9.1.4**, in the four years preceding the Closing Date, no Borrower or Subsidiary has acquired any substantial assets from any other Person nor been the surviving entity in a merger or combination. Borrower has good title to its Equity Interests in its Subsidiaries, subject only to Lender's Lien, and all such Equity Interests are duly issued, fully paid and non-assessable.   There are no outstanding purchase options, warrants, subscription rights, agreements to issue or sell, convertible interests, phantom rights or powers of attorney relating to Equity Interests of Borrower or any Subsidiary.

9.1.5.   Title to Properties; Priority of Liens.   Borrower and any Subsidiary has good and marketable title to (or valid leasehold interests in) all of its Real Estate, and good title to all of its personal Property, including all Property reflected in any financial statements delivered to Lender, in each case free of Liens except Permitted Liens.   Borrower and any Subsidiary has paid and discharged all lawful claims that, if unpaid, could become a Lien on its Properties, other than Permitted Liens.   All Liens of Lender in the Collateral are duly perfected, first priority Liens, subject only to Permitted Liens that are expressly allowed to have priority over Lender's Liens.

9.1.6.   Accounts.   Lender may rely, in determining Eligible Accounts and Eligible Credit Card Receivables, on all statements and representations made by Borrower with respect thereto. Borrower warrants, with respect to each Account at the time it is shown as an Eligible Account or an Eligible Credit Card Receivable in a Borrowing Base Certificate, that:

(a)       it is genuine and in all respects what it purports to be, and is not evidenced by a judgment;

(b)    it arises out of a completed, *bona fide* sale and delivery of goods in the Ordinary Course of Business, and substantially in accordance with any purchase order, contract or other document relating thereto;

(c)    it is for a sum certain, maturing as stated in the invoice covering such sale, a copy of which has been furnished or is available to Lender on request;

(d)    it is not subject to any, Lien (other than Lender's Lien), or any deduction, defense, dispute, counterclaim or other adverse condition except as arising in the Ordinary Course of Business and disclosed to Lender; and it is absolutely owing by the Account Debtor, without contingency in any respect;

(e)    no purchase order, agreement, document or Applicable Law restricts assignment of the Account to Lender (regardless of whether, under the UCC, the restriction is ineffective), and the Borrower is the sole payee or remittance party shown on the invoice;

(f)    no extension, compromise, settlement, modification, credit, deduction or return has been authorized with respect to the Account, except discounts, allowances or returns granted in the Ordinary Course of Business for prompt payment that are reflected on the face of the invoice related thereto and in the reports submitted to Lender hereunder; and

(g)    to Borrower's knowledge, (i) there are no facts or circumstances that are reasonably likely to impair the enforceability or collectability of such Account; (ii) the Account Debtor had the capacity to contract when the Account arose, continues to meet the Borrower's customary credit standards, is Solvent, is not contemplating or subject to an Insolvency Proceeding, and has not failed, or suspended or ceased doing business; and (iii) there are no proceedings or actions threatened or pending against any Account Debtor that could reasonably be expected to have a material adverse effect on the Account Debtor's financial condition.

9.1.7.    <u>Financial Statements</u>.  The consolidated and consolidating balance sheets, and related statements of income, cash flow and Equity Interest holders' equity, of Borrower and its Subsidiaries that have been and are hereafter delivered to Lender, are prepared in accordance with U.S. GAAP, and fairly present the financial positions and results of operations of Borrower and its Subsidiaries at the dates and for the periods indicated.  All projections delivered from time to time to Lender have been prepared in good faith, based on reasonable assumptions in light of the circumstances at such time.  Except as set forth in Schedule 9.1.7, since December 31, 2013, there has been no change in the condition, financial or otherwise, of Borrower or any Subsidiary that could reasonably be expected to have a Material Adverse Effect.  No financial statement delivered to Lender at any time contains any untrue statement of a material fact, nor fails to disclose any material fact necessary to make such statement not materially misleading.  Borrower and its Subsidiaries are Solvent.

9.1.8.    <u>Surety Obligations</u>.   No Borrower or Subsidiary is obligated as surety or indemnitor under any bond or other contract that assures payment or performance of any obligation of any Person, except as permitted hereunder.

9.1.9.    <u>Taxes</u>.  Except as set forth in Schedule 9.1.9, Borrower and each Subsidiary has filed all federal, state and local tax returns and other reports that it is required by law to file, and has paid, or made provision for the payment of, all Taxes upon it, its income and its Properties that are due and payable, except to the extent being Properly Contested.  The provision for Taxes on the books of

Borrower and Subsidiary is adequate for all years not closed by applicable statutes, and for its current Fiscal Year.

9.1.10. <u>Brokers</u>.   Except as set forth in Schedule 9.1.10, there are no brokerage commissions, finder's fees or investment banking fees payable in connection with any transactions contemplated by the Loan Documents.

9.1.11. <u>Intellectual Property</u>. Borrower and each Subsidiary owns or has the lawful right to use all Intellectual Property necessary for the conduct of its business, without conflict with any rights of others. There is no pending or, to Borrower's knowledge, threatened Intellectual Property Claim with respect to Borrower, any Subsidiary or any of their Property (including any Intellectual Property). Except as disclosed on **Schedule 9.1.11**, neither Borrower or any Subsidiary pays or owes any Royalty or other compensation to any Person with respect to any Intellectual Property. All Intellectual Property owned, used or licensed by, or otherwise subject to any interests of, Borrower or a Subsidiary is shown on **Schedule 9.1.11**.

9.1.12. <u>Governmental Approvals</u>.   Borrower and each Subsidiary is in material compliance with, and is in good standing with respect to, all Governmental Approvals necessary to conduct its business and to own, lease and operate its Properties. All necessary import, export or other licenses, permits or certificates for the import or handling of any goods or other Collateral have been procured and are in effect, and Borrower and Subsidiaries have complied in all material respects with all foreign and domestic laws with respect to the shipment and importation of any goods or Collateral, except where noncompliance could not reasonably be expected to have a Material Adverse Effect.

9.1.13. <u>Compliance with Laws</u>.   Borrower and each Subsidiary have duly complied, and their Properties and business operations are in compliance, in all material respects with all Applicable Law, except where noncompliance could not reasonably be expected to have a Material Adverse Effect. Except as set forth in Schedule 9.1.13, there have been no citations, notices or orders of material noncompliance issued to Borrower or any Subsidiary under any Applicable Law that have not been cured. No Inventory has been produced in violation of the FLSA.

9.1.14. <u>Compliance with Environmental Laws</u>.   Except as disclosed on **Schedule 9.1.14**, neither Borrower's or its Subsidiary's past or present operations, Real Estate or other Properties are subject to any federal, state or local investigation to determine whether any remedial action is needed to address any environmental pollution, hazardous material or environmental clean-up.   Neither Borrower or any Subsidiary has received any Environmental Notice.  Neither Borrower or any Subsidiary has any contingent liability with respect to any Environmental Release, environmental pollution or hazardous material on any Real Estate now or previously owned, leased or operated by it.

9.1.15. <u>Burdensome Contracts</u>. Neither Borrower or any Subsidiary is a party or subject to any contract, agreement or charter restriction that could reasonably be expected to have a Material Adverse Effect.   Neither Borrower or any Subsidiary is party or subject to any Restrictive Agreement, except as shown on **Schedule 9.1.15**. No such Restrictive Agreement prohibits the execution, delivery or performance of any Loan Document by an Obligor.

9.1.16. <u>Litigation</u>.  Except as shown on **Schedule 9.1.16**, there are no proceedings or investigations pending or, to Borrower's knowledge, threatened against Borrower or any Subsidiary, or any of their businesses, operations, Properties, prospects or conditions, that (a) relate to any Loan Documents or transactions contemplated thereby; or (b) could reasonably be expected to have a

Material Adverse Effect if determined adversely to Borrower or any Subsidiary. Except as shown on such Schedule, no Obligor has a Commercial Tort Claim (other than, as long as no Default or Event of Default exists, a Commercial Tort Claim for less than $50,000). Neither Borrower nor any Subsidiary is in default with respect to any order, injunction or judgment of any Governmental Authority.

9.1.17. <u>No Defaults</u>. No event or circumstance has occurred or exists that constitutes a Default or Event of Default. Neither Borrower nor any Subsidiary is in default, and no event or circumstance has occurred or exists that with the passage of time or giving of notice would constitute a default by Borrower or any Subsidiary under any Material Contract or in the payment of any Borrowed Money or that could permit the termination of a Material Contract prior to its scheduled termination date.

9.1.18. <u>ERISA</u>. Except as disclosed on **Schedule 9.1.18**:

(a)     Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code, and other federal and state laws. Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the knowledge of Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification. Each Obligor and ERISA Affiliate has met all applicable requirements under the Code, ERISA and the Pension Protection Act of 2006, and no application for a waiver of the minimum funding standards or an extension of any amortization period has been made with respect to any Plan.

(b)     There are no pending or, to the knowledge of Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted in or could reasonably be expected to have a Material Adverse Effect.

(c)     (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) no Obligor or ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) no Obligor or ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; (v) no Obligor or ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA; and (vi) as of the most recent valuation date for any Pension Plan or Multiemployer Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is at least 60%, and no Obligor or ERISA Affiliate knows of any fact or circumstance that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 60% as of such date.

9.1.19. <u>Trade Relations</u>.   There exists no actual or, to Borrower's knowledge, threatened termination, limitation or modification of any business relationship between Borrower or any Subsidiary and any customer or supplier, or any group of customers or suppliers, who individually or in the aggregate are material to the business of Borrower or any Subsidiary. There exists no condition or circumstance that could reasonably be expected to impair the ability of Borrower or any Subsidiary to

conduct its business at any time hereafter in substantially the same manner as conducted on the Closing Date.

9.1.20. <u>Labor Relations</u>. Except as described on **Schedule 9.1.20**, neither Borrower or any Subsidiary is party to or bound by any collective bargaining agreement, management agreement or consulting agreement. There are no material grievances, disputes or controversies with any union or other organization of Borrower's or any Subsidiary's employees, or, to Borrower's knowledge, any asserted or threatened strikes, work stoppages or demands for collective bargaining.

9.1.21. <u>Payable Practices</u>. No Borrower or Subsidiary has made any material change in its historical accounts payable practices from those in effect on the Closing Date.

9.1.22. <u>Not a Regulated Entity</u>. No Obligor is (a) an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment company" within the meaning of the Investment Company Act of 1940; or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any public utilities code or any other Applicable Law regarding its authority to incur Debt.

9.1.23. <u>Margin Stock</u>. No Borrower or Subsidiary is engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. No Loan proceeds or Letters of Credit will be used by Borrower to purchase or carry, or to reduce or refinance any Debt incurred to purchase or carry, any Margin Stock or for any related purpose governed by Regulations T, U or X of the Board of Governors.

9.1.24. <u>OFAC</u>. No Borrower or any Subsidiary, nor to the knowledge of Borrower, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity currently the subject of any Sanctions. Neither Borrower or any Subsidiary is located, organized or resident in a Designated Jurisdiction.

9.2.    **Complete Disclosure**. No Loan Document contains any untrue statement of a material fact, nor fails to disclose any material fact necessary to make the statements contained therein not materially misleading. There is no fact or circumstance that any Obligor has failed to disclose to Lender in writing that could reasonably be expected to have a Material Adverse Effect.

## SECTION 10.   COVENANTS AND CONTINUING AGREEMENTS

10.1.   **Affirmative Covenants**. As long as any this Agreement is in effect or Obligations are outstanding, Borrower shall, and shall cause each Subsidiary to:

10.1.1. <u>Inspections; Appraisals</u>.

(a)    Permit Lender from time to time, but not more frequently than four times per year if no Event of Default exists and is continuing, and subject (except when a Default or Event of Default exists and is continuing) to reasonable prior written notice and normal business hours, to visit and inspect the Properties of Borrower or any Subsidiary, inspect, audit and make extracts from Borrower's or Subsidiary's books and records, prepare a Borrowing Base roll-forward (the results of which must be satisfactory to Lender) and discuss with its officers, employees, agents, advisors and independent accountants of Borrower's or Subsidiary's business, financial condition, assets, prospects and results of operations. Lender shall not have any duty to Borrower to make any inspection, nor to

share any results of any inspection, appraisal or report with Borrower. Borrower acknowledges that all inspections, appraisals and reports are prepared by Lender for its purposes, and Borrower shall not be entitled to rely upon them.

(b)        Reimburse Lender for all documented third party charges, costs and expenses actually incurred by Lender in connection with (i) examinations of any Obligor's books and records or any other financial or Collateral matters as Lender deems appropriate, which examinations, prior to the occurrence of an Event of Default, shall be conducted up to four (4) time per annum; and (ii) appraisals of Inventory, which appraisals, prior to the occurrence of an Event of Default, shall be conducted once per annum. Borrower agrees to pay Lender's then standard charges for examination activities, including the standard charges of Lender's external examination and appraisal groups, as well as the documented charges of any third party used for such purposes. During the continuation of an Event of Default, there shall be no limit to the frequency of examinations or appraisals conducted at Borrower's expense.

10.1.2.   Financial and Other Information.  Keep adequate records and books of account with respect to its business activities, in which proper entries are made in accordance with GAAP reflecting all financial transactions; and furnish to Lender:

(a)        as soon as available, and in any event within 120 days after the close of each Fiscal Year, consolidated balance sheets as of the end of such Fiscal Year and the related statements of income, cash flow and Equity Interest holders' equity for such Fiscal Year and the management letter relating thereto, on a consolidated basis for Borrower and its Subsidiaries, which consolidated statements shall be audited by a firm of independent certified public accountants of recognized standing selected by Borrower and reasonably acceptable to Lender;

(b)        as soon as available, and in any event within 45 days after the end of each Fiscal Quarter of Borrower, unaudited consolidated balance sheets as of the end of such Fiscal Quarter and the related statements of income and cash flow for such Fiscal Quarter and for the portion of the Fiscal Quarter then elapsed, on a consolidated basis for Borrower and its Subsidiaries, and certified by the chief financial officer of Borrower as prepared in accordance with GAAP and fairly presenting the financial position and results of operations for such quarterly period, subject to normal year-end adjustments and the absence of footnotes, together with a Compliance Certificate for such Fiscal Quarter and a Certificate of No-Default, each executed by a Senior Officer of the Borrower, in form and substance satisfactory to Lender;

(c)        as soon as available, and in any event within 30 days after the end of each month, unaudited consolidated balance sheets as of the end of such month and the related statements of income and cash flow for such month, on a consolidated basis for Borrower and its Subsidiaries, and certified by the chief financial officer of Borrower as prepared in accordance with GAAP and fairly presenting the financial position and results of operations for such quarterly period, subject to normal year-end adjustments and the absence of footnotes, together with a Certificate of No-Default, executed by a Senior Officer of the Borrower, in form and substance satisfactory to Lender;

(d)        not later than 30 days prior to, but in no event later than 30 days after, the first day of each Fiscal Year,  an annual budget for of Borrower and its Subsidiaries, on a consolidated basis, month by month;

(e)        on or before Tuesday of each week for the immediately preceding week or more frequently if requested by Lender, together with the Borrowing Base Certificate delivered pursuant to

Section 8.1 of this Agreement, (i) a detailed Accounts and Credit Card Receivables aging, and (ii) a detailed Inventory report, in each case reconciling to the Accounts, Credit Card Receivables and Inventory reported on the then current Borrowing Base Certificate, all in form satisfactory to Lender;

(f)    on or before the fifteenth (15th) day of each month, a listing of Borrower's trade payables, specifying the trade creditor and balance due and a detailed trade payable aging as of the last day of the immediately preceding month;

(g)    promptly after the sending or filing thereof, copies of any proxy statements, financial statements or reports that Borrower has made generally available to its shareholders; copies of any regular, periodic and special reports or registration statements or prospectuses that Borrower files with the Securities and Exchange Commission or any other Governmental Authority, or any securities exchange; and copies of any press releases or other statements made available by Borrower to the public concerning material changes to or developments in the business of Borrower;

(h)    promptly after the sending or filing thereof, copies of any annual report to be filed in connection with each Plan; and

(i)    as soon as available at Lender's request, a detailed trial balance, cash activity report and sales journal for the immediately preceding month, all in form satisfactory to Lender;

(j)    such other reports and information (financial or otherwise) as Lender may reasonably request from time to time in connection with any Collateral or Borrower's, any Subsidiary's or other Obligor's financial condition or business.

10.1.3. <u>Notices</u>.    Notify Lender in writing, promptly after Borrower's obtaining knowledge thereof, of any of the following that affects an Obligor:  (a) the threat or commencement of any proceeding or investigation, whether or not covered by insurance, if an adverse determination could have a Material Adverse Effect; (b) any pending or threatened labor dispute, strike or walkout, or the expiration of any material labor contract; (c) any default under or termination of a Material Contract; (d) the existence of any Default or Event of Default; (e) any judgment in an amount exceeding $50,000; (f) the assertion of any Intellectual Property Claim, if an adverse resolution could have a Material Adverse Effect; (g) any violation or asserted violation of any Applicable Law (including ERISA, OSHA, FLSA, or any Environmental Laws), if an adverse resolution could have a Material Adverse Effect; (h) any Environmental Release by an Obligor or on any Property owned, leased or occupied by an Obligor; or receipt of any Environmental Notice; (i) the occurrence of any ERISA Event; (j) the discharge of or any withdrawal or resignation by Borrower's independent accountants; or (k) any opening of a new office or place of business, at least 30 days prior to such opening.

10.1.4. <u>Landlord and Storage Agreements</u>.  Upon request, provide Lender with copies of all existing agreements, and promptly after execution thereof provide Lender with copies of all future agreements, between an Obligor and any landlord, warehouseman, processor, shipper, bailee or other Person that owns any premises at which any Collateral may be kept or that otherwise may possess or handle any Collateral.

10.1.5. <u>Compliance with Laws</u>.  Comply in all material respects with all Applicable Laws, including ERISA, Environmental Laws, FLSA, OSHA, Anti-Terrorism Laws, and laws regarding collection and payment of Taxes, and maintain all Governmental Approvals necessary to the ownership of its Properties or conduct of its business, unless failure to comply (other than failure to comply with Anti-

Terrorism Laws) or maintain could not reasonably be expected to have a Material Adverse Effect. Without limiting the generality of the foregoing, if any Environmental Release occurs at or on any Properties of Borrower or any Subsidiary, it shall act promptly and diligently to investigate and report to Lender and all appropriate Governmental Authorities the extent of, and to make appropriate remedial action to eliminate, such Environmental Release, whether or not directed to do so by any Governmental Authority.

10.1.6. <u>Taxes</u>. Pay and discharge all Taxes prior to the date on which they become delinquent or penalties attach, unless such Taxes are being Properly Contested.

10.1.7. <u>Insurance</u>. In addition to the insurance required hereunder with respect to Collateral, maintain insurance with insurers, reasonably satisfactory to Lender, (a) with respect to the Properties and business of Borrower and any Subsidiaries of such type (including product liability, workers' compensation, larceny, embezzlement, or other criminal misappropriation insurance), in such amounts, and with such coverages and deductibles as are customary for companies similarly situated; and (b) business interruption insurance to the extent carried by Borrower with deductibles and subject to an Insurance Assignment satisfactory to Lender.

10.1.8. <u>Licenses</u>. Keep each License affecting any Collateral (including the manufacture, distribution or disposition of Inventory) or any other material Property of Borrower and its Subsidiaries, the loss of which would have a Material Adverse Effect, in full force and effect; promptly notify Lender of any proposed modification to any such License, or entry into any new License, in each case at least 30 days prior to its effective date; pay all Royalties when due; and notify Lender of any default or breach asserted by any Person to have occurred under any License.

10.1.9. <u>Future Subsidiaries</u>. Promptly notify Lender upon any Person becoming a Subsidiary and, if such Person is not a Foreign Subsidiary, cause it to guaranty the Obligations in a manner satisfactory to Lender, and to execute and deliver such documents, instruments and agreements and to take such other actions as Lender shall require to evidence and perfect a Lien in favor of Lender on all assets of such Person, including delivery of such legal opinions, in form and substance reasonably satisfactory to Lender, as it shall deem appropriate.

10.1.10. <u>Depository Bank</u>. Maintain Lender as its principal depository bank, including for the maintenance of all operating, collection, disbursement and other deposit accounts and for all Cash Management Services.

10.2. **Negative Covenants.** As long as this Agreement remains in effect or Obligations are outstanding, Borrower shall not, and shall cause each Subsidiary not to:

10.2.1. <u>Permitted Debt</u>. Create, incur, guarantee or suffer to exist any Debt, except:

(a)      the Obligations;

(b)      Subordinated Debt;

(c)      Permitted Purchase Money Debt;

(d)    Borrowed Money (other than the Obligations, Subordinated Debt and Permitted Purchase Money Debt), but only to the extent outstanding on the Closing Date and not satisfied with proceeds of the initial Loans;

(e)    Debt with respect to Bank Products incurred in the Ordinary Course of Business;

(f)    Debt that is in existence when a Person becomes a Subsidiary or that is secured by an asset when acquired by Borrower or a Subsidiary, as long as such Debt was not incurred in contemplation of such Person becoming a Subsidiary or such acquisition;

(g)    Permitted Contingent Obligations;

(h)    Refinancing Debt as long as each Refinancing Condition is satisfied;

(h)    Debt described on Schedule 10.2.1;  and

(i)    Debt that is not included in any of the preceding clauses of this Section, is not secured by a Lien and does not exceed $200,000 in the aggregate at any time.

10.2.2.  Permitted Liens.  Create or suffer to exist any Lien upon any of its Property, except the following (collectively, "Permitted Liens"):

(a)    Liens in favor of Lender;

(b)    Purchase Money Liens securing Permitted Purchase Money Debt;

(c)    Liens for Taxes not yet due or being Properly Contested;

(d)    statutory Liens (other than Liens for Taxes or imposed under ERISA) arising in the Ordinary Course of Business, but only if (i) payment of the obligations secured thereby is not yet due or is being Properly Contested, and (ii) such Liens do not materially impair the value or use of the Property or materially impair operation of the business of Borrower or any Subsidiary;

(e)    Liens incurred or deposits made in the Ordinary Course of Business to secure the performance of government tenders, bids, contracts, statutory obligations and other similar obligations, as long as such Liens are at all times junior to Lender's Liens and are required or provided by law;

(f)    Liens arising in the Ordinary Course of Business that are subject to Lien Waivers;

(g)    Liens arising by virtue of a judgment or judicial order against Borrower or any Subsidiary, or any Property of Borrower or a Subsidiary, as long as such Liens are (i) in existence for less than 30 consecutive days or being Properly Contested, and (ii) at all times junior to Lender's Liens;

(h)    easements, rights-of-way, restrictions, covenants or other agreements of record, and other similar charges or encumbrances on Real Estate, that do not secure any monetary obligation and do not interfere with the Ordinary Course of Business;

(i)       normal and customary rights of setoff upon deposits in favor of depository institutions, and Liens of a collecting bank on Payment Items in the course of collection; and

(j)       existing Liens shown on **Schedule 10.2.2.**

10.2.3.  <u>Capital Expenditures</u>.  Make Capital Expenditures in excess of (a) $750,000 during Fiscal Year ending December 31, 2015; (b) $1,200,000 during the Fiscal Year ending December 31, 2016; and (c) $1,000,000 during the Fiscal Year ending December 31, 2017; <u>provided, that</u>, Capital Expenditures made during any Fiscal Year from the proceeds of capital contributions or subordinated loans made by members of the Borrower to the Borrower during such Fiscal Year, on terms and conditions satisfactory to Lender, shall be excluded from the calculation of Capital Expenditures for the purpose of determining compliance with this Section 10.2.3.

10.2.4.  <u>Distributions; Upstream Payments</u>.  Declare or make any Distributions, except Upstream Payments and Tax Distributions; or create or suffer to exist any encumbrance or restriction on the ability of a Subsidiary to make any Upstream Payment, except for restrictions under the Loan Documents, under Applicable Law or in effect on the Closing Date as shown on **Schedule 9.1.15.**

10.2.5.  <u>Restricted Investments</u>.  Make any Restricted Investment.<u>Disposition of Assets</u>. Make any Asset Disposition, except a Permitted Asset Disposition, a disposition of Equipment under **Section 8.4.2**, or a transfer of Property by a Subsidiary or Obligor to Borrower.<u>Loans</u>. Make any loans or other advances of money to any Person, except (a) advances to an officer or employee for salary, travel expenses, commissions and similar items in the Ordinary Course of Business; (b) prepaid expenses and extensions of trade credit made in the Ordinary Course of Business; and (c) deposits with financial institutions permitted hereunder.

10.2.8.  <u>Restrictions on Payment of Certain Debt</u>.  Make any payments (whether voluntary or mandatory, or a prepayment, redemption, retirement, defeasance or acquisition) with respect to any (a) Subordinated Debt, except regularly scheduled payments of principal, interest and fees, but only to the extent permitted under any subordination agreement relating to such Debt (and a Senior Officer of Borrower shall certify to Lender, not less than five Business Days prior to the date of payment, that all conditions under such agreement have been satisfied); or (b) Borrowed Money (other than the Obligations) prior to its due date under the agreements evidencing such Debt as in effect on the Closing Date (or as amended thereafter with the consent of Lender).

10.2.13.       <u>Fundamental Changes</u>.  Change its name or conduct business under any fictitious name; change its tax, charter or other organizational identification number; change its form or state of organization; liquidate, wind up its affairs or dissolve itself; or merge, combine or consolidate with any Person, whether in a single transaction or in a series of related transactions, without the prior consent of Lender, except for mergers or consolidations of a wholly-owned Subsidiary with another wholly-owned Subsidiary or into Borrower.

10.2.14.       <u>Subsidiaries</u>.  Form or acquire any Subsidiary after the Closing Date, except in accordance with **Section 10.1.9.**

10.2.15.       <u>Organic Documents</u>.  Amend, modify or otherwise change any of its Organic Documents, without the prior consent of Lender, not to be unreasonably withheld, conditioned or delayed, except in connection with a transaction permitted under **Section 10.2.10.**

10.2.16.    <u>Tax Consolidation</u>.  File or consent to the filing of any consolidated income tax return with any Person other than Borrower and any Subsidiaries, except as may be required pursuant to Applicable Law.

10.2.17.    <u>Accounting Changes</u>.  Make any material change in accounting treatment or reporting practices, except as required by GAAP and in accordance with **Section 1.2**; or change its Fiscal Year, without the prior consent of Lender, not to be unreasonably withheld, conditioned or delayed.

10.2.18.    <u>Restrictive Agreements</u>.  Become a party to any Restrictive Agreement, except a Restrictive Agreement (a) in effect on the Closing Date; (b) relating to secured Debt permitted hereunder, as long as the restrictions apply only to collateral for such Debt; or (c) constituting customary restrictions on assignment in leases and other contracts.

10.2.19.    <u>Hedging Agreements</u>.  Enter into any Hedging Agreement, except to hedge risks arising in the Ordinary Course of Business and not for speculative purposes.

10.2.20.    <u>Conduct of Business</u>.  Except as set forth in Schedule 10.2.20, engage in any business, other than its business as conducted on the Closing Date and any activities incidental thereto.

10.2.21.    <u>Affiliate Transactions</u>.  Enter into or be party to any transaction with an Affiliate, except (a) transactions expressly permitted by the Loan Documents; (b) payment of reasonable compensation to officers and employees for services actually rendered, and payment of customary directors' fees and indemnities; (c) transactions solely among Borrower; (d) transactions with Affiliates consummated prior to the Closing Date, as shown on **Schedule 10.2.21**; and (e) transactions with Affiliates in the Ordinary Course of Business, upon fair and reasonable terms fully disclosed to Lender and no less favorable than would be obtained in a comparable arm's-length transaction with a non-Affiliate.

10.2.22.    <u>Plans</u>.  Become party to any Multiemployer Plan, other than any in existence on the Closing Date.

10.2.23.    <u>Amendments to Subordinated Debt</u>.  Amend, supplement or otherwise modify any document, instrument or agreement relating to any Subordinated Debt, without Lender's prior consent, if such modification (a) increases the principal balance of such Debt, or increases any required payment of principal or interest; (b) accelerates the date on which any installment of principal or any interest is due, or adds any additional redemption, put or prepayment provisions; (c) shortens the final maturity date or otherwise accelerates amortization; (d) increases the interest rate; (e) increases or adds any fees or charges; (f) modifies any covenant in a material manner or adds any representation, covenant or default that is more onerous or restrictive in any material respect for Borrower or any Subsidiary, or that is otherwise materially adverse to Borrower, any Subsidiary or Lenders; or (g) results in the Obligations not being fully benefited by the subordination provisions thereof.

10.2.24.    <u>Minimum Consolidated EBITDA</u>.  Permit Borrower's Consolidated EBITDA to be less than (a) <$1,200,000> for the three month period ending March 31, 2015; (b) <$725,000> for the six month period ending June 30, 2015; and (c) <$800,000> for the nine month period ending September 30, 2015.

10.2.25.    <u>Fixed Charge Coverage Ratio</u>.  Permit the Fixed Charge Coverage Ratio to be less than the ratio set forth below for each corresponding period.

| Period | Minimum Fixed Charge Coverage Ratio |
|---|---|
| Twelve month period ending December 31, 2015 | 1.05:1.0 |
| Twelve month period ending March 31, 2016 | 1.05:1.0 |
| Twelve month period ending June 30, 2016 | 1.15:1.0 |
| Twelve month period ending September 30, 2016 | 1.15:1.0 |
| Twelve month period ending December 31, 2016 | 1.10:1.00 |
| Twelve month period ending March 31, 2017 and for the twelve month period ending as of the last day of each Fiscal Quarter thereafter | 1.15:1.00 |

**SECTION 11.    EVENTS OF DEFAULT; REMEDIES ON DEFAULT**

11.1.    **Events of Default.**  Each of the following shall be an "Event of Default" if it occurs for any reason whatsoever, whether voluntary or involuntary, by operation of law or otherwise:

(a)    Borrower fails to pay its Obligations when due (whether at stated maturity, on demand, upon acceleration or otherwise);

(b)    Any representation, warranty or other written statement of an Obligor made in connection with any Loan Documents or transactions contemplated thereby is incorrect or misleading in any material respect when given;

(c)    Borrower breaches or fail to perform any covenant contained in **Section 7.2, 7.4, 8.1, 8.2.4, 8.2.5, 8.6.2, 10.1.1, 10.1.2 or 10.2**; provided, however, notwithstanding anything to the contrary contained in this Agreement, an Event of Default arising from Borrower's failure to satisfy the obligations and covenants set forth in **10.2.24** and/or **10.2.25** may be cured by Borrower subject to the following conditions:

(i)    Borrower shall, in writing, request that Lender, solely for the purpose of determining compliance with Section 10.2.24 and/or Section 10.2.25, include as Consolidated Net Income in the calculation of Consolidated EBITDA for the most recently ended Fiscal Quarter and for each testing period thereafter which includes such Fiscal Quarter, the amount of capital contributions and/or subordinated loans made by members of the Borrower to the Borrower or its Consolidated Subsidiaries, which are made during the most recently ended Fiscal Quarter or prior to the day that is ten (10) Business Days after the day on which financial statements for such Fiscal Quarter are required to be delivered under 10.1.2(b);

(ii)    such capital contribution must represent, to the satisfaction of Lender, a permanent (non-redeemable) cash contribution to the business operations of the Borrower or

its Consolidated Subsidiaries and such subordinated loans shall be on terms and conditions satisfactory to Lender in all respects;

(iii)    Borrower is not permitted, under this clause (c), to cure an Event of Default arising from a failure to satisfy 10.2.24 and/or 10.2.25 (a "**Financial Covenant Default**") if Borrower has previously cured (using the mechanism described in this clause (c)) a Financial Covenant Default relating to a testing period ending within the previous twelve month period; and

(iv)    Borrower is not permitted to cure a Financial Covenant Default using the mechanism described in this clause (c) more than three (3) times prior to the Revolver Termination Date.

(d)    An Obligor breaches or fails to perform any other covenant contained in any Loan Documents, and such breach or failure is not cured within 15 days after a Senior Officer of such Obligor has knowledge thereof or receives notice thereof from Lender, whichever is sooner; provided, however, that such notice and opportunity to cure shall not apply if the breach or failure to perform is not capable of being cured within such period or is a willful breach by an Obligor;

(e)    A Guarantor repudiates, revokes or attempts to revoke its Guaranty; an Obligor or third party denies or contests the validity or enforceability of any Loan Documents or Obligations, or the perfection or priority of any Lien granted to Lender; or any Loan Document ceases to be in full force or effect for any reason (other than a waiver or release by Lender);

(f)    Any breach or default of an Obligor occurs under (i) any Hedging Agreement, or (ii) any instrument or agreement to which it is a party or by which it or any of its Properties is bound, relating to any Debt (other than the Obligations) in excess of $50,000, if the maturity of or any payment with respect to such Debt may be accelerated or demanded due to such breach;

(g)    Any judgment or order for the payment of money is entered against an Obligor in an amount that exceeds, individually or cumulatively with all unsatisfied judgments or orders against all Obligors, $100,000 (net of insurance coverage therefor that has not been denied by the insurer), unless a stay of enforcement of such judgment or order is in effect, by reason of a pending appeal or otherwise;

(h)    A loss, theft, damage or destruction occurs with respect to any Collateral if the amount not covered by insurance exceeds $50,000;

(i)    An Obligor is enjoined, restrained or in any way prevented by any Governmental Authority from conducting any material part of its business; an Obligor suffers the loss, revocation or termination of any material license, permit, lease or agreement necessary to its business; there is a cessation of any material part of an Obligor's business for a material period of time; any material Collateral or Property of an Obligor is taken or impaired through condemnation; an Obligor agrees to or commences any liquidation, dissolution or winding up of its affairs; or an Obligor is not Solvent;

(j)    An Insolvency Proceeding is commenced by an Obligor; an Obligor makes an offer of settlement, extension or composition to its unsecured creditors generally; a trustee is appointed to take possession of any substantial Property of or to operate any of the business of an Obligor; or an Insolvency Proceeding is commenced against an Obligor and: the Obligor consents to institution of the

proceeding, the petition commencing the proceeding is not timely contested by the Obligor, the petition is not dismissed within 60 days after filing, or an order for relief is entered in the proceeding;

(k)      An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan that has resulted or could reasonably be expected to result in liability of an Obligor to a Pension Plan, Multiemployer Plan or PBGC, or that constitutes grounds for appointment of a trustee for or termination by the PBGC of any Pension Plan or Multiemployer Plan; an Obligor or ERISA Affiliate fails to pay when due any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan;

(l)      (i) Borrower or any of its senior management is or at any time has been criminally indicted or convicted for a felony offense under any state or federal law; or (ii) the results of any background investigation or report conducted by Lender with respect to any of Borrower's senior management or financial personnel fail to be satisfactory to Lender, in Lender's sole discretion; or

(m)      A Change of Control occurs; or any event occurs or condition exists that has a Material Adverse Effect.

11.2.    **Remedies upon Default.** If an Event of Default described in **Section 11.1(j)** occurs with respect to Borrower, then to the extent permitted by Applicable Law, all Obligations (other than Bank Product Obligations) shall become automatically due and payable and this Agreement shall terminate, without any action by Lender or notice of any kind. In addition, or if any other Event of Default exists, Lender may in its discretion do any one or more of the following from time to time:

(a)      declare any Obligations (other than Bank Product Obligations) immediately due and payable, whereupon they shall be due and payable without diligence, presentment, demand, protest or notice of any kind, all of which are hereby waived by Borrower to the fullest extent permitted by law;

(b)      terminate, reduce or condition any Loan, Letter of Credit or make any adjustment to the Borrowing Base;

(c)      require Obligors to Cash Collateralize their LC Obligations, Bank Product Obligations and other Obligations that are contingent or not yet due and payable, and, if Obligors fail promptly to deposit such Cash Collateral, Lender may advance the required Cash Collateral as Revolving Loans (whether or not an Overadvance exists or is created thereby, or the conditions in **Section 6** are satisfied); and

(d)      exercise any other rights or remedies afforded under any agreement, by law, at equity or otherwise, including the rights and remedies of a secured party under the UCC. Such rights and remedies include the rights to (i) take possession of any Collateral; (ii) require Borrower to assemble Collateral, at Borrower's expense, and make it available to Lender at a place designated by Lender; (iii) enter any premises where Collateral is located and store Collateral on such premises until sold (and if the premises are owned or leased by Borrower, Borrower agrees not to charge for such storage), subject, in the case of any premises leased by Borrower, to the terms and conditions of the lease and Lien Waiver with respect to such premises; and (iv) sell or otherwise dispose of any Collateral in its then condition, or after any further manufacturing or processing thereof, at public or private sale, with such notice as may be required by Applicable Law, in lots or in bulk, at such locations, all as Lender, in its discretion, deems advisable. Borrower agrees that 10 days notice of any proposed sale or other

disposition of Collateral by Lender shall be reasonable, and that any sale conducted on the internet or to a licensor of Intellectual Property shall be commercially reasonable. Lender may conduct sales on any Obligor's premises, without charge, and any sale may be adjourned from time to time in accordance with Applicable Law. Lender shall have the right to sell, lease or otherwise dispose of any Collateral for cash, credit or any combination thereof, and Lender may purchase any Collateral at public or, if permitted by law, private sale and, in lieu of actual payment of the purchase price, may credit bid and set off the amount of such price against the Obligations.

11.3.    **License.**  During such time as an Event of Default exists and is continuing, Lender is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all Intellectual Property of Borrower, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other Property, in advertising for sale, mar keting, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral. Borrower's rights and interests under Intellectual Property shall inure to Lender's benefit.

11.4.    **Setoff.**  At any time during an Event of Default, Lender, and any of its Affiliates are authorized, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by Lender, or such Affiliate to or for the credit or the account of an Obligor against its Obligations, whether or not Lender or such Affiliate shall have made any demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or are owed to a branch or office of Lender or such Affiliate different from the branch or office holding such deposit or obligated on such indebtedness. The rights of Lender, and each such Affiliate under this Section are in addition to other rights and remedies (including other rights of setoff) that such Person may have.

11.5.    **Remedies Cumulative; No Waiver.**

11.5.1. Cumulative Rights.  All agreements, warranties, guaranties, indemnities and other undertakings of Obligors under the Loan Documents are cumulative and not in derogation of each other. The rights and remedies of Lender under the Loan Documents are cumulative, may be exercised at any time and from time to time, concurrently or in any order, and are not exclusive of any other rights or remedies available by agreement, by law, at equity or otherwise. All such rights and remedies shall continue in full force and effect until Full Payment of all Obligations.

11.5.2. Waivers.  No waiver or course of dealing shall be established by (a) the failure or delay of Lender to require strict performance by any Obligor under any Loan Document, or to exercise any rights or remedies with respect to Collateral or otherwise; (b) the making of any Loan or issuance of any Letter of Credit during a Default, Event of Default or other failure to satisfy any conditions precedent; or (c) acceptance by Lender of any payment or performance by an Obligor under any Loan Documents in a manner other than that specified therein. Any failure to satisfy a financial covenant on a measurement date shall not be cured or remedied by satisfaction of such covenant on a subsequent date.

**SECTION 12.    BENEFIT OF AGREEMENT; ASSIGNMENTS**

12.1.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of Borrower and Lender, and their respective successors and assigns, except that Borrower shall not have the right to assign its rights or delegate its obligations under any Loan Documents.

**SECTION 13.    MISCELLANEOUS**

13.1.    <u>Consents, Amendments and Waivers</u>.

13.1.1.  <u>Amendment</u>.  No modification of any Loan Document, including any extension or amendment of a Loan Document or any waiver of a Default or Event of Default, shall be effective without the prior written agreement of Lender and each Obligor party to such Loan Document; <u>provided</u>, <u>however</u>, that only the consent of the parties to a Bank Product Agreement shall be required for any modification of such agreement.  Any waiver or consent granted by Lender shall be effective only if in writing, and only for the matter specified.

13.2.    <u>Indemnity</u>.    **BORROWER SHALL INDEMNIFY AND HOLD HARMLESS THE LENDER INDEMNITEES AGAINST ANY CLAIMS THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY LENDER INDEMNITEE, INCLUDING CLAIMS ASSERTED BY ANY OBLIGOR OR OTHER PERSON OR ARISING FROM THE NEGLIGENCE OF AN LENDER INDEMNITEE.**  In no event shall any party to a Loan Document have any obligation thereunder to indemnify or hold harmless a Lender Indemnitee with respect to a Claim that is determined in a final, non-appealable judgment by a court of competent jurisdiction to result from the gross negligence, willful misconduct or fraud of such Lender Indemnitee.

13.3.    <u>Notices and Communications</u>.

13.3.1.    <u>Notice Address</u>.    Subject to **Section 4.1.2**, all notices and other communications by or to a party hereto shall be in writing and shall be given to Borrower, at Borrower's address shown on the signature pages hereof, and to any other Person at its address shown on the signature pages hereof or at such other address as a party may hereafter specify by notice in accordance with this **Section 13.3**.  Each communication shall be effective only (a) if given by facsimile transmission, when transmitted to the applicable facsimile number, if confirmation of receipt is received; (b) if given by mail, three Business Days after deposit in the U.S. mail, with first-class postage pre-paid, addressed to the applicable address; (c) if given by personal delivery, when duly delivered to the notice address with receipt acknowledged; or (d) if given by overnight delivery, within one Business Day of delivery to the overnight courier.  Notwithstanding the foregoing, no notice to Lender pursuant to **Section 2.1.4** or **4.1.1** shall be effective until actually received by the individual to whose attention at Lender such notice is required to be sent.  Any written communication that is not sent in conformity with the foregoing provisions shall nevertheless be effective on the date actually received by the noticed party.

13.3.2.    <u>Electronic Communications; Voice Mail</u>.    Electronic mail and internet websites may be used only for routine communications, such as delivery of Borrower Materials, administrative matters, distribution of Loan Documents, and matters permitted under **Section 4.1.2**.  Lender makes no assurances as to the privacy and security of electronic communications.  Electronic and voice mail may not be used as effective notice under the Loan Documents.

13.3.3.    <u>Non-Conforming Communications</u>.    Lender may rely upon any communications purportedly given by or on behalf of Borrower even if they were not made in a manner

specified herein, were incomplete or were not confirmed, or if the terms thereof, as understood by the recipient, varied from a later confirmation.  Borrower shall indemnify and hold harmless each Lender Indemnitee from any liabilities, losses, costs and expenses arising from any electronic or telephonic communication purportedly given by or on behalf of Borrower.

13.4.   **Performance of Borrower's Obligations.**  Lender may, in its discretion at any time and from time to time, at Borrower's expense, pay any amount or do any act required of Borrower under any Loan Documents or otherwise lawfully requested by Lender to (a) enforce any Loan Documents or collect any Obligations; (b) protect, insure, maintain or realize upon any Collateral; or (c) defend or maintain the validity or priority of Lender's Liens in any Collateral, including any payment of a judgment, insurance premium, warehouse charge, finishing or processing charge, or landlord claim, or any discharge of a Lien.  All payments, costs and expenses (including Extraordinary Expenses) of Lender under this Section shall be reimbursed to Lender by Borrower, **on demand**, with interest from the date incurred until paid in full, at the Default Rate applicable to Revolving Loans.  Any payment made or action taken by Lender under this Section shall be without prejudice to any right to assert an Event of Default or to exercise any other rights or remedies under the Loan Documents.

13.5.   **Credit Inquiries.**  Lender may (but shall have no obligation) to respond to usual and customary credit inquiries from third parties concerning any Obligor or Subsidiary.

13.6.   **Severability.**  Wherever possible, each provision of the Loan Documents shall be interpreted in such manner as to be valid under Applicable Law.  If any provision is found to be invalid under Applicable Law, it shall be ineffective only to the extent of such invalidity and the remaining provisions of the Loan Documents shall remain in full force and effect.

13.7.   **Cumulative Effect; Conflict of Terms.**  The provisions of the Loan Documents are cumulative.  The parties acknowledge that the Loan Documents may use several limitations or measurements to regulate similar matters, and they agree that these are cumulative and that each must be performed as provided.  Except as otherwise provided in another Loan Document (by specific reference to the applicable provision of this Agreement), if any provision contained herein is in direct conflict with any provision in another Loan Document, the provision herein shall govern and control.

13.8.   **Counterparts; Execution.**  Any Loan Document may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement shall become effective when Lender has received counterparts bearing the signatures of all parties hereto.  Delivery of a signature page of any Loan Document by telecopy or other electronic means shall be effective as delivery of a manually executed counterpart of such agreement.  Any electronic signature, contract formation on an electronic platform and electronic record-keeping shall have the same legal validity and enforceability as a manually executed signature or use of a paper-based recordkeeping system to the fullest extent permitted by Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any similar state law based on the Uniform Electronic Transactions Act.

13.9.   **Entire Agreement.**  Time is of the essence with respect to all Loan Documents and Obligations.  The Loan Documents constitute the entire agreement, and supersede all prior understandings and agreements, among the parties relating to the subject matter thereof.

13.10.  **No Advisory or Fiduciary Responsibility.**  In connection with all aspects of each transaction contemplated by any Loan Document, Borrower acknowledges and agrees that (a)(i) this

credit facility and any arranging or other services by Lender, or any of Lender's Affiliates are arm's-length commercial transactions between Borrower and its Affiliates, on one hand, and Lender or any of its Affiliates, on the other hand; (ii) Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate; and (iii) Borrower is capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated by the Loan Documents; (b) each of Lender and its Affiliates is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for Borrower, its Affiliates or any other Person, and has no obligation with respect to the transactions contemplated by the Loan Documents except as expressly set forth therein; and (c) Lender and its Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of Borrower and its Affiliates, and have no obligation to disclose any of such interests to Borrower or its Affiliates.  To the fullest extent permitted by Applicable Law, Borrower hereby waives and releases any claims that it may have against Lender and Lender's Affiliates with respect to any breach of agency or fiduciary duty in connection with any transaction contemplated by a Loan Document.

13.11.  **Confidentiality**.  Lender shall maintain the confidentiality of all Information (as defined below), except that Information may be disclosed (a) to its Affiliates, and to its and their partners, directors, officers, employees, agents, advisors and representatives (provided they are informed of the confidential nature of the Information and instructed to keep it confidential); (b) to the extent requested by any governmental, regulatory or self-regulatory authority purporting to have jurisdiction over it or its Affiliates; (c) to the extent required by Applicable Law or by any subpoena or other legal process; (d) to any other party hereto; (e) in connection with any action or proceeding relating to any Loan Documents or Obligations; (f) subject to an agreement containing provisions substantially the same as this Section, to any Transferee or any actual or prospective party (or its advisors) to any Bank Product or to any swap, derivative or other transaction under which payments are to be made by reference to an Obligor or Obligor's obligations; (g) with the written consent of Borrower; or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) is available to Lender or any of its Affiliates on a nonconfidential basis from a source other than Borrower that to Lender's actual knowledge, does not have an obligation to keep such information confidential. Notwithstanding the foregoing, Lender may publish or disseminate general information concerning this credit facility for league table, tombstone and advertising purposes, and may use Borrower's logos, trademarks or product photographs in advertising materials.  As used herein, "Information" means information received from an Obligor or Subsidiary relating to it or its business that is identified as confidential when delivered.  A Person required to maintain the confidentiality of Information pursuant to this Section shall be deemed to have complied if it exercises a degree of care similar to that accorded its own confidential information.  Lender acknowledges that (i) Information may include material non-public information; (ii) it has developed compliance procedures regarding the use of such information; and (iii) it will handle the material non-public information in accordance with Applicable Law.

13.12.  **GOVERNING LAW**.  UNLESS EXPRESSLY PROVIDED IN ANY LOAN DOCUMENT, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ALL CLAIMS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAW PRINCIPLES EXCEPT FEDERAL LAWS RELATING TO NATIONAL BANKS.

13.13.  **Consent to Forum.**

13.13.1.        Forum. **BORROWER HEREBY CONSENTS TO THE NON-EXCLUSIVE JURISDICTION OF ANY FEDERAL OR STATE COURT SITTING IN OR WITH JURISDICTION OVER NEW YORK COUNTY, NEW YORK, IN ANY DISPUTE, ACTION, LITIGATION OR OTHER PROCEEDING RELATING IN ANY WAY TO ANY LOAN DOCUMENTS, AND AGREES THAT ANY DISPUTE, ACTION, LITIGATION OR OTHER PROCEEDING SHALL BE BROUGHT BY IT SOLELY IN ANY SUCH COURT. BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL CLAIMS, OBJECTIONS AND DEFENSES THAT IT MAY HAVE REGARDING ANY SUCH COURT'S PERSONAL OR SUBJECT MATTER JURISDICTION, VENUE OR INCONVENIENT FORUM. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 13.3.1.** A final judgment in any proceeding of any such court shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or any other manner provided by Applicable Law.

13.13.2.        Other Jurisdictions.   Nothing herein shall limit the right of Lender to bring proceedings against any Obligor in any other court, nor limit the right of any party to serve process in any other manner permitted by Applicable Law.   Nothing in this Agreement shall be deemed to preclude enforcement by Lender of any judgment or order obtained in any forum or jurisdiction.

13.14.   **Waivers by Borrower**. **To the fullest extent permitted by Applicable Law, Borrower waives (a) the right to trial by jury (which Lender hereby also waives) in any proceeding or dispute of any kind relating in any way to any Loan Documents, Obligations or Collateral; (b) presentment, demand, protest, notice of presentment, default, non-payment, maturity, release, compromise, settlement, extension or renewal of any commercial paper, accounts, documents, instruments, chattel paper and guaranties at any time held by Lender on which Borrower may in any way be liable, and hereby ratifies anything Lender may do in this regard; (c) notice prior to taking possession or control of any Collateral; (d) any bond or security that might be required by a court prior to allowing Lender to exercise any rights or remedies; (e) the benefit of all valuation, appraisement and exemption laws; (f) any claim against Lender on any theory of liability, for special, indirect, consequential, exemplary or punitive damages (as opposed to direct or actual damages) in any way relating to any Enforcement Action, Obligations, Loan Documents or transactions relating thereto; and (g) notice of acceptance hereof.** Borrower acknowledges that the foregoing waivers are a material inducement to Lender entering into this Agreement and that it is relying upon the foregoing in its dealings with Borrower. Borrower has reviewed the foregoing waivers with its legal counsel and has knowingly and voluntarily waived its jury trial and other rights following consultation with legal counsel. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

13.15.   **Patriot Act Notice**. Lender hereby notify Borrower that pursuant to the Patriot Act, Lender is required to obtain, verify and record information that identifies Borrower, including its legal name, address, tax ID number and other information that will allow Lender to identify it in accordance with the Patriot Act. Lender will also require information regarding each personal guarantor, if any, and may require information regarding Borrower's management and owners, such as legal name, address, social security number and date of birth.   Borrower shall, promptly upon request,   provide all documentation and other information as Lender may request from time to time in order to comply with any obligations under any "know your customer," anti-money laundering or other requirements of Applicable Law.

13.16.   **NO ORAL AGREEMENT**. **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY**

**EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.**

[Remainder of page intentionally left blank; signatures begin on following page]

**IN WITNESS WHEREOF,** this Agreement has been executed and delivered as of the date set forth above.

**BORROWER**:

**GRACIOUS HOME LLC**

By: _____

Title: Chief Financial Officer

Address:

158 West 27th Street, 12th Floor

New York, NY 10001

Attn: James Linsalata

Telecopy: _____

[Loan and Security Agreement]

**LENDER**:

**SIGNATURE BANK**

By: Robert Wallace
Title: Vice President
Address: 565 Fifth Avenue
                New York, New York 10017
    Attn: _ROBERT WALLACE_
    Telecopy: _646 822- 4478_

[Loan and Security Agreement]

[Execution Version]

## EXHIBIT A

## **Definitions**

As used herein, the following terms have the meanings set forth below:

"Account" has the meaning as set forth in the UCC, including all rights to payment for goods sold or leased, or for services rendered.

"Account Debtor" means a Person obligated under an Account, Chattel Paper or General Intangible.

"Acquisition" means a transaction or series of transactions resulting in (a) acquisition of a business, division or substantially all assets of a Person; (b) record or beneficial ownership of 50% or more of the Equity Interests of a Person; or (c) merger, consolidation or combination of Borrower or a Subsidiary with another Person.

"Affiliate" means with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have correlative meanings.

"Anti-Terrorism Law" means any law relating to terrorism or money laundering, including the Patriot Act.

"Applicable Law" means all laws, rules, regulations and governmental guidelines applicable to the Person, conduct, transaction, agreement or matter in question, including all applicable statutory law, common law and equitable principles, and all provisions of constitutions, treaties, statutes, rules, regulations, orders and decrees of Governmental Authorities.

"Applicable Margin" means 1.00%.

"Asset Disposition" means a sale, lease, license, consignment, transfer or other disposition of Property of an Obligor, including a disposition of Property in connection with a sale-leaseback transaction or synthetic lease.

"Availability" means the Borrowing Base minus Revolver Usage.

"Availability Reserve" means an amount equal to $250,000.

"Bank Product" means any of the following products, services or facilities extended to Borrower or an Affiliate of Borrower by Lender or any of its Affiliates means (a) Cash Management Services; (b) products under Hedging Agreements; (c) commercial credit card and merchant card services; and (d) other banking products or services, other than Letters of Credit.

"Bank Product Obligations" means Debt, obligations and other liabilities with respect to Bank Products owing by Borrower or an Affiliate of Borrower to a Lender; provided, that Bank Product Obligations of an Obligor shall not include its Excluded Swap Obligations.

"Bankruptcy Code" means Title 11 of the United States Code.

"Board of Governors" means the Board of Governors of the Federal Reserve System.

"Borrowed Money" means with respect to any Obligor, without duplication, its (a) Debt that (i) arises from the lending of money by any Person to such Obligor, (ii) is evidenced by notes, drafts, bonds, debentures, credit documents or similar instruments, (iii) accrues interest or is a type upon which interest charges are customarily paid (excluding trade payables owing in the Ordinary Course of Business), or (iv) was issued or assumed as full or partial payment for Property; (b) Capital Leases; (c) reimbursement obligations with respect to letters of credit; and (d) guaranties of any Debt of the foregoing types owing by another Person.

"Borrower Materials" means Borrowing Base Certificates, Compliance Certificates and other information, reports, financial statements and other materials delivered by Borrower hereunder.

"Borrowing" means a group of Loans that are made on the same day and have the same interest option.

"Borrowing Base" means on any date of determination, an amount equal to the lesser of (a) the Maximum Revolving Credit; or (b) the sum of (i) up to 85% of the Value of Eligible Accounts, plus (ii) up to 85% of the Value of Eligible Credit Card Receivables, plus (iii) the lesser of (x) 85% of the net going out of business value of Eligible Inventory as determined pursuant to the most recent appraisal of Borrower's Inventory, in form, scope and methodology and by an appraiser satisfactory to Lender, and (y) 70% of the Value of Eligible Inventory, minus Reserves, including, without limitation, the Availability Reserve.

"Borrowing Base Certificate" means a certificate, in form and substance satisfactory to Lender, by which Borrower certifies the Borrowing Base.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in New York.

"Capital Expenditures" means all liabilities incurred or expenditures made by Borrower or any of its Subsidiaries for the acquisition of fixed assets, or any improvements, replacements, substitutions or additions thereto with a useful life of more than one year.

"Capital Lease" means any lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Cash Collateral" means cash, and any interest or other income earned thereon, that is delivered to Lender to Cash Collateralize any Obligations.

"Cash Collateral Account" means a demand deposit, money market or other account established by Lender at such financial institution as Lender may select in its discretion, which account shall be subject to a Lien in favor of Lender.

3561927.11

"Cash Collateralize" means the delivery of cash to Lender, as security for the payment of Obligations, in an amount equal to (a) with respect to LC Obligations, 105% of the aggregate LC Obligations, and (b) with respect to any inchoate, contingent or other Obligations (including Bank Product Obligations), Lender's good faith estimate of the amount due or to become due, including fees, expenses and indemnification hereunder. "Cash Collateralization" has a correlative meaning.

"Cash Equivalents" means (a) marketable obligations issued or unconditionally guaranteed by, and backed by the full faith and credit of, the United States government, maturing within 12 months of the date of acquisition; (b) certificates of deposit, time deposits and bankers' acceptances maturing within 12 months of the date of acquisition, and overnight bank deposits, in each case which are issued by Signature Bank or a commercial bank organized under the laws of the United States or any state or district thereof, rated A-1 (or better) by S&P or P-1 (or better) by Moody's at the time of acquisition, and (unless issued by Lender) not subject to offset rights; (c) repurchase obligations with a term of not more than 30 days for underlying investments of the types described in clauses (a) and (b) entered into with any bank described in clause (b); (d) commercial paper issued by Signature Bank or rated A-1 (or better) by S&P or P-1 (or better) by Moody's, and maturing within nine months of the date of acquisition; and (e) shares of any money market fund that has substantially all of its assets invested continuously in the types of investments referred to above, has net assets of at least $500,000,000 and has the highest rating obtainable from either Moody's or S&P.

"Cash Management Services" means services relating to operating, collections, payroll, trust, or other depository or disbursement accounts, including automated clearinghouse, e-payable, electronic funds transfer, wire transfer, controlled disbursement, overdraft, depository, information reporting, lockbox and stop payment services.

"CERCLA" means the Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C. § 9601 et seq.).

"Change in Law" means the occurrence, after the date hereof, of (a) the adoption, taking effect or phasing in of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof; or (c) the making, issuance or application of any request, guideline, requirement or directive (whether or not having the force of law) by any Governmental Authority; provided, however, that "Change in Law" shall include, regardless of the date enacted, adopted or issued, all requests, rules, guidelines, requirements or directives (i) under or relating to the Dodd-Frank Wall Street Reform and Consumer Protection Act, or (ii) promulgated pursuant to Basel III by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any similar authority) or any other Governmental Authority.

"Change of Control" means (a) RFG Investors LLC, Golden Apple LLC, The Silver Penny LLC, Jim Linsalata and Jordan Smilowitz (or some combination thereof) ceases to own and control, beneficially and of record, directly or indirectly, all Equity Interests in American Retail Flagship Fund LLC; (b) American Retail Flagship Fund LLC ceases to own an control, beneficially and of record, directly or indirectly, all Equity Interests in Gracious Home Holding; (c) Gracious Home Holding ceases to own and control, beneficially and of record, directly or indirectly, all Equity Interests in Borrower; (d) a change in the majority of directors of Borrower or any Guarantor during any 12 month period, unless approved by the majority of directors serving at the beginning of such period; or (e) the sale or transfer of all or substantially all assets of Borrower or any Guarantor.

"Claims" means all claims, liabilities, obligations, losses, damages, penalties, judgments, proceedings, interest, costs and expenses of any kind (including remedial response costs, reasonable attorneys' fees and Extraordinary Expenses) at any time (including after Full Payment of the Obligations) incurred by any Lender Indemnitee or asserted against any Lender Indemnitee by any Obligor or other Person, in any way relating to (a) any Loans, Letters of Credit, Loan Documents, Borrower Materials, or the use thereof or transactions relating thereto, (b) any action taken or omitted in connection with any Loan Documents, (c) the existence or perfection of any Liens, or realization upon any Collateral, (d) exercise of any rights or remedies under any Loan Documents or Applicable Law, or (e) failure by any Obligor to perform or observe any terms of any Loan Document, in each case including all costs and expenses relating to any investigation, litigation, arbitration or other proceeding (including an Insolvency Proceeding or appellate proceedings), whether or not the applicable Lender Indemnitee is a party thereto.

"Closing Date" means as defined in **Section 6.1**.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means all Property described in **Section 7.1**, all Property described in any Security Documents as security for any Obligations, and all other Property that now or hereafter secures (or is intended to secure) any Obligations.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*).

"Compliance Certificate" means a certificate, in form and substance satisfactory to Lender, by which Borrower certifies that Borrower is in compliance with **Sections 10.2.3** and **10.2.21** hereof.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated), or are franchise or branch profits Taxes.

"Consolidated Non-Cash Rent Paid" means, for any period, all non-cash rent paid during such period by Borrower and its Consolidated Subsidiaries, on a consolidated basis, all as determined in accordance with GAAP.

"Consolidated EBITDA" means, as determined on a consolidated basis for Borrower and its Consolidated Subsidiaries, Consolidated Net Income, calculated before interest expense, provision for income taxes, depreciation and amortization expense, gains or losses arising from the sale of capital assets, gains arising from the write-up of assets, and any extraordinary gains (in each case, to the extent included in determining net income), plus, each of the following (without duplication as an addition) if and only if such item was deducted in determining net income: (i) Consolidated Non-Recurring Restructuring Charges in an aggregate amount not to exceed $653,600; and (ii) Consolidated Non-Cash Rent Paid.

"Consolidated Net Income" means, for any period, the consolidated net income (exclusive of any extraordinary gain and exclusive of any extraordinary loss) of Borrower and its Consolidated Subsidiaries, on a consolidated basis, all as determined in accordance with GAAP.

"Consolidated Non-Recurring Restructuring Charges" means, for any period, any onetime, non-recurring charges, costs, fees and expenses of Borrower and its Consolidated Subsidiaries, on a consolidated basis, as determined in accordance with GAAP, directly incurred as a result of restructuring

356192711

activities, in connection with the transactions contemplated by this Agreement and discontinued operations (other than such charges, costs, fees and expenses to the extent constituting losses arising from such discontinued operations).

"Consolidated Subsidiary" means each Subsidiary of Borrower which, in accordance with GAAP, should be included in the consolidated financial statements of Borrower.

"Contingent Obligation" means any obligation of a Person arising from a guaranty, indemnity or other assurance of payment or performance of any Debt, lease, dividend or other obligation ("<u>primary obligations</u>") of another obligor ("<u>primary obligor</u>") in any manner, whether directly or indirectly, including any obligation of such Person under any (a) guaranty, endorsement, co-making or sale with recourse of an obligation of a primary obligor; (b) obligation to make take-or-pay or similar payments regardless of nonperformance by any other party to an agreement; and (c) arrangement (i) to purchase any primary obligation or security therefor, (ii) to supply funds for the purchase or payment of any primary obligation, (iii) to maintain or assure working capital, equity capital, net worth or solvency of the primary obligor, (iv) to purchase Property or services for the purpose of assuring the ability of the primary obligor to perform a primary obligation, or (v) otherwise to assure or hold harmless the holder of any primary obligation against loss in respect thereof. The amount of any Contingent Obligation shall be deemed to be the stated or determinable amount of the primary obligation (or, if less, the maximum amount for which such Person may be liable under the instrument evidencing the Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto.

"Credit Card Issuer" shall mean any person (other than a Borrower) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., and Novus Services, Inc. and other issuers approved by the Lender

"Credit Card Processor" shall mean any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Borrower's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Notifications" has the meaning provided in **Section 5.6(b)(ii)**.

"Credit Card Receivables" means each "payment intangible" (as set forth in the UCC) together with all income, payments and proceeds thereof, owed by a Credit Card Issuer or Credit Card Processor to Borrower resulting from charges by a customer of the Borrower on credit or debit cards issued by such Credit Card Issuer in connection with the sale of goods by the Borrower, or services performed by the Borrower, in each case in the ordinary course of its business.

"CWA" means the Clean Water Act (33 U.S.C. §§ 1251 <u>et seq.</u>).

"Debt" means as applied to any Person, without duplication, (a) all items that would be included as liabilities on a balance sheet in accordance with GAAP, including Capital Leases, but excluding trade payables incurred and being paid in the Ordinary Course of Business; (b) all Contingent Obligations; (c)

-- 5 --

all reimbursement obligations in connection with letters of credit issued for the account of such Person; and (d) in the case of Borrower, the Obligations. The Debt of a Person shall include any recourse Debt of any partnership in which such Person is a general partner or joint venturer.

"Default" means an event or condition that, with the lapse of time or giving of notice, would constitute an Event of Default.

"Default Rate" means for any Obligation (including, to the extent permitted by law, interest not paid when due), 2.00% plus the interest rate otherwise applicable thereto.

"Deposit Account Control Agreement" means control agreement satisfactory to Lender executed by an institution maintaining a Deposit Account for an Obligor, to perfect Lender's Lien on such account.

"Designated Jurisdiction" means any country or territory that is the subject of any Sanction.

"Distribution" means any declaration or payment of a distribution, interest or dividend on any Equity Interest (other than payment-in-kind); distribution, advance or repayment of Debt to a holder of Equity Interests; or purchase, redemption, or other acquisition or retirement for value of any Equity Interest.

"Dollars" means lawful money of the United States.

"Dominion Account" means a special account established by Borrower at Signature Bank or another bank acceptable to Lender, over which Lender has exclusive control for withdrawal purposes.

"Eligible Accounts" means an Account owing to Borrower that arises in the Ordinary Course of Business from the sale of goods, is payable in Dollars and is deemed by Lender, in its discretion, to be an Eligible Account. Without limiting the foregoing, no Account shall be an Eligible Account if (a) it is unpaid for more than 60 days after the original due date, or more than 90 days after the original invoice date; (b) 20% or more of the Accounts owing by the Account Debtor are not Eligible Accounts under the foregoing clause; (c) when aggregated with other Accounts owing by the Account Debtor, it exceeds 10% of the aggregate Eligible Accounts (or such higher percentage as Lender may establish for the Account Debtor from time to time); (d) it does not conform with a covenant or representation herein; (e) it is owing by a creditor or supplier, or is otherwise subject to a potential offset, counterclaim, dispute, deduction, discount, recoupment, reserve, defense, chargeback, credit or allowance (but ineligibility shall be limited to the amount thereof); (f) an Insolvency Proceeding has been commenced by or against the Account Debtor; or the Account Debtor has failed, has suspended or ceased doing business, is liquidating, dissolving or winding up its affairs, is not Solvent, or is subject to any country sanctions program or specially designated nationals list maintained by the Office of Foreign Assets Control of the U.S. Treasury Department; or the Borrower is not able to bring suit or enforce remedies against the Account Debtor through judicial process; (g) the Account Debtor is organized or has its principal offices or assets outside the United States or Canada, unless the Account is supported by a letter of credit (delivered to and directly drawable by Lender) or credit insurance satisfactory in all respects to Lender; (h) it is owing by a Governmental Authority, unless the Account Debtor is the United States or any department, agency or instrumentality thereof and the Account has been assigned to Lender in compliance with the federal Assignment of Claims Act; (i) it is not subject to a duly perfected, first priority Lien in favor of Lender, or is subject to any other Lien; (j) the goods giving rise to it have not been delivered to the Account Debtor, the services giving rise to it have not been accepted by the

-- 6 --

Account Debtor, or it otherwise does not represent a final sale; provided that the exclusions set forth in this item (j) shall not be duplicative of any Reserves established for special orders, gift cards or store credits reflected on any Borrowing Base Certificate; (k) it is evidenced by Chattel Paper or an Instrument of any kind, or has been reduced to judgment; (l) its payment has been extended or the Account Debtor has made a partial payment; (m) it arises from a sale to an Affiliate, from a sale on a cash-on-delivery, bill-and-hold, sale or return, sale on approval, consignment, or other repurchase or return basis, or from a sale for personal, family or household purposes; (n) it represents a progress billing or retainage, or relates to services for which a performance, surety or completion bond or similar assurance has been issued; or (o) it includes a billing for interest, fees or late charges, but ineligibility shall be limited to the extent thereof.  In calculating delinquent portions of Accounts under clauses (a) and (b), credit balances more than 90 days old will be excluded.

"Eligible Credit Card Receivables" means at the time of any determination thereof, each Credit Card Receivable that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination, as determined by the Lender in its discretion:

such Credit Card Receivable (i) has been earned by performance and represents the bona fide amounts due to Borrower from a Credit Card Issuer or Credit Card Processor, and in each case originated in the ordinary course of business of Borrower, and (ii) in each case is acceptable to the Lender in its discretion, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (i) below.  Without limiting the foregoing, to qualify as an Eligible Credit Card Receivable, such Credit Card Receivable shall indicate no Person other than Borrower as payee or remittance party. In determining the amount to be so included, the face amount of a Credit Card Receivable shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that Borrower may be obligated to rebate to a customer, a Credit Card Issuer or Credit Card Processor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Credit Card Receivable but not yet applied by Borrower to reduce the amount of such Credit Card Receivable.  Except as otherwise agreed by the Lender, any Credit Card Receivable included within any of the following categories shall not constitute an Eligible Credit Card Receivable:

(a)    Credit Card Receivables which do not constitute a "payment intangible" (as set forth in the UCC);

(b)    Credit Card Receivables that have been outstanding for more than five (5) Business Days from the date of sale;

(c)    Credit Card Receivables (i) that are not subject to a perfected first-priority security interest in favor of the Lender, or (ii) with respect to which Borrower does not have good, valid and marketable title thereto, free and clear of any Lien (other than Liens granted to the Lender);

(d)    Credit Card Receivables which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback);

(e)     Credit Card Receivables as to which the Credit Card Issuer or Credit Card Processor has the right under certain circumstances to require the Borrower to repurchase the Credit Card Receivables from such Credit Card Issuer or Credit Card Processor;

(f)     Credit Card Receivables due from a Credit Card Issuer or Credit Card Processor which is the subject of any bankruptcy or insolvency proceedings;

(g)     Credit Card Receivables which are not a valid, legally enforceable obligation of the applicable Credit Card Issuer or Credit Card Processor with respect thereto;

(h)     Credit Card Receivables which do not conform to all representations, warranties or other provisions in the Loan Documents relating to Credit Card Receivables; or

(i)     Credit Card Receivables which the Lender determines in its discretion to be uncertain of collection or which do not meet such other reasonable eligibility criteria for Credit Card Receivables as the Lender may determine.

"Eligible Inventory" means Inventory owned by Borrower that Lender, in its discretion, deems to be Eligible Inventory. Without limiting the foregoing, no Inventory shall be Eligible Inventory unless it (a) is finished goods, and not raw materials, work-in-process, packaging or shipping materials, labels, samples, display items not offered for sale, bags, replacement parts or manufacturing supplies; (b) is not held on consignment, nor subject to any deposit or down payment; (c) is in new and saleable condition and is not damaged, defective, shopworn or otherwise unfit for sale; (d) is not slow-moving, perishable, obsolete or unmerchantable, and does not constitute returned or repossessed goods; (e) meets all standards imposed by any Governmental Authority that are applicable to Borrower, has not been acquired from an entity subject to Sanctions or any specially designated nationals list maintained by OFAC, and does not constitute hazardous materials under any Environmental Law, except for paints, solvents and other chemicals packaged in accordance with Environmental Law; (f) conforms with the covenants and representations herein; (g) is subject to Lender's duly perfected, first priority Lien, and no other Lien; (h) is warehoused at or being stored within the continental United States, is not in transit, and is not consigned to any Person; (i) is not subject to any warehouse receipt or negotiable Document; (j) is not subject to any License or other arrangement that restricts Borrower's or Lender's right to dispose of such Inventory, unless Lender has received an appropriate Lien Waiver; and (k) is not located on leased premises or in the possession of a warehouseman, processor, repairman, mechanic, shipper, freight forwarder or other Person, unless the lessor or such Person has delivered a Lien Waiver or an appropriate Reserve has been established.

"Enforcement Action" means any action to enforce any Obligations (other than Product Obligations) or Loan Documents or to exercise any rights or remedies relating to any Collateral (whether by judicial action, self-help, notification of Account Debtors, setoff or recoupment, credit bid, action in an Obligor's Insolvency Proceeding or otherwise).

"Environmental Laws" means Applicable Laws (including programs, permits and guidance promulgated by regulators) relating to public health (other than occupational safety and health regulated by OSHA) or the protection or pollution of the environment, including CERCLA, RCRA and CWA.

"Environmental Notice" means a notice (whether written or oral) from any Governmental Authority or other Person of any possible noncompliance with, investigation of a possible violation of,

-- 8 --

litigation relating to, or potential fine or liability under any Environmental Law, or with respect to any Environmental Release, environmental pollution or hazardous materials, including any complaint, summons, citation, order, claim, demand or request for correction, remediation or otherwise.

"Environmental Release" means a release as defined in CERCLA or under any other Environmental Law.

"Equity Interest" means the interest of any (a) shareholder in a corporation; (b) partner in a partnership (whether general, limited, limited liability or joint venture); (c) member in a limited liability company; or (d) other Person having any other form of equity security or ownership interest.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with an Obligor within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Obligor or ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Obligor or ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) the determination that any Pension Plan or Multiemployer Plan is considered an at risk plan or a plan in critical or endangered status under the Code, ERISA or the Pension Protection Act of 2006; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (g) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Obligor or ERISA Affiliate.

"Event of Default" means as defined in **Section 11**.

"Excluded Swap Obligation" means with respect to an Obligor, each Swap Obligation as to which, and only to the extent that, such Obligor's guaranty of or grant of a Lien as security for such Swap Obligation is or becomes illegal under the Commodity Exchange Act because the Obligor does not constitute an "eligible contract participant" as defined in the act (determined after giving effect to any keepwell, support or other agreement for the benefit of such Obligor and all guarantees of Swap Obligations by other Obligors) when such guaranty or grant of Lien becomes effective with respect to the Swap Obligation. If a Hedging Agreement governs more than one Swap Obligation, only the Swap Obligation(s) or portions thereof described in the foregoing sentence shall be Excluded Swap Obligation(s) for the applicable Obligor.

"Excluded Taxes" means (a) Taxes imposed on or measured by a Recipient's net income (however denominated), franchise Taxes and branch profits Taxes (i) as a result of such Recipient being organized under the laws of, or having its principal office or applicable Lending Office located in, the jurisdiction imposing such Tax, or (ii) constituting Other Connection Taxes; (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of Lender with respect to its interest in a Loan

-- 9 --

pursuant to a law in effect when the Lender acquires such interest or changes its Lending Office, unless the Taxes were payable to its assignor immediately prior to such assignment or to the Lender immediately prior to its change in Lending Office; and (c) U.S. federal withholding Taxes imposed pursuant to FATCA.

"Extraordinary Expenses" means all documented third party costs, expenses or advances that Lender actually incurs during a Default or Event of Default, or during the pendency of an Insolvency Proceeding of an Obligor, including those relating to (a) any audit, inspection, repossession, storage, repair, appraisal, insurance, manufacture, preparation or advertising for sale, sale, collection, or other preservation of or realization upon any Collateral; (b) any action, arbitration or other proceeding (whether instituted by or against Lender, Lender, any Obligor, any representative of creditors of an Obligor or any other Person) in any way relating to any Collateral (including the validity, perfection, priority or avoidability of Lender's Liens with respect to any Collateral), Loan Documents, Letters of Credit or Obligations, including any lender liability or other Claims; (c) the exercise of any rights or remedies of Lender in, or the monitoring of, any Insolvency Proceeding; (d) settlement or satisfaction of taxes, charges or Liens with respect to any Collateral; (e) any Enforcement Action; and (f) negotiation and documentation of any modification, waiver, workout, restructuring or forbearance with respect to any Loan Documents or Obligations.  Such costs, expenses and advances include transfer fees, Other Taxes, storage fees, insurance costs, permit fees, utility reservation and standby fees, legal fees, appraisal fees, brokers' and auctioneers' fees and commissions, accountants' fees, environmental study fees, wages and salaries paid to employees of any Obligor or independent contractors in liquidating any Collateral, and travel expenses.

"FATCA" means Sections 1471 through 1474 of the Code (including any amended or successor version if substantively comparable and not materially more onerous to comply with), and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Rate" means (a) the weighted average of interest rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on the applicable Business Day (or on the preceding Business Day, if the applicable day is not a Business Day), as published by the Federal Reserve Bank of New York on the next Business Day; or (b) if no such rate is published on the next Business Day, the average rate (rounded up, if necessary, to the nearest 1/8 of 1%) charged to Signature Bank on the applicable day on such transactions, as determined by Lender.

"Fiscal Quarter" means each period of three months, commencing on the first day of a Fiscal Year.

"Fiscal Year" means the fiscal year of Borrower for accounting and tax purposes, ending on December 31 of each year.

"Fixed Charge Coverage Ratio" means, for any period, the ratio, determined on a consolidated basis for Borrowers and Subsidiaries for the most recent four Fiscal Quarters, of (a) Consolidated EBITDA to (b) Fixed Charges.

"Fixed Charges" means, for any period, the sum of (i) interest expense (other than payment-in-kind) paid or accrued during such period, (ii) taxes to the extent accrued or otherwise payable for such period, plus (iii) regularly scheduled payments of principal for Borrowed Money paid or required to be paid during such period, plus (iv) Distributions made during such period, plus (v) Capital Expenditures for

such period which are not financed with Borrowed Money (other than Revolver Loans), but specifically excluding Capital Expenditures made from the proceeds of capital contributions or subordinated loans made to the Borrower from its members, on terms and conditions satisfactory to Lender, as contemplated under Section 10.2.3, plus, (vi) management fees paid during such period.

"FLSA" means the Fair Labor Standards Act of 1938.

"Foreign Subsidiary" means a Subsidiary that is a "controlled foreign corporation" under Section 957 of the Code, such that a guaranty by such Subsidiary of the Obligations or a Lien on the assets of such Subsidiary to secure the Obligations would result in material tax liability to Borrower.

"Full Payment" means with respect to any Obligations, (a) the full and indefeasible cash payment thereof, including any interest, fees and other charges accruing during an Insolvency Proceeding (whether or not allowed in the proceeding); and (b) if such Obligations are LC Obligations or inchoate or contingent in nature, Cash Collateralization thereof (or delivery of a standby letter of credit acceptable to Lender in its discretion, in the amount of required Cash Collateral). No Loans shall be deemed to have been paid in full unless this Agreement has been terminated.

"GAAP" means generally accepted accounting principles in effect in the United States from time to time.

"Governmental Approvals" means all authorizations, consents, approvals, licenses and exemptions of, registrations and filings with, and required reports to, all Governmental Authorities.

"Governmental Authority" means any federal, state, local, foreign or other agency, authority, body, commission, court, instrumentality, political subdivision, central bank, or other entity or officer exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions for any governmental, judicial, investigative, regulatory or self-regulatory authority (including any supra-national bodies such as the European Union or European Central Bank).

"Guarantors" means Americas Retail Flagship Fund LLC, Gracious Home Holdings LLC and each Person that guarantees payment or performance of Obligations.

"Guaranty" means each guaranty agreement executed by a Guarantor in favor of Lender.

"Hedging Agreement" means any "swap agreement" as defined in Section 101(53B)(A) of the Bankruptcy Code.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or relating to any payment of an Obligation; and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Insolvency Proceeding" means any case or proceeding commenced by or against a Person under any state, federal or foreign law for, or any agreement of such Person to, (a) the entry of an order for relief under the Bankruptcy Code, or any other insolvency, debtor relief or debt adjustment law; (b) the appointment of a receiver, trustee, liquidator, administrator, conservator or other custodian for such Person or any part of its Property; or (c) an assignment or trust mortgage for the benefit of creditors.

-- 11 --

"Intellectual Property" means all intellectual and similar Property of a Person, including inventions, designs, patents, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software and databases; all embodiments or fixations thereof and all related documentation, applications, registrations and franchises; all licenses or other rights to use any of the foregoing; and all books and records relating to the foregoing.

"Intellectual Property Claim" means any claim or assertion (whether in writing, by suit or otherwise) that Borrower's or a Subsidiary's ownership, use, marketing, sale or distribution of any Inventory, Equipment, Intellectual Property or other Property violates another Person's Intellectual Property.

"Inventory" has the meaning as set forth in the UCC, including all goods intended for sale, lease, display or demonstration; all work in process; and all raw materials, and other materials and supplies of any kind that are or could be used in connection with the manufacture, printing, packing, shipping, advertising, sale, lease or furnishing of such goods, or otherwise used or consumed in Borrower's business (but excluding Equipment).

"Investment" means an Acquisition, an acquisition of record or beneficial ownership of any Equity Interests of a Person, or an advance or capital contribution to or other investment in a Person.

"IP Assignment" means a collateral assignment or security agreement pursuant to which an Obligor grants a Lien on its Intellectual Property to Lender, as security for its Obligations.

"IRS" means the United States Internal Revenue Service.

"LC Application" means an application by Borrower to Lender for issuance of a Letter of Credit, in form and substance satisfactory to Lender.

"LC Conditions" means the following conditions necessary for issuance of a Letter of Credit: (a) each of the conditions set forth in **Section 6**; (b) after giving effect to such issuance, total LC Obligations do not exceed the Letter of Credit Subline, no Over-Formula Amount exists and Revolver Usage does not exceed the Borrowing Base; (c) the Letter of Credit and payments thereunder are denominated in Dollars or other currency satisfactory to Lender; and (d) the purpose and form of the proposed Letter of Credit are satisfactory to Lender in its discretion.

"LC Documents" means all documents, instruments and agreements (including LC Requests and LC Applications) delivered by Borrower or any other Person to Lender in connection with any Letter of Credit.

"LC Obligations" means the sum of (a) all amounts owing by Borrower for drawings under Letters of Credit; and (b) the Stated Amount of all outstanding Letters of Credit.

"LC Request" means a request for issuance of a Letter of Credit, to be provided by Borrower to Lender, in form satisfactory to Lender.

"Lender Indemnitees" means Lender and its officers, directors, employees, Affiliates, agents and attorneys.

-- 12 --

"Lender Professionals" means attorneys, accountants, appraisers, auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts retained by Lender.

"Lender" means as defined in the preamble to this Agreement.

"Letter of Credit" means any standby or documentary letter of credit, foreign guaranty, documentary bankers acceptance or similar instrument issued by for the account or benefit of Borrower or an Affiliate of Borrower.

"Letter of Credit Subline" means $2,500,000.

"License" means any license or agreement under which an Obligor is authorized to use Intellectual Property in connection with any manufacture, marketing, distribution or disposition of Collateral, any use of Property or any other conduct of its business.

"Licensor" means any Person from whom an Obligor obtains the right to use any Intellectual Property.

"Lien" means a Person's interest in Property securing an obligation owed to, or a claim by, such Person, including any lien, security interest, pledge, hypothecation, assignment, trust, reservation, encroachment, easement, right-of-way, covenant, condition, restriction, leases, or other title exception or encumbrance.

"Lien Waiver" means an agreement, in form and substance satisfactory to Lender, by which (a) for any material Collateral located on leased premises, the lessor waives or subordinates any Lien it may have on the Collateral, and agrees to permit Lender to enter upon the premises and remove the Collateral or to use the premises to store or dispose of the Collateral; (b) for any Collateral held by a warehouseman, processor, shipper, customs broker or freight forwarder, such Person waives or subordinates any Lien it may have on the Collateral, agrees to hold any Documents in its possession relating to the Collateral as agent for Lender, and agrees to deliver the Collateral to Lender upon request; (c) for any Collateral held by a repairman, mechanic or bailee, such Person acknowledges Lender's Lien, waives or subordinates any Lien it may have on the Collateral, and agrees to deliver the Collateral to Lender upon request; and (d) for any Collateral subject to a Licensor's Intellectual Property rights, the Licensor grants to Lender the right, vis-à-vis such Licensor, to enforce Lender's Liens with respect to the Collateral, including the right to dispose of it with the benefit of the Intellectual Property, whether or not a default exists under any applicable License.

"Loan Documents" means this Agreement, Other Agreements and Security Documents.

"Loan Year" means each 12 month period commencing on the Closing Date and on each anniversary of the Closing Date.

"Margin Stock" means as defined in Regulation U of the Board of Governors.

"Material Adverse Effect" means the effect of any event or circumstance that, taken alone or in conjunction with other events or circumstances, (a) has or could be reasonably expected to have a material adverse effect on the business, operations, properties, prospects or condition (financial or otherwise) of any Obligor, on the value of any material Collateral, on the enforceability of any Loan

-- 13 --

Documents, or on the validity or priority of Lender's Liens on any Collateral; (b) materially impairs the ability of any Obligor, to perform its obligations under the Loan Documents, including repayment of any Obligations; or (c) otherwise materially impairs the ability of Lender to enforce or collect any Obligations or to realize upon any Collateral.

"Material Contract" means any agreement or arrangement to which Borrower or a Subsidiary is party (other than the Loan Documents and purchase orders) (a) that is deemed to be a material contract under any securities law applicable to such Person, including the Securities Act of 1933; (b) for which breach, termination, nonperformance or failure to renew could reasonably be expected to have a Material Adverse Effect; or (c) that relates to Subordinated Debt, or to Debt in an aggregate amount of $250,000 or more.

"Maximum Revolving Credit" means $6,500,000.

"Moody's" means Moody's Investors Service, Inc., and its successors.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Obligor or ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Proceeds" means with respect to an Asset Disposition, proceeds (including, when received, any deferred or escrowed payments) received by Borrower or a Subsidiary in cash from such disposition, net of (a) reasonable and customary costs and expenses actually incurred in connection therewith, including legal fees and sales commissions; (b) amounts applied to repayment of Debt secured by a Permitted Lien senior to Lender's Liens on Collateral sold; (c) transfer or similar taxes; and (d) reserves for indemnities, until such reserves are no longer needed.

"Notice of Borrowing" means a Notice of Borrowing to be provided by Borrower to request a Borrowing of Revolving Loans, in form satisfactory to Lender.

"Obligations" means all (a) principal of and premium, if any, on the Loans, (b) LC Obligations and other obligations of Obligors with respect to Letters of Credit, (c) interest, expenses, fees, indemnification obligations, Extraordinary Expenses and other amounts payable by Obligors under Loan Documents, (d) Secured Bank Product Obligations, and (e) other Debts, obligations and liabilities of any kind owing by Obligors pursuant to the Loan Documents, whether now existing or hereafter arising, whether evidenced by a note or other writing, whether allowed in any Insolvency Proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, or joint or several; provided, that Obligations of an Obligor shall not include its Excluded Swap Obligations.

"Obligor" means Borrower, any Guarantor, or other Person that is liable for payment of any Obligations or that has granted a Lien in favor of Lender on its assets to secure any Obligations.

"OFAC" means Office of Foreign Assets Control of the U.S. Treasury Department.

"Ordinary Course of Business" means the ordinary course of business of Borrower or any Subsidiary, undertaken in good faith and consistent with Applicable Law and past practices.

3561927.11

"Organic Documents" means with respect to any Person, its charter, certificate or articles of incorporation, bylaws, articles of organization, limited liability agreement, operating agreement, members agreement, shareholders agreement, partnership agreement, certificate of partnership, certificate of formation, voting trust agreement, or similar agreement or instrument governing the formation or operation of such Person.

"OSHA" means the Occupational Safety and Hazard Act of 1970.

"Other Agreement" means each LC Document, Lien Waiver, Credit Card Notifications, Borrowing Base Certificate, Compliance Certificate, Borrower Materials, or other note, document, instrument or agreement (other than this Agreement or a Security Document) now or hereafter delivered by an Obligor or other Person to Lender in connection with any transactions relating hereto.

"Other Connection Taxes" means Taxes imposed on a Recipient due to a present or former connection between it and the taxing jurisdiction (other than connections arising from the Recipient having executed, delivered, become party to, performed obligations or received payments under, received or perfected a Lien or engaged in any other transaction pursuant to, enforced, or sold or assigned an interest in, any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court, documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a Lien under, or otherwise with respect to, any Loan Document.

"Over-Formula Amount" means as defined in **Section 2.1.5**.

"Over-Formula Loan" means a Revolving Loan made when an Overadvance exists or is caused by the funding thereof.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

"Payment Item" means each check, draft or other item of payment payable to Borrower, including those constituting proceeds of any Collateral.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means any employee pension benefit plan (as defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Obligor or ERISA Affiliate or to which the Obligor or ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the preceding five plan years.

"Permitted Asset Disposition" means as long as no Default or Event of Default exists and all Net Proceeds are remitted, if so required hereunder, to Lender, an Asset Disposition that is (a) a sale of Inventory in the Ordinary Course of Business; (b) a disposition of Equipment that, in the aggregate during any 12 month period, has a fair market or book value (whichever is more) of $50,000 or less; (c) a disposition of Inventory that is obsolete, unmerchantable or otherwise unsalable in the Ordinary Course of Business; (d) termination of a lease of real or personal Property that is not necessary for the Ordinary

-- 15 --

Course of Business, could not reasonably be expected to have a Material Adverse Effect and does not result from an Obligor's default; or (e) approved in writing by Lender.

"Permitted Contingent Obligations" means Contingent Obligations (a) arising from endorsements of Payment Items for collection or deposit in the Ordinary Course of Business; (b) arising from Hedging Agreements permitted hereunder; (c) existing on the Closing Date, and any extension or renewal thereof that does not increase the amount of such Contingent Obligation when extended or renewed; (d) incurred in the Ordinary Course of Business with respect to surety, appeal or performance bonds, or other similar obligations; (e) arising from customary indemnification obligations in favor of purchasers in connection with dispositions of Equipment permitted hereunder; (f) arising under the Loan Documents; or (g) in an aggregate amount of $50,000 or less at any time.

"Permitted Lien" means as defined in **Section 10.2.2**.

"Permitted Purchase Money Debt" means Purchase Money Debt of Borrower and any Subsidiaries that is unsecured or secured only by a Purchase Money Lien, as long as the aggregate amount does not exceed $250,000 at any time and its incurrence does not violate **Section 10.2.3**.

"Person" means any individual, corporation, limited liability company, partnership, joint venture, association, trust, unincorporated organization, Governmental Authority or other entity.

"Plan" means any employee benefit plan (as defined in Section 3(3) of ERISA) established by an Obligor or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, an ERISA Affiliate.

"Prime Rate" means the rate of interest announced by Signature Bank from time to time as its prime rate.  Such rate is set by Signature Bank on the basis of various factors, including its costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above or below such rate.  Any change in such rate publicly announced by Signature Bank shall take effect at the opening of business on the day specified in the announcement.

"Prime Rate Loan" means any Loan that bears interest at the Prime Rate.

"Properly Contested" means with respect to any obligation of an Obligor, (a) the obligation is subject to a bona fide dispute regarding amount or the Obligor's liability to pay; (b) the obligation is being properly contested in good faith by appropriate proceedings promptly instituted and diligently pursued; (c) appropriate reserves have been established in accordance with GAAP; (d) non-payment could not have a Material Adverse Effect, nor result in forfeiture or sale of any assets of the Obligor; (e) no Lien is imposed on assets of the Obligor, unless bonded and stayed to the reasonable satisfaction of Lender; and (f) if the obligation results from entry of a judgment or other order, such judgment or order is stayed pending appeal or other judicial review.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"Purchase Money Debt" means (a) Debt (other than the Obligations) for payment of any of the purchase price of fixed assets; (b) Debt (other than the Obligations) incurred substantially

-- 16 --

contemporaneously with the acquisition of any fixed assets, for the purpose of financing any of the purchase price thereof; and (c) any renewals, extensions or refinancings (but not increases) thereof.

"Purchase Money Lien" means a Lien that secures Purchase Money Debt, encumbering only the fixed assets acquired with such Debt and constituting a Capital Lease or a purchase money security interest under the UCC.

"Qualified ECP" means an Obligor with total assets exceeding $10,000,000, or that constitutes an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" under Section 1a(18)(A)(v)(II) of such act.

"RCRA" means the Resource Conservation and Recovery Act (42 U.S.C. §§ 6991-6991i).

"Real Estate" means all right, title and interest (whether as owner, lessor or lessee) in any real Property or any buildings, structures, parking areas or other improvements thereon.

"Recipient" means Lender or any other recipient of a payment to be made by an Obligor under a Loan Document or on account of an Obligation.

"Refinancing Conditions" means the following conditions for Refinancing Debt:  (a) it is in an aggregate principal amount that does not exceed the principal amount of the Debt being extended, renewed or refinanced; (b) it has a final maturity no sooner than, a weighted average life no less than, and an interest rate no greater than, the Debt being extended, renewed or refinanced; (c) it is subordinated to the Obligations at least to the same extent as the Debt being extended, renewed or refinanced; (d) the representations, covenants and defaults applicable to it are no less favorable to Borrower than those applicable to the Debt being extended, renewed or refinanced; (e) no additional Lien is granted to secure it; (f) no additional Person is obligated on such Debt; and (g) upon giving effect to it, no Default or Event of Default exists.

"Refinancing Debt" means Borrowed Money that is the result of an extension, renewal or refinancing of Debt permitted under **Section 10.2.1(b), (d)** or **(f)**.

"Reimbursement Date" means as defined in **Section 2.3.2**.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Reserves" means any and all reserves which Lender deems necessary, in Lender's sole discretion, to maintain with respect to the Collateral or the Borrower.

"Restricted Investment" means any Investment by Borrower or a Subsidiary, other than (a) Investments in Subsidiaries to the extent existing on the Closing Date; (b) Cash Equivalents that are subject to Lender's Lien and control, pursuant to documentation in form and substance satisfactory to Lender; (c) loans and advances permitted under Section 10.2.7; and (d) Permitted Acquisitions.

"Restrictive Agreement" means an agreement (other than a Loan Document) that conditions or restricts the right of Borrower, any Subsidiary or other Obligor to incur or repay Borrowed Money, to grant Liens on any assets, to declare or make Distributions, to modify, extend or renew any agreement evidencing Borrowed Money, or to repay any intercompany Debt.

-- 17 --

"Revolving Loan" means a loan made pursuant to **Section 2.1**, and any Over-Formula Loan.

"Revolver Termination Date" means February 10, 2018.

"Revolver Usage" means (a) the aggregate amount of outstanding Revolving Loans; <u>plus</u> (b) the aggregate Stated Amount of outstanding Letters of Credit, except to the extent Cash Collateralized by Borrower.

"Royalties" means all royalties, fees, expense reimbursement and other amounts payable by Borrower under a License.

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sanction" means any international economic sanction administered or enforced by the United States Government (including OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury or other relevant sanctions authority.

"Security Documents" means the IP Assignments, Deposit Account Control Agreements, and all other documents, instruments and agreements now or hereafter securing (or given with the intent to secure) any Obligations.

"Senior Officer" means the chairman of the board, president, chief executive officer, chief operating officer or chief financial officer of Borrower or, if the context requires, an Obligor.

"Signature Bank" means Signature Bank a national banking association, and its successors and assigns.

"Solvent" means as to any Person, such Person (a) owns Property whose fair salable value is greater than the amount required to pay all of its debts (including contingent, subordinated, unmatured and unliquidated liabilities); (b) owns Property whose present fair salable value (as defined below) is greater than the probable total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities) of such Person as they become absolute and matured; (c) is able to pay all of its debts as they mature; (d) has capital that is not unreasonably small for its business and is sufficient to carry on its business and transactions and all business and transactions in which it is about to engage; (e) is not "insolvent" within the meaning of Section 101(32) of the Bankruptcy Code; and (f) has not incurred (by way of assumption or otherwise) any obligations or liabilities (contingent or otherwise) under any Loan Documents, or made any conveyance in connection therewith, with actual intent to hinder, delay or defraud either present or future creditors of such Person or any of its Affiliates. "<u>Fair salable value</u>" means the amount that could be obtained for assets within a reasonable time, either through collection or through sale under ordinary selling conditions by a capable and diligent seller to an interested buyer who is willing (but under no compulsion) to purchase.

"Specified Obligor" means an Obligor that is not then an "eligible contract participant" under the Commodity Exchange Act.

"Stated Amount" means the stated amount of a Letter of Credit, including any automatic increase provided by the terms of the Letter of Credit or related LC Documents, whether or not then effective.

-- 18 --

"Subordinated Debt" means Debt incurred by Borrower that is expressly subordinate and junior in right of payment to Full Payment of all Obligations, and is on terms (including maturity, interest, fees, repayment, covenants and subordination) satisfactory to Lender.

"Subsidiary" means any entity at least 50% of whose voting securities or Equity Interests is owned by Borrower (including indirect ownership through other entities in which Borrower directly or indirectly owns 50% of the voting securities or Equity Interests).

"Swap Obligations" means with respect to an Obligor, its obligations under a Hedging Agreement that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Tax Distribution" means Distribution by Borrower to the holders of the Equity Interest of Borrower solely to the extent necessary to permit such holders to discharge their respective tax liabilities arising directly as holders of the Equity Interests of Borrower, determined based on the assumption that all such holders are subject to the highest marginal tax rate in effect at the time of such Distribution and subject to the maximum limitation of the utilization of deductions, losses, allowance and credits.

"Termination Date" means the earliest to occur of (a) the Revolver Termination Date; (b) the date on which Borrower terminates this Agreement pursuant to **Section 2.1.4**; or (c) the date on which this Agreement is terminated pursuant to **Section 11.2**.

"Transferee" means any actual or potential Eligible Assignee, Participant or other Person acquiring an interest in any Obligations.

"UCC" has the meaning as set forth in the Uniform Commercial Code as in effect in the State of New York or, when the laws of any other jurisdiction govern the perfection or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction.

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to the Code, ERISA or the Pension Protection Act of 2006 for the applicable plan year.

"Upstream Payment" means a Distribution by a Subsidiary of Borrower to Borrower.

"U.S. Person" means "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" means as defined in **Section 5.10.2(b)(iii)**.

"Value" means (a) for Inventory, its value determined on the basis of the lower of cost or market, calculated on a first-in, first-out basis, and excluding any portion of cost attributable to intercompany profit between Borrower and any of its Affiliates; and (b) for an Account or Credit Card Receivable, its face amount, net of any returns, rebates, discounts (calculated on the shortest terms),

-- 19 --

credits, allowances or Taxes (including sales, excise or other taxes) that have been or could be claimed by the Account Debtor or any other Person.

3561927.11

[Execution Version]

SCHEDULES
To
Loan and Security Agreement

See Attached.

SCHEDULE 5.6
to
Loan and Security Agreement


**[LIST OF CREDIT CARD ISSUERS AND CREDIT CARD PROCESSORS]**


1. American Express – Agreement for American Express Credit Card Acceptance (Merchant Agreement)
2. First Data  - Merchant Agreement

SCHEDULE 8.5
to
Loan and Security Agreement

**DEPOSIT ACCOUNTS**

| Depository Bank | Account Number | Type of Account |
|---|---|---|
| Signature Bank | 000001502288594 | Dominion Account |
| JP Morgan Chase Bank, N.A. | 000000935447847 | Operating |
| JP Morgan Chase Bank, N.A. | 000000428294503 | Payroll |
| JP Morgan Chase Bank, N.A. | 000000935447607 | Funding/ Collection Account |
| JP Morgan Chase Bank, N.A. | 000000970434445 | Restricted Account for Standby Letters of Credit |
| JP Morgan Chase Bank, N.A. | 000000515852361 | Incoming Wire Account |
| Signature Bank | 1502288594 | Collection Account |
| Signature Bank | 1502288578 | Operating Account |
| Signature Bank | 1502288586 | Payroll/Tax Account |

SCHEDULE 8.6.1
to
Loan and Security Agreement

## BUSINESS LOCATIONS

1.      Borrower currently has the following business locations, and no others:

Chief Executive Office:  158 West 27th Street, 12th Floor, New York, NY 10001

Other Locations:  .

| Address | Lessee Entity |
| --- | --- |
| 45 West 25th Street<br>New York, NY 10010 | GH Chelsea LLC |
| 30-30 60th Street<br>Woodside, NY 11377 | Americas Retail Flagship Fund LLC |
| 1992 Broadway<br>New York, NY 10023 | GH West Side LLC |
| 1220 East Side (building 2)<br>1210 Third Avenue<br>New York, NY 10021 | GH East Side LLC |
| 1220 East Side (building 1)<br>1220 Third Avenue<br>New York, NY 10021 | GH East Side LLC |
| 1201 East Side<br>1197-1201 Third Avenue<br>New York, NY 10021 | GH East Side LLC |

2.      In the five years preceding the Closing Date, Borrower has had no office or place of business located in any county other than as set forth above, except:

None.

3.      Each Subsidiary currently has the following business locations, and no others:

Chief Executive Office:  158 West 27th Street, 12th Floor, New York, NY 10001

Other Locations appear in the table below:

| Address: | Subsidiary |
|---|---|
| 45 West 25th Street<br>New York, NY 10010 | GH Chelsea LLC |
| 1992 Broadway<br>New York, NY 10023 | GH West Side LLC |
| 1220 East Side (building 2)<br>1210 Third Avenue<br>New York, NY 10021 | GH East Side LLC |
| 1220 East Side (building 1)<br>1220 Third Avenue<br>New York, NY 10021 | GH East Side LLC |
| 1201 East Side<br>1197-1201 Third Avenue<br>New York, NY 10021 | GH East Side LLC |
| 30-30 60th Street<br>Woodside, NY 11377 | Americas Retail Flagship Fund LLC |

4.      The following bailees, warehouseman, similar parties and consignees hold inventory of Borrower or a Subsidiary:

None.

SCHEDULE 9.1.4
to
Loan and Security Agreement

**NAMES AND CAPITAL STRUCTURE**

1.    The corporate names, jurisdictions of incorporation, and authorized and issued Equity Interests of Borrower and any Subsidiary are as follows:

| Name | Jurisdiction | Class of Equity Interests | Number and Class of Outstanding Equity Interests |
|------|-------------|---------------------------|--------------------------------------------------|
| Gracious Home LLC | Formed in Delaware; | 1 class of Common Interests | 100% of all Common Interests |
| GH Chelsea LLC | Formed in Delaware; | 1 class of Common Interests | 100% of all Common Interests |
| GH West Side LLC | Formed in Delaware; | 1 class of Common Interests | 100% of all Common Interests |
| GH East Side LLC | Formed in Delaware; | 1 class of Common Interests | 100% of all Common Interests |
| Gracious Home Payroll LLC | Formed in Delaware; | 1 class of Common Interests | 100% of all Common Interests |

2.    The record holders of Equity Interests of Borrower and Subsidiary are as follows:

| Name | Class of Stock | Percentage of Equity Interests | Record Owner |
|------|---------------|-------------------------------|--------------|
| Gracious Home LLC | Common Interests | 100% | Gracious Home Holdings LLC |
| Gracious Home Payroll LLC | Common Interests | 100% | Gracious Home LLC |
| GH East Side LLC | Common Interests | 100% | Gracious Home LLC |
| GH West Side LLC | Common Interests | 100% | Gracious Home LLC |
| GH Chelsea LLC | Common Interests | 100% | Gracious Home LLC |
| | | | |

3.    All agreements binding on holders of Equity Interests of Borrower and any Subsidiaries with respect to such interests are as follows:

a) Limited Liability Company Agreement of GH East Side LLC dated December 1, 2010, as amended from time to time.

b)  Limited Liability Company Agreement of GH West Side LLC dated December 1, 2010, as amended from time to time.

c) Limited Liability Company Agreement of GH Chelsea LLC dated December 1, 2010, as amended from time to time.

d) Limited Liability Company Agreement of Gracious Home Payroll LLC dated February 7, 2011, as amended from time to time.

e) Limited Liability Company Agreement of Gracious Home LLC dated December 1, 2010, as amended from time to time.

4.      In the four years preceding the Closing Date, neither Borrower or any Subsidiary has acquired any substantial assets from any other Person nor been the surviving entity in a merger or combination, except:

None.

SCHEDULE 9.1.7
to
Loan and Security Agreement


**FINANCIAL STATEMENTS**

Borrower and its subsidiaries, on a consolidated basis, have negative income and negative EBITDA for the period ending December 31, 2014.

SCHEDULE 9.1.9
to
Loan and Security Agreement

**TAXES**

New York Department of Taxation is currently undertaking a sales tax audit with respect to Americas Retail Flagship Fund for the period of 12/1/2010 through 8/31/2013, with an extension to finalize the audit through 6/20/2015.  The result of the audit is not yet known.

SCHEDULE 9.1.10
to
Loan and Security Agreement

**<u>BROKERS</u>**

Glass Ratner Advisory & Capital Group LLC will receive a fee in connection with this transaction.

SCHEDULE 9.1.11
to
Loan and Security Agreement

**PATENTS, TRADEMARKS, COPYRIGHTS AND LICENSES**

1.    Borrower's and Subsidiaries' patents:

None.

2.    Borrower's and Subsidiaries' trademarks:

See attached.

3.    Borrower's and Subsidiaries' copyrights:

None.

4.    Borrower's and Subsidiaries' licenses (other than routine business licenses, authorizing them to transact business in local jurisdictions):

| Licensor/Licensees | Description of License | Term of License | Royalties Payable |
|---|---|---|---|
| Licensor: Gracious (IP) LLC<br>Licensees: Gracious Home LLC, Gracious Home Payroll LLC, GH East Side LLC, GH West Side LLC, GH Chelsea LLC | License for use of certain trademarks owned by Gracious (IP) LLC | 1 year term and 1 year automatic renewals thereafter | None. |
| Licensor: Gracious (IP) LLC<br>Licensee: D&L Transfer Associates, Inc. | Use of certain marks for use on trucks. | Term is as long as D & L remains a supplier of Gracious Home LLC. | |
| Licensor: Gracious (IP) LLC<br>Licensee: Tandia Transportation Corp.. | Use of certain marks for use on trucks. | None indicated. | |

SCHEDULE 9.1.13
to
Loan and Security Agreement

**COMPLIANCE WITH LAWS**

None.

310454.7
3561927.7
53487/0002-11476123v5

SCHEDULE 9.1.14
to
Loan and Security Agreement


**ENVIRONMENTAL MATTERS**


None.

SCHEDULE 9.1.15
to
Loan and Security Agreement

**<u>RESTRICTIVE AGREEMENTS</u>**

None.

SCHEDULE 9.1.16
to
Loan and Security Agreement

## LITIGATION

1.     Proceedings and investigations pending against Borrower's or its Subsidiaries:

None.

2.     Threatened proceedings or investigations of which Borrower or any Subsidiary is aware:

None.

3.     Pending Commercial Tort Claim of any Obligor:

None.

SCHEDULE 9.1.18
to
Loan and Security Agreement


**PENSION PLAN DISCLOSURES**

None.

SCHEDULE 9.1.20
to
Loan and Security Agreement

**<u>LABOR CONTRACTS</u>**

Borrower and its Subsidiaries is a party to the following collective bargaining agreements, management agreements and consulting agreements:

None.

SCHEDULE 10.2.1
to
Loan and Security Agreement

**PERMITTED DEBT**

| Name/Address of Payee | Principal Balance as of _____ | Nature of Debt |
|---|---|---|
| JP Morgan Chase Bank, N.A. | $374,987.34 | Credit Card Debt |
| American Express | $367,242.42 | Credit Card Debt |
| JP Morgan Chase Bank, N.A. | $542,000.00 | Standby Letter of Credit - CTCS-382853 |
| JP Morgan Chase Bank, N.A. | $200,000.00 | Standby Letter of Credit - CTCS-338845 |
| JP Morgan Chase Bank, N.A. | $275,000.00 | Standby Letter of Credit- CTCS-393701 |

SCHEDULE 10.2.2
to
Loan and Security Agreement

**EXISTING LIENS**

1.  Lien held by Ford Motor Credit Co. with respect to a 2013 Ford vehicle (pick-up truck).  Debtor is Gracious Home LLC.

2.  Lien held by Ford Motor Credit Co. with respect to a 2013 Ford vehicle (van).  Debtor is Gracious Home LLC.

| JURISDICTION | DEBTOR | SECURED PARTY | COLLATERAL | TYPE OF FILING | FILING DATE | FILING NUMBER |
|---|---|---|---|---|---|---|
| | | | *GRACIOUS HOME LLC* | | | |
| DE SOS | Gracious Home LLC | Dell Financial Services L.L.C. | All computer equipment, peripherals, and other equipment, wherever located heretofore or hereafter leased to Lessee pursuant to Lease# 001-6647373-009, and all of Lessee's rights, title and interest in and to use any software and services financed under and additions accessions and replacements thereto, and thereof, now or hereafter installed in, affixed to, or used in, conjunction with the Equipment and Software and proceeds thereof together with all rental or installment payments, insurance proceeds, credits or refunds obtained by Lessee from a manufacturer, licensor or service provider, or other proceeds and payments due to to | Original | 12/23/2011 | 2011 4947738 |

| JURISDICTION | DEBTOR | SECURED PARTY | COLLATERAL | TYPE OF FILING | FILING DATE | FILING NUMBER |
|---|---|---|---|---|---|---|
| | | | become due and arising from or relating to said Equipment, Software or Lease. | | | |
| DE SOS | Gracious Home LLC | Dell Financial Services L.L.C. | All computer equipment, peripherals, and other equipment, wherever located heretofore or hereafter leased to Lessee pursuant to Lease# 001-6647373-010, and all of Lessee's rights, title and interest in and to use any software and services financed under and additions accessions and replacements thereto, and thereof, now or hereafter installed in, affixed to, or used in, conjunction with the Equipment and Software and proceeds thereof together with all rental or installment payments, insurance proceeds, credits or refunds obtained by Lessee from a manufacturer, licensor or service provider, or other proceeds and payments due and to become due and arising from or relating to said Equipment, Software or Lease. | Original | 01/23/2012 | 2012 0277170 |
| DE SOS | Gracious Home LLC | IBM Credit LLC | Specific equipment together with all related software, whether | Original | 09/25/2012 | 2012 3689249 |

| JURISDICTION | DEBTOR | SECURED PARTY | COLLATERAL | TYPE OF FILING | FILING DATE | FILING NUMBER |
|---|---|---|---|---|---|---|
| | | | now owned or hereafter acquired and wherever located (as described in the IBM Credit LLC Agt. #H27260, including all additions, attachments, accessories, accessions and upgrades thereto and any and all substitutions, replacements or exchanges for any such item of equipment or software and any and all proceeds of any of the foregoing, including, without limitation, payments under insurance or any indemnity or warranty relating to loss or damage to such equipment and software. | | | |
| DE SOS | Gracious Home LLC | Dell Financial Services L.L.C. | All computer equipment, peripherals, and other equipment, wherever located heretofore or hereafter leased to Lessee pursuant to Lease# 003-6647373-011, and all of Lessee's rights, title and interest in and to use any software and services financed under and additions accessions and replacements thereto, and thereof, now or hereafter installed in, affixed to, or used in, conjunction with the | Original | 02/09/2013 | 2013 0538042 |

310454.7
3561927.7
53487/0002-11476123v5

| JURISDICTION | DEBTOR | SECURED PARTY | COLLATERAL | TYPE OF FILING | FILING DATE | FILING NUMBER |
|---|---|---|---|---|---|---|
| | | | Equipment and Software and proceeds thereof together with all rental or installment payments, insurance proceeds, credits or refunds obtained by Lessee from a manufacturer, licensor or service provider, or other proceeds and payments due and to become due and arising from or relating to said Equipment, Software or Lease. | | | |

310454.7
3561927.7
53487/0002-11476123v5

SCHEDULE 10.2.20
to
Loan and Security Agreement


**<u>CONDUCT OF BUSINESS</u>**


None.

SCHEDULE 10.2.21
to
Loan and Security Agreement

## EXISTING AFFILIATE TRANSACTIONS

Gracious (IP) LLC is a party to a license agreement with Gracious Home LLC, Gracious Home Payroll LLC, GH East Side LLC, GH West Side LLC, and GH Chelsea LLC whereby Gracious (IP) licenses to Gracious Home LLC, Gracious Home Payroll LLC, GH East Side LLC, GH West Side LLC, and GH Chelsea LLC the use of certain trademarks identified on Schedule A thereto.  Said license agreement was executed on December 11, 2012 and has a term of one (1) year.  Upon expiration of the term, the license agreement automatically renews for successive one year periods.

# EXHIBIT C

[Execution Version]

## GUARANTY AGREEMENT

This Guaranty Agreement (as amended, amended and restated, supplemented or otherwise modified, renewed or replaced from time to time, this "**Guaranty Agreement**"), dated as of February 10, 2015, is executed by and among **AMERICAS RETAIL FLAGSHIP FUND LLC**, a Delaware limited liability company ("**Americas**"), **GRACIOUS HOME HOLDINGS LLC**, a Delaware limited liability company, **GRACIOUS (IP) LLC**, a Delaware limited liability company ("**Gracious IP**"), **GRACIOUS HOME PAYROLL LLC**, a Delaware limited liability company ("**Payroll**"), **GH EAST SIDE LLC**, a Delaware limited liability company ("**East Side**"), **GH WEST SIDE LLC**, a Delaware limited liability company ("**West Side**") and **GH CHELSEA LLC**, a Delaware limited liability company ("**Chelsea**"; and together with Americas, Holdings, Gracious IP, Payroll, East Side and West Side, each individually, a "**Guarantor**" and collectively, the "**Guarantors**") in favor of **SIGNATURE BANK** ("**Lender**").

## RECITALS

WHEREAS, pursuant to that certain Loan and Security Agreement dated as of the date hereof by and between, GRACIOUS HOME LLC, ("**Borrower**") and Lender (including all annexes, exhibits and schedules thereto, and as amended, amended and restated, supplemented or otherwise modified, renewed or replaced from time to time, the "**Loan Agreement**"), Lender may make loans and other financial accommodations to or for the benefit of Borrower; and

WHEREAS, each Guarantor will benefit, directly or indirectly, from the credit facility and other financial accommodations to Borrower contemplated by the Loan Agreement and the other Loan Documents; and

WHEREAS, it is a condition to the effectiveness of the Loan Agreement that this Guaranty Agreement be executed and delivered by the parties hereto.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Guarantor hereby agrees for the benefit of Lender as follows:

1.     **DEFINITIONS.** Except as specifically defined in this Guaranty Agreement, capitalized terms used herein shall have the respective meanings given thereto in the Loan Agreement.

2.     **GUARANTY.**

2.1    **Guaranty.**

(a)     Each Guarantor unconditionally and irrevocably guarantees, on a joint and several basis, to Lender the due and punctual payment and performance of the Obligations (as defined in the Loan Agreement) of the Borrower (the "**Guaranteed Obligations**"). Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from it, and it will remain bound upon this Guaranty Agreement notwithstanding any extension or renewal of any Guaranteed Obligation.

(b)     Each Guarantor, to the extent permitted by applicable law, waives presentation to, demand for payment from and protest to, as the case may be, Borrower or any other guarantor of any of the Guaranteed Obligations, and also waives notice of protest for nonpayment, notice of acceleration and notice of intent to accelerate. The obligations of each

Guarantor hereunder shall not be affected by: (i) the failure of Lender to assert any claim or demand or to exercise or enforce any right or remedy against Borrower or any other guarantor of any of the Guaranteed Obligations under the provisions of the Loan Agreement or any other Loan Document or otherwise; (ii) any extension or renewal of any provision hereof or thereof; (iii) any rescission, waiver, compromise, acceleration, amendment or modification of any of the terms or provisions of the Loan Agreement or of any other Loan Document; or (iv) the failure to perfect any security interest in or the release, exchange, waiver or foreclosure of any security interest held by Lender for the Guaranteed Obligations.

(c)     Each Guarantor further agrees that this Guaranty Agreement constitutes a guaranty of performance and of payment when due and not just of collection, and waives, to the fullest extent permitted by applicable law, any right to require that any resort be had by Lender to any security held for payment of the Guaranteed Obligations or to any balance of any deposit, account or credit on the books of Lender in favor of Borrower or any other guarantor of any of the Guaranteed Obligations or to any other Person.

(d)     Each Guarantor hereby expressly acknowledges that Lender shall have no responsibility to keep such Guarantor informed of the financial condition of Borrower or any other guarantor of any of the Guaranteed Obligations or of any circumstances affecting Borrower's collateral or the ability of Borrower to perform under the Loan Agreement.

(e)     This Guaranty Agreement shall not be affected by the genuineness, validity, regularity or enforceability of the Guaranteed Obligations, or any other instrument evidencing any of the Guaranteed Obligations, or by the existence, validity, enforceability, perfection, or extent of any collateral therefor or by any other circumstance relating to the Guaranteed Obligations which might otherwise constitute a defense to this Guaranty Agreement. Lender makes no representation or warranty in respect to any such circumstances and has no duty or responsibility whatsoever to any Guarantor in respect to the management and maintenance of the Guaranteed Obligations or Borrower's collateral.

(f)     Each Guarantor expects to derive benefit, directly and indirectly, from successful operations of the Borrower and the other Guarantor and any financial accommodations extended by Lender to the Borrower. Each Guarantor hereby acknowledges, confirms and agrees that all Guaranteed Obligations arising under or in connection with this Guaranty Agreement shall be joint and several as between all Guarantors.

2.2   **No Impairment of Guaranty.** The obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including, without limitation, any claim or waiver, release, surrender, alteration or compromise, and shall not be subject to any defense (other than by payment of the Guaranteed Obligations in full in cash) or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Guarantor hereunder shall not be discharged or impaired or otherwise affected by the failure of Lender to assert any claim or demand or to enforce any remedy hereunder or under the Loan Agreement or any other agreement, by any waiver or delay, willful or otherwise, in the performance of the Guaranteed Obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of any Guarantor or would otherwise operate as a

discharge of any such Guarantor as a matter of law, unless and until the Guaranteed Obligations are paid in full.

2.3    **Continuation and Reinstatement, etc.** Each Guarantor further agrees that its guaranty hereunder shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest on any Guaranteed Obligation is rescinded or must otherwise be restored by Lender upon the bankruptcy or other reorganization of Borrower or any other guarantor of any of the Guaranteed Obligations or otherwise. In furtherance of the provisions of this Guaranty Agreement, and not in limitation of any other right which Lender may have at law or in equity against Borrower or any other guarantor of any of the Guaranteed Obligations, by virtue hereof, upon failure of Borrower to pay any Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice or otherwise, each Guarantor hereby promises to and will, upon receipt of written demand by Lender, forthwith pay or cause to be paid to Lender in cash an amount equal to the unpaid amount of all Guaranteed Obligations arising in connection with the Loan Agreement and other Loan Documents, together with interest on the portion thereof that represents outstanding Obligations at the rate provided for in Section 3.1 of the Loan Agreement.

Upon payment by Guarantors of any sums to Lender, all rights of each Guarantor against Borrower arising as a result thereof, by way of right of subrogation or otherwise, shall in all respects be subordinate and junior in right of payment to the prior final and indefeasible payment in full of all the Guaranteed Obligations to Lender. In furtherance of the foregoing, until the Guaranteed Obligations have been paid in full in cash, (i) each Guarantor hereby postpones and agrees not to exercise any right of subrogation such Guarantor has or may have as against Borrower or other guarantor with respect to the Guaranteed Obligations; (ii) each Guarantor hereby postpones and agrees not to exercise any right to proceed against Borrower or any other Person now or hereafter liable on account of the Obligations for contribution, indemnity, reimbursement, or any other similar rights (irrespective of whether direct or indirect, liquidated or contingent) with respect to the Guaranteed Obligations; and (iii) each Guarantor hereby postpones and agrees not to exercise any right it may have to proceed or to seek recourse against or with respect to any property or asset of Borrower or any other Person now or hereafter liable on account of the Obligations or in respect of the Guaranteed Obligations. Notwithstanding anything to the contrary contained in this Guaranty Agreement, no Guarantor shall exercise any rights of subrogation, contribution, indemnity, reimbursement or other similar rights against, and shall not proceed or seek recourse against or with respect to any property or asset of, Borrower or any other guarantor of any of the Guaranteed Obligations (including after payment in full of the Guaranteed Obligations) if all or any portion of the Obligations have been satisfied in connection with an exercise of remedies in respect of the Equity Interests of Borrower or such other guarantor of any of the Guaranteed Obligations. If an amount shall be paid to any Guarantor for the account of Borrower in respect of the rights referred to in this paragraph, such amount shall be held in trust for the benefit of Lender to be credited and applied to the Guaranteed Obligations, whether matured or unmatured.

2.4    **Limitation on Guaranteed Amount.** Notwithstanding any other provision of this Guaranty Agreement, the amount guaranteed by each Guarantor hereunder shall be limited to the extent, if any, required so that its obligations under this Guaranty Agreement shall not be rendered voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or to being set aside or annulled under any applicable state law or foreign statute relating to fraud on

creditors or under common law. In determining the limitations, if any, on the amount of such Guarantor's obligations hereunder pursuant to the preceding sentence, any rights of subrogation or contribution which such Guarantor may have under this Guaranty Agreement or applicable statute shall be taken into account.

**3.    REPRESENTATIONS AND WARRANTIES.**

Each Guarantor makes the following representations and warranties, all of which shall survive the execution and delivery of the Loan Agreement, the other Loan Documents and this Guaranty Agreement:

(i)    the execution, delivery and performance of this Guaranty Agreement (a) will not violate, or involve Lender in violation of, any provision of applicable law, any order of any court or other agency of the United States or any state thereof, applicable to such Guarantor or any of his properties or assets; (b) does not require the consent or approval of any Person or entity, including but not limited to any governmental authority, or any filing or registration of any kind; and (c) is the legal, valid and binding obligation of such Guarantor enforceable against such Guarantor in accordance with its terms, except to the extent that enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally, and general principles of equity;

(ii)    in executing and delivering this Guaranty Agreement, each Guarantor has (a) without reliance on Lender or any information received from Lender and based upon such documents and information it deems appropriate, made an independent investigation of the transactions contemplated hereby and the other Loan Documents, the Borrower's business, assets, operations, prospects and condition, financial or otherwise, and any circumstances which may bear upon such transactions, the Borrower or the obligations and risks undertaken herein with respect to the Guaranteed Obligations; (b) adequate means to obtain from Borrower on a continuing basis information concerning Borrower; (c) has full and complete access to the Loan Documents and any other documents executed in connection with the Loan Documents; and (d) not relied and will not rely upon any representations or warranties of Lender not embodied herein or any acts heretofore or hereafter taken by Lender (including but not limited to any review by Lender of the affairs of Borrower); and

(iii)    the execution, delivery and performance of this Guaranty Agreement will not result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any properties or assets of Guarantors other than pursuant to this Guaranty Agreement or the other Loan Documents to which it is a party (including, without limitation, the Pledge Agreement and General Security Agreement entered into by each Guarantor in favor of Lender).

**4.    MISCELLANEOUS**

4.1    **Notices.** All communications and notices hereunder shall be in writing and given as provided in Section 13.3 of the Loan Agreement, provided that all communications and notices hereunder to any Guarantor shall be given to such Guarantor at the address set forth on the signature page hereof.

4.2    **Binding Effect; Several Agreement; Assignments.** Whenever in this Guaranty Agreement any of the parties hereto is referred to, such reference shall be deemed to include the

heirs, executors, administrators, successors and assigns of such party; and all covenants, promises and agreements by or on behalf of any Guarantor that are contained in this Guaranty Agreement shall bind and inure to the benefit of each party hereto and their respective heirs, executors, administrators, successors and assigns. This Guaranty Agreement shall become effective as to each Guarantor when a counterpart hereof executed on behalf of such Guarantor shall have been delivered to Lender, and a counterpart shall have been executed on behalf of Lender, and thereafter shall be binding upon such Guarantor and Lender and their respective heirs, executors, administrators, successors and assigns, and shall inure to the benefit of such Guarantor, Lender, and their respective heirs, executors, administrators, successors and assigns, except that no Guarantor shall have the right to assign its rights or obligations hereunder or an interest herein (and any such attempted assignment shall be void).

4.3   **SERVICE OF PROCESS. EACH GUARANTOR (I) HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE STATE COURTS OF THE STATE OF NEW YORK AND TO THE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, FOR THE PURPOSE OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF OR BASED UPON THIS GUARANTY AGREEMENT, OR THE SUBJECT MATTER HEREOF BROUGHT BY LENDER OR ITS SUCCESSORS AND ASSIGNS, (II) HEREBY WAIVES, AND AGREES NOT TO ASSERT, BY WAY OF MOTION, AS A DEFENSE, OR OTHERWISE, IN ANY SUCH SUIT, ACTION OR PROCEEDING, ANY CLAIM THAT IT IS NOT SUBJECT PERSONALLY TO THE JURISDICTION OF THE ABOVE-NAMED COURTS, THAT ITS PROPERTY IS EXEMPT OR IMMUNE FROM ATTACHMENT OR EXECUTION, THAT THE SUIT, ACTION OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM, THAT THE VENUE OF THE SUIT, ACTION OR PROCEEDING IS IMPROPER, OR THAT THIS GUARANTY AGREEMENT OR THE SUBJECT MATTER HEREOF OR THEREOF MAY NOT BE ENFORCED IN OR BY SUCH COURT, AND (III) HEREBY AGREES NOT TO ASSERT ANY OFFSETS OR COUNTERCLAIMS (OTHER THAN COMPULSORY COUNTERCLAIMS) IN ANY SUCH ACTION, SUIT OR PROCEEDING. EACH GUARANTOR HEREBY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 4.1 HEREOF, PROVIDED, HOWEVER, THAT NOTHING IN THIS GUARANTY AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW. A FINAL JUDGMENT AGAINST ANY GUARANTOR IN ANY SUCH ACTION, SUIT OR PROCEEDING SHALL BE CONCLUSIVE, AND MAY BE ENFORCED IN OTHER JURISDICTIONS (X) BY SUIT, ACTION OR PROCEEDING ON THE JUDGMENT, A CERTIFIED OR TRUE COPY OF WHICH SHALL BE CONCLUSIVE EVIDENCE OF THE FACT AND OF THE AMOUNT OF ANY INDEBTEDNESS OR LIABILITY OF SUCH GUARANTOR OR (Y) IN ANY OTHER MANNER PROVIDED BY OR PURSUANT TO THE LAWS OF SUCH OTHER JURISDICTION, PROVIDED, HOWEVER, THAT LENDER MAY AT ITS OPTION BRING SUIT, OR INSTITUTE OTHER JUDICIAL PROCEEDINGS AGAINST ANY GUARANTOR OR ANY OF ITS ASSETS IN ANY STATE OR FEDERAL COURT OF THE UNITED STATES OR OF ANY COUNTRY OR PLACE WHERE SUCH GUARANTOR OR SUCH ASSETS MAY BE FOUND.**

4.4   **GOVERNING LAW. THIS GUARANTY AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK (BUT WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICT OF LAWS).**

4.5   **No Waiver, etc.** Neither a failure nor a delay on the part of Lender in exercising any right, power or privilege under this Guaranty Agreement shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege. The rights, remedies and benefits of Lender expressly specified herein are cumulative and not exclusive of any other rights, remedies or benefits which Lender may have under this Guaranty Agreement, at law, in equity, by statute, or otherwise.

4.6   **Modification, etc.** No modification, amendment or waiver of any provision of this Guaranty Agreement, nor the consent to any departure by any Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on any Guarantor in any case shall entitle such Guarantor to any other or further notice or demand in the same, similar or other circumstances.

4.7   **Severability.** If any one or more of the provisions contained in this Guaranty Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall in no way be affected or impaired thereby.

4.8   **Headings.** Section headings used herein are for convenience of reference only and are not to affect the construction of, or be taken into consideration in interpreting, this Guaranty Agreement.

4.9   **Counterparts.** This Guaranty Agreement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 4.2. Delivery of an executed signature page to this Guaranty Agreement by facsimile or other electronic transmission shall be as effective as delivery of a manually executed counterpart to this Guaranty Agreement.

4.10   **WAIVER OF JURY TRIAL. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, THE PARTIES HEREBY WAIVE, AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS GUARANTY AGREEMENT OR THE SUBJECT MATTER HEREOF, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT OR TORT OR OTHERWISE. EACH GUARANTOR ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY LENDER THAT THE PROVISIONS OF THIS SECTION 4.10 CONSTITUTE A MATERIAL INDUCEMENT UPON WHICH LENDER HAS RELIED, IS RELYING AND WILL RELY IN ENTERING INTO THIS GUARANTY AGREEMENT. EACH GUARANTOR AND LENDER MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 4.10 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF GUARANTOR TO THE WAIVER OF ITS RIGHTS TO TRIAL BY JURY.**

4.11    **Right of Setoff.** If an Event of Default under the Loan Agreement shall have occurred and be continuing, Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by Lender to or for the credit or the account of any Guarantor against any or all of the obligations of such Guarantor now or hereafter existing under this Guaranty Agreement and the other Loan Documents held by Lender, irrespective of whether or not Lender shall have made any demand under this Guaranty Agreement or any other Loan Document and although such obligations may be unmatured. The rights of Lender under this Section 4.11 are in addition to the other rights and remedies (including other rights of setoff) which Lender may have.  Lender agrees to promptly notify each Guarantor after any such setoff and application made by Lender; provided that the failure to give such notice shall not affect the validity of such setoff and application.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, each Guarantor has executed this Guaranty Agreement as of the date first written above.

AMERICAS RETAIL FLAGSHIP FUND LLC

By: _____
Name: Isidore Mayrock
Title: Chairman

Address for each Guarantor:
    158 West 27th Street, 12th Floor
    New York, NY 10001

**GRACIOUS HOME HOLDINGS LLC**

By: _____
Name: James Linsalata
Title: Chief Financial Officer

**GRACIOUS HOME PAYROLL LLC**

By: _____
Name: James Linsalata
Title: Chief Financial Officer

**GH EAST SIDE LLC**

By: _____
Name: James Linsalata
Title: Chief Financial Officer

**GH WEST SIDE LLC**

By: _____
Name: James Linsalata
Title: Chief Financial Officer

**GH CHELSEA LLC**

By: _____
Name: James Linsalata
Title: Chief Financial Officer

IN WITNESS WHEREOF, each Guarantor has executed this Guaranty Agreement as of the date first written above.

**AMERICAS RETAIL FLAGSHIP FUND LLC**

By: _____
Name: Isidore Mayrock
Title: Chairman

Address for each Guarantor:
    158 West 27th Street, 12th Floor
    New York, NY 10001

**GRACIOUS HOME HOLDINGS LLC**

By: _____
Name: James Linsalata
Title: Chief Financial Officer

**GRACIOUS HOME PAYROLL LLC**

By: _____
Name: James Linsalata
Title: Chief Financial Officer

**GH EAST SIDE LLC**

By: _____
Name: James Linsalata
Title: Chief Financial Officer

**GH WEST SIDE LLC**

By: _____
Name: James Linsalata
Title: Chief Financial Officer

**GH CHELSEA LLC**

By: _____
Name: James Linsalata
Title: Chief Financial Officer

Guaranty Agreement

**GRACIOUS (IP) LLC**

By: _____

Name: James Linsalata
Title: Chief Financial Officer

[Guaranty]

# EXHIBIT D

[Execution Version]

# GENERAL SECURITY AGREEMENT

GENERAL SECURITY AGREEMENT, dated as of February 10, 2015 (as this agreement may be amended, restated, supplemented or otherwise modified from time to time, this "**Security Agreement**"), by and among **AMERICAS RETAIL FLAGSHIP FUND LLC**, a Delaware limited liability company ("**Americas**"), **GRACIOUS HOME HOLDINGS LLC**, a Delaware limited liability company, **GRACIOUS (IP) LLC**, a Delaware limited liability company ("**Gracious IP**"), **GRACIOUS HOME PAYROLL LLC**, a Delaware limited liability company ("**Payroll**"), **GH EAST SIDE LLC**, a Delaware limited liability company ("**East Side**"), **GH WEST SIDE LLC**, a Delaware limited liability company ("**West Side**") and **GH CHELSEA LLC**, a Delaware limited liability company ("**Chelsea**"; and together with Americas, Holdings, Gracious IP, Payroll, East Side and West Side, each individually, a "**Grantor**" and collectively, the "**Grantors**") and **SIGNATURE BANK** (together with its successors and assigns, collectively, "**Lender**").

## WITNESSETH:

WHEREAS, pursuant to that certain Loan and Security Agreement dated as of the date hereof by and among, GRACIOUS HOME LLC ("**Borrower**") and Lender (including all annexes, exhibits and schedules thereto, and as amended, amended and restated, supplemented or otherwise modified, renewed or replaced from time to time, the "**Loan Agreement**"), Lender may make loans and other financial accommodations to or for the benefit of Borrower; and

WHEREAS, pursuant to that certain Guaranty Agreement dated as of the date hereof by Grantors in favor of Lender (as from time to time amended, restated, supplemented or otherwise modified, the "**Guaranty**"), each Grantor has guaranteed the obligations of Borrower under the Loan Agreement and other Loan Documents; and

WHEREAS, in order to induce Lender to enter into the Loan Agreement and the other Loan Documents and to induce Lender to make the Loans and issue Letters of Credit as provided for in the Loan Agreement, each Grantor has agreed to grant a continuing Lien on the Collateral (as hereinafter defined) to secure such Grantor's obligations under the Guaranty;

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      **Defined Terms**. The following terms shall have the following respective meanings:

"**Accounts**" means all of each Grantor's now owned or hereafter acquired or arising accounts, as defined in the UCC, including any rights to payment for the sale or lease of goods or rendition of services, whether or not they have been earned by performance.

"**Chattel Paper**" means a Grantor's now owned or hereafter acquired "chattel paper" as such term is defined in the UCC, including electronic chattel paper.

"**Deposit Accounts**" means all "deposit accounts" as such term is defined in the UCC, now or hereafter held in the name of a Grantor.

"**Documents**" means all "documents" as such term is defined in the UCC, including bills of lading, warehouse receipts or other documents of title, now owned or hereafter acquired by any Grantor.

"**Equipment**" means all "equipment" as such term is defined in the UCC, now owned or hereafter acquired by any Grantor.

"**General Intangibles**" means all "general intangibles" as such term is defined in the UCC, now owned or hereafter acquired by any Grantor.

"**Goods**" means all "goods" as defined in the UCC, now owned or hereafter acquired by any Grantor, wherever located, including embedded software to the extent included in "goods" as defined in the UCC, manufactured homes, standing timber that is cut and removed for sale and unborn young of animals.

"**Instruments**" means all instruments as such term is defined in the UCC, now owned or hereafter acquired by any Grantor.

"**Inventory**" has the meaning as set forth in the UCC, including all goods intended for sale, lease, display or demonstration; all work in process; and all raw materials, and other materials and supplies of any kind that are or could be used in connection with the manufacture, printing, packing, shipping, advertising, sale, lease or furnishing of such goods, or otherwise used or consumed in a Grantor's business (but excluding Equipment).

"**Intellectual Property**" means all intellectual and similar property of a Person, including inventions, designs, patents, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software and databases; all embodiments or fixations thereof and all related documentation, applications, registrations and franchises; all licenses or other rights to use any of the foregoing; and all books and records relating to the foregoing.

"**Investment Property**" means all of any Grantor's right title and interest in and to any and all: (a) securities whether certificated or uncertificated; (b) securities entitlements; (c) securities accounts; (d) commodity contracts; or (e) commodity accounts.

"**IP Assignment**" means a collateral assignment or security agreement pursuant to which any Grantor grants a Lien on Intellectual Property to Lender, as security for the Guaranteed Obligations

"**Letter-of-Credit Rights**" means "letter-of-credit rights" as such term is defined in the UCC, now owned or hereafter acquired by any Grantor, including rights to payment or performance under a letter of credit, whether or not such Grantor, as beneficiary, has demanded or is entitled to demand payment or performance.

"**Material Contract**" means, collectively, all of a Grantor's rights and remedies under, and all moneys and claims for money due or to become due to such Grantor or Subsidiary pursuant to (a) those contracts set forth on Schedule 1.1 hereto, (b) an agreement that is deemed to be a material contract under any securities law applicable to such Person, including the Securities Act of 1933; (b) an agreement (other than the Loan Documents) for which breach, termination, nonperformance or failure to renew could reasonably be expected to have a Material

Adverse Effect on the Borrower's or Grantors' business; or (c) an agreement that relates to Subordinated Debt, or to Debt in an aggregate amount of $250,000 or more.

"**Payment Account**" means each bank account established pursuant to this Security Agreement, to which the proceeds of Accounts and other Collateral are deposited or credited, and which is maintained in the name of Lender or any Grantor, as Lender may determine, on terms acceptable to Lender.

"**Proprietary Rights**" means all of any Grantor's now owned and hereafter arising or acquired: licenses, franchises, permits, patents, patent rights, copyrights, works which are the subject matter of copyrights, trademarks, service marks, trade names, trade styles, patent, trademark and service mark applications, and all licenses and rights related to any of the foregoing, and all other rights under any of the foregoing, all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the foregoing, and all rights to sue for past, present and future infringement of any of the foregoing.

"**Software**" means all "software" as such term is defined in the UCC, now owned or hereafter acquired by any Grantor, other than software embedded in any category of Goods, including all computer programs and all supporting information provided in connection with a transaction related to any program.

"**Supporting Obligations**" means all "supporting obligations" as such term is defined in the UCC.

"**UCC**" means the Uniform Commercial Code, as in effect from time to time, of the State of New York or of any other state the laws of which are required as a result thereof to be applied in connection with the issue of perfection of security interests.

All other capitalized terms used but not otherwise defined herein have the meanings given to them in the Loan Agreement. All other undefined terms contained in this Security Agreement, unless the context indicates otherwise, have the meanings provided for by the UCC to the extent the same are used or defined therein.

2.      **Grant of Lien**.

(a)      As security for all Guaranteed Obligations, each Grantor hereby grants to Lender a continuing security interest in, Lien on, assignment of and right of set-off against, all of the following property and assets of such Grantor, whether now owned or existing or hereafter acquired or arising, regardless of where located:

(i)      all Accounts;

(ii)      all Inventory;

(iii)      all contract rights, including, without limitation Material Contracts;

(iv)      all Chattel Paper;

(v)      all Documents;

(vi)      all Instruments;

(vii)      all Supporting Obligations and Letter-of-Credit Rights;

(viii)      all General Intangibles (including payment intangibles and Software);

(ix)     all Goods;

(x)      all Equipment;

(xi)     all Investment Property;

(xii)    all money, cash, cash equivalents, securities and other property of any kind of such Grantor held directly or indirectly by Lender;

(xiii)   all of such Grantor's Deposit Accounts, credits, and balances with and other claims against Lender or any of its Affiliates or any other financial institution with which such Grantor maintains deposits, including any Payment Accounts;

(xiv)    all books, records and other property related to or referring to any of the foregoing, including books, records, account ledgers, data processing records, computer software and other property and General Intangibles at any time evidencing or relating to any of the foregoing;

(xv)     all commercial tort claims in which such Grantor is a plaintiff;

(xvi)    all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing, including, but not limited to, proceeds of any insurance policies, claims against third parties, and condemnation or requisition payments with respect to all or any of the foregoing.

All of the foregoing, together with all Pledged Collateral (as defined in the Pledge Agreement) of Grantors pledged to Lender pursuant to the Pledge Agreement, dated of even date herewith (the "**Pledge Agreement**"), and all other property of any Grantor in which Lender may at any time be granted a Lien as collateral for the Guaranteed Obligations, is herein collectively referred to as the "**Collateral**".

(b)      All of the Guaranteed Obligations shall be secured by all of the Collateral.

(c)      The security interest in the Collateral granted to Lender pursuant to this Security Agreement is granted in conjunction with a security interest in the Pledged Collateral granted by each Grantor to Lender pursuant to the Pledge Agreement. Each Grantor hereby acknowledges and agrees that this Security Agreement is intended to set forth the rights and obligations of the parties with respect to the security interest granted in the Collateral which does not constitute Pledged Collateral. The rights and obligations of the parties with respect to the security interest in the Pledged Collateral shall be as set forth in the Pledge Agreement.

3.     **Perfection and Protection of Security Interest**.

(a)      Each Grantor shall, at its expense, perform all steps reasonably requested by Lender at any time to perfect, maintain, protect, and enforce Lender's Liens, including: (i) executing, delivering and/or filing and recording of the IP Assignments and executing and filing financing or continuation statements, and amendments thereof, in form and substance reasonably satisfactory to Lender; (ii) delivering to Lender warehouse receipts covering any portion of the Collateral located in warehouses and for which warehouse receipts are issued and certificates of title covering any portion of the collateral for which certificates of title have been issued; (iii) when an Event of Default has occurred and is continuing, transferring Inventory to warehouses or other locations designated by Lender; (iv) placing notations on such Grantor's books of account to disclose Lender's security interest; and (v) taking such other steps as are

deemed reasonably necessary or desirable by Lender to maintain and protect Lender's Liens. Each Grantor agrees that a carbon, photographic, photostatic, or other reproduction of this Security Agreement or of a financing statement is sufficient as a financing statement.

(b)     Unless Lender shall otherwise consent in writing (which consent may be revoked by Lender in its sole discretion), each Grantor shall deliver to Lender all Collateral consisting of negotiable Documents, certificated securities (accompanied by stock powers executed in blank), Chattel Paper and Instruments promptly after such Grantor receives the same.

(c)     Each Grantor shall, in accordance with the terms of the Loan Agreement, obtain or use its commercially reasonable efforts to obtain: (i) waivers or subordinations of Liens from landlords and mortgagees, and (ii) signed acknowledgements of Lender's Liens from bailees having possession of any Collateral that they hold for the benefit of Lender.

(d)     If required by the terms of the Loan Agreement and not waived by Lender in writing (which waiver may be revoked by Lender in its sole discretion), each Grantor shall obtain authenticated control agreements from each issuer of uncertificated securities, securities intermediary, or commodities intermediary issuing or holding any financial assets or commodities to or for such Grantor.

(e)     If any Grantor is or becomes the beneficiary of a letter of credit, such Grantor shall promptly notify Lender thereof and enter into a tri-party agreement with Lender and the issuer and/or confirmation bank with respect to Letter-of-Credit Rights assigning such Letter-of-Credit Rights to Lender and directing all payments pursuant to the written instructions of Lender, all in form and substance reasonably satisfactory to Lender.

(f)     Each Grantor shall take all steps necessary to grant Lender control of all electronic Chattel Paper in accordance with the Code and all "transferable records" as defined in the Uniform Electronic Transactions Act.

(g)     Each Grantor hereby irrevocably authorizes Lender at any time and from time to time to file in any filing office in any jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of such Grantor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of the State of New York or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by part 5 of Article 9 of the UCC of the State of New York for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether such Grantor is an organization, the type of organization and any organization identification number issued to such Grantor, and (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates. Each Grantor agrees to furnish any such information to Lender promptly upon request. Each Grantor also ratifies its authorization for Lender to have filed in any jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.

(h)     A Grantor shall promptly notify Lender in writing if such Grantor has a Commercial Tort Claim (other than, as long as no Default or Event of Default exists and is continuing, a Commercial Tort Claim for less than $50,000), shall promptly notify Lender of such Commercial Tort Claim, and shall take such actions as Lender deems appropriate to subject

3563946.7

such claim to a duly perfected, first priority Lien in favor of Lender in accordance with, inter alia, UCC 9-108.

(i)     From time to time, each Grantor shall, upon Lender's request, execute and deliver confirmatory written instruments pledging to Lender the Collateral, but such Grantor's failure to do so shall not affect or limit any security interest or any other rights of Lender in and to the Collateral with respect to such Grantor. So long as the Loan Agreement is in effect and until all Guaranteed Obligations have been fully satisfied, Lender's Liens shall continue in full force and effect in all Collateral (whether or not deemed eligible for the purpose of calculating the Availability or as the basis for any advance, loan, extension of credit, or other financial accommodation).

(j)     [Reserved].

(k)     Without limiting the prohibitions on mergers involving any Grantor contained in the Loan Agreement, no Grantor shall reincorporate or reorganize itself under the laws of any jurisdiction other than the jurisdiction in which it is incorporated or organized as of the date hereof or change its type of entity as identified on Schedule II without the prior written consent of Lender, not to be unreasonably withheld, conditioned or delayed..

(l)     Each Grantor acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement without the prior written consent of Lender and agrees that it will not do so without the prior written consent of Lender, subject to such Grantor's rights under Section 9-509(d)(2) of the UCC.

(m)     Except as otherwise permitted by the Loan Agreement, each Grantor shall not enter into any contract that restricts or prohibits the grant of a security interest in the Collateral or Proceeds of the Collateral to Lender.

4.     **Location of Collateral**. Each Grantor represents and warrants to Lender that Schedule I: (a) is a correct and complete list of the location of such Grantor's chief executive offices, the locations of its books and records, the locations of the Collateral, and the locations of all of its other places of business; and (b) correctly identifies any of such facilities and locations that are not owned by such Grantor and sets forth the names of the owners and lessors or sublessors of such facilities and locations. Each Grantor covenants and agrees that it will not (i) maintain any Collateral at any location other than those locations listed for such Grantor on Schedule I, (ii) otherwise change or add to any of such locations, or (iii) change the location of such Grantor's chief executive office from the location identified in Schedule I, unless such Grantor gives Lender at least thirty (30) days' prior written notice thereof and executes any and all financing statements and other documents that Lender reasonably requests in connection therewith. Without limiting the foregoing, except as otherwise provided in the Loan Agreement, each Grantor represents that all of its Inventory (other than Inventory in transit) is, and covenants that all of its Inventory will be, located either (a) on premises owned by such Grantor, (b) on premises leased by such Grantor, provided that Lender has received an executed landlord waiver from the landlord of such premises in form and substance reasonably satisfactory to Lender, or (c) in a warehouse or with a bailee, provided that Lender has received an executed bailee letter from the applicable Person in form and substance reasonably satisfactory to Lender.

5.     **Jurisdiction of Organization**. Schedule II hereto identifies each Grantor's name as of the Closing Date as it appears in official filings in the state of its incorporation or other organization, the type of entity of such Grantor (including corporation, partnership, limited partnership or limited liability company), organizational identification number issued by such Grantor's state of incorporation or organization or a statement that no such number has been issued and the jurisdiction in which such Grantor is incorporated or organized. Each Grantor has only one state of incorporation or organization.

6.     **Title to, Liens on, and Sale and Use of Collateral**. Each Grantor represents and warrants to Lender and agrees with Lender that: (a) such Grantor has rights in and the power to transfer all of the Collateral free and clear of all Liens whatsoever, except for Permitted Liens; (b) Lender's Liens in the Collateral will not be subject to any prior Lien (except for those Permitted Liens that by definition are permitted to be senior to Lender's Liens); and (c) such Grantor will use, store, and maintain the Collateral with all reasonable care and will use such Collateral for lawful purposes only.

7.     **[Reserved]**.

8.     **Access and Examination; Appraisals**.

(a)     Each Grantor shall permit Lender from time to time, but, except when a Default or Event of Default exists and is continuing, in no event more frequently than once per year, subject to reasonable prior written notice (except when a Default or Event of Default exists or is continuing) and normal business hours, to visit and inspect the properties of such Grantor, inspect, audit and make extracts from such Grantor's books and records, review such Grantor's Inventory and discuss with its officers, employees, agents, advisors and independent accountants such Grantor's business, financial condition, assets, prospects and results of operations. Lender shall have no duty to such Grantor to make any review or inspection, nor to share any results of any review, inspection, appraisal or report with such Grantor. Each Grantor acknowledges that all reviews, inspections, appraisals and reports are prepared by Lender for its purposes, and such Grantor shall not be entitled to rely upon them.

(b)     Each Grantor shall reimburse Lender for all documented third party charges, costs and expenses actually incurred by Lender in connection with (i) examinations of such Grantor's books and records or any other financial or Collateral matters as Lender deems appropriate, which examinations, prior to the occurrence of an Event of Default., shall be conducted up to four (4) times per annum; and (ii) appraisals of Inventory, which appraisals, prior to the occurrence of an Event of Default, shall be conducted once per annum. Subject to and without limiting the foregoing, each Grantor specifically agrees to pay Lender's then standard charges for examination activities, including the standard charges of Lender's external examination and appraisal groups, as well as the documented charges of any third party used for such purposes.   During the continuation of an Event of Default, there shall be no limit to the frequency of examinations or appraisals conducted at a Grantor's expense.

(c)     This Section 8 shall not be construed to limit Lender's right to conduct reviews or examinations or to obtain appraisals at any time in its discretion, nor to use consultants or other third parties for such purposes.

9.     **Financial and Collateral Reporting**. Each Grantor shall provide Lender with all financial statements, financial reports, reports relating to the Collateral and such other reports and

information as may be reasonably requested by Lender from time to time prepared for such Grantor substantially similar to the financial statements, reports and information required to be delivered by Borrower to Lender pursuant to the Loan Agreement.

10.    **Accounts**.

(a)    Each Grantor shall keep accurate and complete records of its Accounts, including all payments and collections thereon, and shall submit to Lender such records in the same form and manner (including frequency) as is required of the Borrower under the Loan Agreement.

(b)    If an Account of any Grantor includes a charge for any Taxes, Lender is authorized, in its discretion, to pay the amount thereof to the proper taxing authority for the account of such Grantor and to charge Borrower therefor; provided, however, that Lender shall not be liable for any Taxes that may be due from such Grantor or with respect to any Collateral.

(c)    Whether or not a Default or Event of Default exists, Lender shall have the right at any time, in the name of a Grantor or, when a Default or Event of Default exists, in the name of Lender, or any designee of Lender or a Grantor, to verify the validity or amount of any Accounts of a Grantor by mail, telephone or otherwise. Each Grantor shall cooperate fully with Lender in an effort to facilitate and promptly conclude any such verification process.

(d)    Grantors shall maintain Dominion Accounts pursuant to lockbox or other arrangements reasonably acceptable to Lender. Grantors shall obtain an agreement (in form and substance reasonably satisfactory to Lender) from each lockbox servicer and Dominion Account bank, establishing Lender's control over and Lien in the lockbox or Dominion Account, requiring immediate deposit of all remittances received in the lockbox to a Dominion Account, and waiving offset rights of such servicer or bank, except for customary administrative charges. If a Dominion Account is not maintained with Signature Bank, Lender may require immediate transfer of all funds in such account to a Dominion Account maintained with Signature Bank. Lender assumes no responsibility to Grantors for any lockbox arrangement or Dominion Account, including any claim of accord and satisfaction or release with respect to any Payment Items accepted by any bank.

(e)    Each Grantor shall request in writing and otherwise take all necessary steps to ensure that all payments on Accounts or otherwise relating to Collateral are made directly to a Dominion Account (or a lockbox relating to a Dominion Account). If a Grantor or any Subsidiary receives cash or Payment Items with respect to any Collateral, it shall hold same in trust for Lender and promptly (not later than the next Business Day) deposit same into a Dominion Account.

11.    **Inventory**.

(a)    Each Grantor shall keep accurate and complete records of its Inventory, including costs and monthly withdrawals and additions, and, if requested by Lender, shall submit to Lender monthly inventory and reconciliation reports in form reasonably satisfactory to Lender, within twenty (20) days of months end. Grantors shall conduct a physical inventory at least once per calendar year (and on a more frequent basis if requested by Lender when an Event of Default exists) and periodic cycle counts consistent with historical practices, and shall provide to Lender a report based on each such inventory and count promptly upon completion thereof, together with

such supporting information as Lender may reasonably request. Lender may participate in and observe each physical count.

(b)    Grantors shall not return any Inventory to a supplier, vendor or other Person, whether for cash, credit or otherwise, unless (a) such return is in the Ordinary Course of Business; (b) no Default, Event of Default or Overadvance exists or would result therefrom; (c) Lender is promptly notified if the aggregate Value of all Inventory returned in any month exceeds $100,000; and (d) any, if an Event of Default exists, payment received by a Grantor for a return is promptly remitted to Lender for application to the Guaranteed Obligations.

(c)    Grantors shall not accept any Inventory on consignment or approval. Grantors shall not sell any Inventory on consignment or approval or any other basis under which the customer may return or require a Grantor to repurchase such Inventory. Grantors shall use, store and maintain all Inventory with reasonable care and caution, in accordance with applicable standards of any insurance and in conformity with all Applicable Law, and shall make current rent payments (within applicable grace periods provided for in leases) at all locations where any Collateral is located.

12.    **Equipment**.

(a)    Each Grantor shall keep accurate and complete records of its Equipment, including kind, quality, quantity, cost, acquisitions and dispositions thereof, and, if requested by Lender, shall submit to Lender, on such periodic basis as Lender may request, but not more frequently than quarterly, a current schedule thereof, in form reasonably satisfactory to Lender. Promptly upon request, each Grantor shall deliver to Lender evidence of its ownership or interests in any Equipment.

(b)    No Grantor shall sell, lease or otherwise dispose of any Equipment, without the prior written consent of Lender, other than (a) a Permitted Asset Disposition; and (b) replacement of Equipment that is worn, damaged or obsolete with Equipment of like function and value, if the replacement Equipment is acquired substantially contemporaneously with such disposition and is free of Liens other than Permitted Liens.

(c)    Equipment is in good operating condition and repair, and all necessary replacements and repairs have been made so that the value and operating efficiency of the Equipment is preserved at all times, reasonable wear and tear excepted. Grantors shall ensure that the Equipment is mechanically and structurally sound, and capable of performing the functions for which it was designed, in accordance with manufacturer specifications. Grantors shall not permit any Equipment to become affixed to real Property unless any landlord or mortgagee delivers a Lien Waiver.

13.    **Material Contracts**. Grantors shall materially perform all of its obligations under Material Contract and shall promptly notify Lender of any event or circumstance that would constitute a default under any Material Contract.

14.    **[Reserved]**

15.    **Right to Cure**. Lender may, in its discretion at any time and from time to time, at Grantors' expense, pay any amount or do any act required of Grantors under any Loan Documents or otherwise lawfully requested by Lender to (a) enforce any Loan Documents or collect any Guaranteed Obligations; (b) protect, insure, maintain or realize upon any Collateral;

or (c) defend or maintain the validity or priority of Lender's Liens in any Collateral, including any payment of a judgment, insurance premium, warehouse charge, finishing or processing charge, or landlord claim, or any discharge of a Lien. All payments, costs and expenses (including Extraordinary Expenses) of Lender under this Section shall be reimbursed to Lender by Grantors, **on demand,** with interest from the date incurred until paid in full, at the Default Rate applicable to Revolving Loans under the Loan Agreement. Any payment made or action taken by Lender under this Section shall be without prejudice to any right to assert an Event of Default or to exercise any other rights or remedies under the Loan Documents.

16.     **Power of Attorney**. Grantors hereby irrevocably constitute and appoint Lender (and all Persons designated by Lender) as such Grantor's true and lawful attorney (and agent-in-fact) for the purposes provided in this section. Lender, or Lender's designee, may, without notice and in either its or a Grantor's name, but at the cost and expense of Grantors:

(a)     Endorse a Grantor's name on any Payment Item or other proceeds of Collateral (including proceeds of insurance) that come into Lender's possession or control; and

(b)     During an Event of Default, (i) notify any Account Debtors of the assignment of their Accounts, demand and enforce payment of Accounts by legal proceedings or otherwise, and generally exercise any rights and remedies with respect to Accounts; (ii) settle, adjust, modify, compromise, discharge or release any Accounts or other Collateral, or any legal proceedings brought to collect Accounts or Collateral; (iii) sell or assign any Accounts and other Collateral upon such terms, for such amounts and at such times as Lender deems advisable; (iv) collect, liquidate and receive balances in Deposit Accounts or investment accounts, and take control, in any manner, of proceeds of Collateral; (v) prepare, file and sign a Grantor's name to a proof of claim if such Grantor fails to file a proof of claim more than thirty (30) days prior to the bar date for the filing of a proof of claim, or other document in a bankruptcy of an Account Debtor, or to any notice, assignment or satisfaction of Lien or similar document; (vi) receive, open and dispose of mail addressed to a Grantor, and notify postal authorities to deliver any such mail to an address designated by Lender; (vii) endorse any Chattel Paper, Document, Instrument, bill of lading, or other document or agreement relating to any Accounts, Inventory or other Collateral; (viii) use a Grantor's stationery and sign its name to verifications of Accounts and notices to Account Debtors; (ix) use information contained in any data processing, electronic or information systems relating to Collateral; (x) make and adjust claims under insurance policies; (xi) take any action as may be necessary or appropriate to obtain payment under any letter of credit, banker's acceptance or other instrument for which a Grantor is a beneficiary; and (xii) take all other actions as Lender deems appropriate to fulfill Grantors' obligations under the Loan Documents.

17.     **Lender's Rights, Duties and Liabilities**.

(a)     Each Grantor assumes all responsibility and liability arising from or relating to the use, sale, license or other disposition of the Collateral. The Guaranteed Obligations shall not be affected by any failure of Lender to take any steps to perfect Lender's Liens or to collect or realize upon the Collateral, nor shall loss of or damage to the Collateral release any Grantor from any of the Guaranteed Obligations. Following the occurrence and during the continuation of an Event of Default, Lender may (but shall not be required to), without notice to or consent from any Grantor, sue upon or otherwise collect, extend the time for payment of,

modify or amend the terms of, compromise or settle for cash, credit, or otherwise upon any terms, grant other indulgences, extensions, renewals, compositions, or releases, and take or omit to take any other action with respect to the Collateral, any security therefor, any agreement relating thereto, any insurance applicable thereto, or any Person liable directly or indirectly in connection with any of the foregoing, without discharging or otherwise affecting the liability of any such Grantor for the Guaranteed Obligations or under the Loan Agreement or any other Loan Document now or hereafter existing between Lender and any such Grantor.

(b)     It is expressly agreed by each Grantor that, anything herein to the contrary notwithstanding, such Grantor shall remain liable under each of its contracts and each of its licenses to observe and perform all the conditions and obligations to be observed and performed by it thereunder. Lender shall have no obligation or liability under any contract or license by reason of or arising out of this Security Agreement or the granting herein of a Lien thereon or the receipt by Lender of any payment relating to any contract or license pursuant hereto. Lender shall not be required or obligated in any manner to perform or fulfill any of the obligations of any Grantor under or pursuant to any contract or license, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any contract or license, or to present or file any claims, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(c)     Lender may at any time after a Default or an Event of Default has occurred and be continuing, without prior notice to any Grantor, notify Account Debtors, and other Persons obligated on the Collateral that Lender has a security interest therein, and that payments shall be made directly to Lender. Once any such notice has been given to any Account Debtor or other Person obligated on the Collateral, no Grantor shall give any contrary instructions to such Account Debtor or other Person without Lender's prior written consent, until such time as Lender determines, in its sole discretion, such Default or Event of Default has been cured or waived.

(d)     Lender may (to the extent permitted under the Loan Agreement with respect to Account Debtors, parties to contracts and obligors of Borrower) in Lender's own name or in the name of any Grantor communicate with Account Debtors, parties to contracts and obligors in respect of Instruments to verify with such Persons, to Lender's satisfaction, the existence, amount and terms of Accounts, payment intangibles, Instruments or Chattel Paper. If a Default or Event of Default shall have occurred and be continuing, each Grantor, at its own expense, shall deliver to Lender such records, verifications and reports in respect of such Grantor's Accounts or Inventory as Lender may request from time to time.

18.    **Intellectual Property**.

(a)     No Grantor has an interest in, or title to, any Intellectual Property except as disclosed on Schedule III. Each Grantor owns or has the lawful right to use all Intellectual Property necessary for the conduct of its business, without conflict with any rights of others. There is no pending or, to any Grantor's knowledge, threatened Intellectual Property Claim with respect to any Grantor, the Borrower, any Subsidiary or any of their Property (including any Intellectual Property).

3563946.7

(b)    Upon request of Lender, each Grantor shall execute and deliver any and all IP Assignments as Lender may request to evidence Lender's Lien on such Intellectual Property and the General Intangibles of such Grantor relating thereto or represented thereby.

19.    **Indemnification**. In any suit, proceeding or action brought by Lender relating to any Collateral for any sum owing with respect thereto or to enforce any rights or claims with respect thereto, each Grantor will save, indemnify and keep Lender harmless from and against all expense (including reasonable attorneys' fees and expenses), loss or damage suffered by reason of any defense, setoff, counterclaim, recoupment or reduction of liability whatsoever of the Account Debtor or other Person obligated on the Collateral, arising out of a breach by any Grantor of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to, or in favor of, such obligor or its successors from a Grantor, except in the case of Lender, to the extent such expense, loss, or damage is attributable solely to the gross negligence, willful misconduct or fraud of Lender as finally determined by a court of competent jurisdiction. All such obligations of any Grantor shall be and remain enforceable against and only against such Grantor and shall not be enforceable against Lender.

20.    **Limitation on Liens on Collateral**. No Grantor will create, permit or suffer to exist, and will defend the Collateral against, and take such other action as is necessary to remove, any Lien on the Collateral except Permitted Liens, and will defend the right, title and interest of Lender in and to any of such Grantor's rights under the Collateral against the claims and demands of all Persons whomsoever.

21.    **Notice Regarding Collateral**. Each Grantor will advise Lender promptly, in reasonable detail, (i) of any Lien (other than Permitted Liens) or claim made or asserted against any of the Collateral, and (ii) of the occurrence of any other event which would have a Material Adverse Effect on Borrower's or Grantors' business operations.

22.    **Remedies; Rights upon Default**.

(a)    In addition to all other rights and remedies granted to it under this Security Agreement, the Pledge Agreement, the Loan Agreement, the other Loan Documents and under any other instrument or agreement securing, evidencing or relating to any of the Guaranteed Obligations, if any Event of Default shall have occurred and be continuing, Lender may exercise all rights and remedies of a secured party under the UCC. Without limiting the generality of the foregoing, such rights and remedies include, but are not limited to, the rights to (i) take possession of any Collateral; (ii) require Grantors to assemble Collateral, at Grantors' expense, and make it available to Lender at a place designated by Lender; (iii) enter any premises where Collateral is located and store Collateral on such premises until sold (and if the premises are owned or leased by a Grantor or Borrower, Grantors agree not to charge for such storage), subject, in the case of any premises leased by a Grantor, to the terms and conditions of the lease and Lien Waiver with respect to such premises; and (iv) sell or otherwise dispose of any Collateral in its then condition, or after any further manufacturing or processing thereof, at public or private sale, with such notice as may be required by Applicable Law, in lots or in bulk, at such locations, all as Lender, in its discretion, deems advisable. Grantors agree that 10 days notice of any proposed sale or other disposition of Collateral by Lender shall be reasonable, and that any sale conducted on the internet or to a licensor of Intellectual Property shall be commercially reasonable. Lender may conduct sales on any Obligor's premises, without charge, and any sale may be adjourned from time to time in accordance with Applicable Law. Lender shall have the

right to sell, lease or otherwise dispose of any Collateral for cash, credit or any combination thereof, and Lender may purchase any Collateral at public or, if permitted by law, private sale and, in lieu of actual payment of the purchase price, may credit bid and set off the amount of such price against the Guaranteed Obligations.

(b)    Except as otherwise specifically provided herein, each Grantor hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by Applicable Law) of any kind in connection with this Security Agreement or any Collateral.

(c)    At any time during an Event of Default, Lender, and any of its Affiliates are authorized, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by Lender, or such Affiliate to or for the credit or the account of any Grantor against the Guaranteed Obligations, whether or not Lender or such Affiliate shall have made any demand under any Loan Document and although such Guaranteed Obligations may be contingent or unmatured or are owed to a branch or office of Lender or such Affiliate different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of Lender, and each such Affiliate under this Section are in addition to other rights and remedies (including other rights of setoff) that such Person may have.

23.    **Grant of License to Use Intellectual Property**. For the purpose of enabling Lender to exercise rights and remedies under Section 22 hereof at any time a Default or an Event of Default exists and is continuing, Lender is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all Intellectual Property of **Grantors**, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other Property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral.  **Grantors'** rights and interests under Intellectual Property shall inure to Lender's benefit.

24.    **Limitation on Lender's Duty in Respect of Collateral**. Lender shall use reasonable care with respect to the Collateral in its possession or under its control. Lender shall not have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of Lender, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.

25.    **Miscellaneous**.

(a)    *Reinstatement*. This Security Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Grantor for liquidation or reorganization, should any Grantor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of any Grantor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Guaranteed Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Guaranteed Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance

had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Guaranteed Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(b)     *Notices.* Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other party, or whenever any of the parties desires to give and serve upon any other party any communication with respect to this Security Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be given in the manner, and deemed received, as provided for in the Loan Agreement.

(c)     *Severability.* Whenever possible, each provision of this Security Agreement shall be interpreted in a manner as to be effective and valid under applicable law, but if any provision of this Security Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Security Agreement. This Security Agreement is to be read, construed and applied together with the Loan Agreement, the Guaranty Agreement, the Pledge Agreement and the other Loan Documents which, taken together, set forth the complete understanding and agreement of Lender and each Grantor with respect to the matters referred to herein and therein.

(d)     *No Waiver; Cumulative Remedies.* Lender shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies hereunder, and no waiver shall be valid unless in writing, signed by Lender and then only to the extent therein set forth. A waiver by Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Lender would otherwise have had on any future occasion. No failure to exercise or any delay in exercising on the part of Lender, any right, power or privilege hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or future exercise thereof or the exercise of any other right, power or privilege. The rights and remedies hereunder provided are cumulative and may be exercised singly or concurrently, and are not exclusive of any rights and remedies provided by law. None of the terms or provisions of this Security Agreement may be waived, altered, modified or amended except by an instrument in writing, duly executed by Lender and each Grantor.

(e)     *Limitation by Law.* All rights, remedies and powers provided in this Security Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law, and all the provisions of this Security Agreement are intended to be subject to all applicable mandatory provisions of law that may be controlling and to be limited to the extent necessary so that they shall not render this Security Agreement invalid, unenforceable, in whole or in part, or not entitled to be recorded, registered or filed under the provisions of any applicable law.

(f)     *Termination of this Security Agreement.* Subject to Section 25(a) hereof, this Security Agreement shall terminate upon the satisfactory collateralization of all Letters of Credit and the Full Payment of the Obligations.

3563946 7

(g)    *Successors and Assigns*. This Security Agreement and all obligations of Grantors hereunder shall be binding upon the successors and assigns of Grantors (including any debtor-in-possession on behalf of any Grantor) and shall, together with the rights and remedies of Lender, hereunder, inure to the benefit of Lender, all future holders of any instrument evidencing any of the Guaranteed Obligations and their respective successors and assigns. No sales of participations, other sales, assignments, transfers or other dispositions of any agreement governing or instrument evidencing the Guaranteed Obligations or any portion thereof or interest therein shall in any manner affect the Lien granted to Lender hereunder. No Grantor may assign, sell, hypothecate or otherwise transfer any interest in or obligation under this Security Agreement.

(h)    *Counterparts*. This Security Agreement may be authenticated in any number of separate counterparts, each of which shall collectively and separately constitute one and the same agreement. This Security Agreement may be authenticated by manual signature, facsimile or electronic means, all of which shall be equally valid.

(i)    *Governing Law*. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ANY OF THE LOAN DOCUMENTS, IN ALL RESPECTS, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS SECURITY AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE. EACH GRANTOR HEREBY CONSENTS AND AGREES THAT THE STATE OR FEDERAL COURTS LOCATED IN NEW YORK COUNTY, CITY OF NEW YORK, SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN SUCH GRANTOR AND LENDER PERTAINING TO THIS SECURITY AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, PROVIDED, THAT LENDER AND SUCH GRANTOR ACKNOWLEDGE THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF NEW YORK COUNTY, CITY OF NEW YORK, AND, PROVIDED, FURTHER, NOTHING IN THIS SECURITY AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF LENDER. EACH GRANTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND SUCH GRANTOR HEREBY WAIVES ANY OBJECTION WHICH THEY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT. EACH GRANTOR HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINTS AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO SUCH GRANTOR AT THE ADDRESS SET FORTH ON THE SIGNATURE PAGES HEREOF AND THAT SERVICE SO MADE SHALL BE DEEMED

COMPLETED UPON THE EARLIER OF ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE U.S. MAILS, PROPER POSTAGE PREPAID.

(j) *Waiver of Jury Trial*. BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX FINANCIAL TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT DISPUTES ARISING HEREUNDER OR RELATING HERETO BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN LENDER AND SUCH GRANTOR ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED IN CONNECTION WITH, THIS SECURITY AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO.

(k) *Section Titles*. The Section titles contained in this Security Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

(l) *No Strict Construction*. The parties hereto have participated jointly in the negotiation and drafting of this Security Agreement. In the event an ambiguity or question of intent or interpretation arises, this Security Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Security Agreement.

(m) *Advice of Counsel*. Each of the parties represents to each other party hereto that it has discussed this Security Agreement and, specifically, the provisions of Section 25(i) and Section 25(j), with its counsel.

(n) *Benefit of Lender*. All Liens granted or contemplated hereby shall be for the benefit of Lender, and all proceeds or payments realized from Collateral in accordance herewith shall be applied to the Obligations in accordance with the terms of the Loan Agreement.

(o) *Joint and Several Liability*. Each Grantor expressly acknowledges that it has guaranteed the Obligations of Borrower on joint and several basis pursuant to the Guaranty. Each Grantor expects to derive benefit, directly and indirectly, from successful operations of the Borrower and the other Grantor and any financial accommodations extended by Lender to the Borrower. Each Grantor hereby acknowledges, confirms and agrees that all Guaranteed Obligations arising under or in connection with the Guaranty are secured, on a joint and several basis, as between each Grantor, by the Collateral.

[Signature page follows]

IN WITNESS WHEREOF, each of the parties hereto has caused this Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

**AMERICAS RETAIL FLAGSHIP FUND LLC**

By: _____

Name: Isidore Mayrock

Title: Chairman

Address for each Grantor:

158 West 27th Street, 12th Floor

New York, NY 10001

**GRACIOUS HOME HOLDINGS LLC**

By: _____

Name: James Linsalata

Title: Chief Financial Officer

**GRACIOUS HOME PAYROLL LLC**

By: _____

Name: James Linsalata

Title: Chief Financial Officer

**GH EAST SIDE LLC**

By: _____

Name: James Linsalata

Title: Chief Financial Officer

**GH WEST SIDE LLC**

By: _____

Name: James Linsalata

Title: Chief Financial Officer

**GH CHELSEA LLC**

By: _____

Name: James Linsalata

Title: Chief Financial Officer

General Security Agreement

IN WITNESS WHEREOF, each of the parties hereto has caused this Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

**AMERICAS RETAIL FLAGSHIP FUND LLC**

By: _____
Name: Isidore Mayrock
Title: Chairman

Address for each Grantor:
    158 West 27th Street, 12th Floor
    New York, NY 10001

**GRACIOUS HOME HOLDINGS LLC**

By: _____
Name: James Linsalata
Title: Chief Financial Officer

**GRACIOUS HOME PAYROLL LLC**

By: _____
Name: James Linsalata
Title: Chief Financial Officer

**GH EAST SIDE LLC**

By: _____
Name: James Linsalata
Title: Chief Financial Officer

**GH WEST SIDE LLC**

By: _____
Name: James Linsalata
Title: Chief Financial Officer

**GH CHELSEA LLC**

By: _____
Name: James Linsalata
Title: Chief Financial Officer

General Security Agreement

**GRACIOUS (IP) LLC**

By: _____

Name: James Linsalata

Title: Chief Financial Officer

[General Security Agreement]

<u>Accepted and Agreed</u>:


**SIGNATURE BANK**

By: _____

Name: Robert Wallace

Title:   Vice President

SCHEDULE I

to

GENERAL SECURITY AGREEMENT

LOCATION OF COLLATERAL

A.    Location of Chief Executive Office

158 West 27th Street, 12th Floor, New York, New York 10001

B.    Location of Books and Records

Current Books and Records: 158 West 27th Street, 12th Floor, New York, New York 10001
Archived/Historical Books and Records: 30-30 60th Street, Woodside, New York 11377

C.    Location of Collateral, all other places of business and leased facilities (including name
of lessor/sublessor).

| Address | Owned/Leased/Third Party* | Name/Address of Lessor or Third Party, as Applicable |
|---|---|---|
| 158 West 27th Street, 12th Floor, New York, New York 10001 | Leased | 158 West 27th Street Owner, LLC, c/o George Comfort& Sons, Inc., 200 Madison Avenue, 26th Floor, New York, New York 10016 |
| 30-30 60th Street Woodside, New York 11377 | Leased | Bradford Swett Management LLC. 1536 Third Avenue, 3rd Floor, New York, New York 10028-2110 |
| 1220 East Side (Building 2) 1210 Third Avenue New York, NY 10021 | Leased | 179 East 70th Street Corp. c/o Douglas Elliman Property Management AR Dept.: MD Newark, New Jersey 07101 |
| 1220 East Side (Building 1) 1220 Third Avenue New York, NY 10021 | Leased | Townsend House Corp. First Service Residential Attn: Althonsa 15th Street 622 Third Avenue New York, New York 10017 |

| | | |
|---|---|---|
| 1201 East Side<br>1197-1201 Third Avenue<br>New York, NY 10021 | Leased | Rockrose Development Corp., TF Cornerstone Inc., 387 Park Avenue South, 7th Floor, New York, New York 10016 |
| 1992 Broadway<br>New York, New York 1002 | Leased | Lincoln Metrocenter Partners LP, P.O. Box 27739 Lockbox 27739, Newark, New Jersey 07101 |
| 45 West 25th Street<br>New York, New York 10010 | Leased | Bonafide Estates, Inc. 630 Fifth Avenue, Suite 3165, New York, New York 10111 |

General Security Agreement

SCHEDULE 1.1

to

SECURITY AGREEMENT

MATERIAL CONTRACTS

Americas Retail Flagship Fund LLC:

1.  Corporate Services Account Agreement, dated November 19, 2013, between American Express Travel Related Services Company, Inc. and Americas Retail Flagship Fund LLC.

2.  Lease Agreement, dated November 15, 1994, between Bradford Swett Management LLC and Americas Retail Flagship Fund LLC, as amended.

3.  Agreement for American Express Card Acceptance between American Express Travel Related Services Company and Americas Retail Flagship Fund LLC.

4.  Continuing Joint and Several Guaranty dated November __, 2014 by Americas Retail Flagship Fund LLC in favor of JP Morgan Chase Bank, N.A.  Pursuant to this Guaranty, the company has a continuing obligation to guarantee credit card obligations and Standby Letters of Credit obligations; provided, however, that the company is not required to guarantee the Standby Letter of Credit obligations to the extent these obligations are secured by cash collateral in an amount equal to or exceeding the obligations under the Standby Letters of Credit.

Gracious Home Holdings LLC:

1.  Continuing Joint and Several Guaranty dated November __, 2014 by Gracious Home Holdings LLC in favor of JP Morgan Chase Bank, N.A.  Pursuant to this Guaranty, the company has a continuing obligation to guarantee credit card obligations and Standby Letters of Credit obligations; provided, however, that the company is not required to guarantee the Standby Letter of Credit obligations to the extent these obligations are secured by cash collateral in an amount equal to or exceeding the obligations under the Standby Letters of Credit.

Gracious (IP) LLC:

1.  License Agreement, dated December 11, 2012, among Gracious (IP) LLC, Gracious Home LLC, Gracious Home Payroll LLC, GH East Side LLC, GH West Side LLC and GH Chelsea LLC.

2.  Continuing Joint and Several Guaranty dated November __, 2014 by Gracious (IP) LLC in favor of JP Morgan Chase Bank, N.A.  Pursuant to this Guaranty, the company has a continuing obligation to guarantee credit card obligations and Standby Letters of Credit obligations; provided, however, that the company is not required to guarantee the Standby Letter of Credit obligations to the extent these obligations are secured by cash collateral in an amount equal to or exceeding the obligations under the Standby Letters of Credit.

Gracious Home Payroll LLC:

General Security Agreement

1. License Agreement, dated December 11, 2012, among Gracious (IP) LLC, Gracious Home LLC, Gracious Home Payroll LLC, GH East Side LLC, GH West Side LLC and GH Chelsea LLC.

2. Continuing Joint and Several Guaranty dated November __, 2014 by Gracious Home Payroll LLC in favor of JP Morgan Chase Bank, N.A.  Pursuant to this Guaranty, the company has a continuing obligation to guarantee credit card obligations and Standby Letters of Credit obligations; provided, however, that the company is not required to guarantee the Standby Letter of Credit obligations to the extent these obligations are secured by cash collateral in an amount equal to or exceeding the obligations under the Standby Letters of Credit.

3. Section 125 Plan Service Agreement, dated October 2008, between Gracious Home Payroll LLC and Benefit Resource, Inc.

GH East Side LLC:

1. License Agreement, dated December 11, 2012, among Gracious (IP) LLC, Gracious Home LLC, Gracious Home Payroll LLC, GH East Side LLC, GH West Side LLC and GH Chelsea LLC.

2. Continuing Joint and Several Guaranty dated November __, 2014 by GH East Side LLC in favor of JP Morgan Chase Bank, N.A.  Pursuant to this Guaranty, the company has a continuing obligation to guarantee credit card obligations and Standby Letters of Credit obligations; provided, however, that the company is not required to guarantee the Standby Letter of Credit obligations to the extent these obligations are secured by cash collateral in an amount equal to or exceeding the obligations under the Standby Letters of Credit.

3. Lease, dated May 29, 2012, between GH East Side LLC and Townsend Home Corp.

4. Lease, dated May 31, 2012, between GH East Side LLC and 179 East 70th Street Corp.

5. Lease, dated January 17, 2002, between GH East Side LLC (as successor by assignment to the original tenant) and Rockrose Development Corp., as amended.

GH West Side LLC:

1. License Agreement, dated December 11, 2012, among Gracious (IP) LLC, Gracious Home LLC, Gracious Home Payroll LLC, GH East Side LLC, GH West Side LLC and GH Chelsea LLC.

2. Continuing Joint and Several Guaranty dated November __, 2014 by GH West Side LLC in favor of JP Morgan Chase Bank, N.A.  Pursuant to this Guaranty, the company has a continuing obligation to guarantee credit card obligations and Standby Letters of Credit obligations; provided, however, that the company is not required to guarantee the Standby Letter of Credit obligations to the extent these obligations are secured by cash collateral in an amount equal to or exceeding the obligations under the Standby Letters of Credit.

3. Lease Agreement, dated December 22, 1997, between GH West Side LLC (as successor by assignment to the original tenant) and Lincoln Metro center Partnership L.P., as amended.

GH Chelsea LLC:

General Security Agreement

1. License Agreement, dated December 11, 2012, among Gracious (IP) LLC, Gracious Home LLC, Gracious Home Payroll LLC, GH East Side LLC, GH West Side LLC and GH Chelsea LLC.

2. Continuing Joint and Several Guaranty dated November __, 2014 by GH Chelsea LLC in favor of JP Morgan Chase Bank, N.A.  Pursuant to this Guaranty, the company has a continuing obligation to guarantee credit card obligations and Standby Letters of Credit obligations; provided, however, that the company is not required to guarantee the Standby Letter of Credit obligations to the extent these obligations are secured by cash collateral in an amount equal to or exceeding the obligations under the Standby Letters of Credit.

3. Lease Agreement, dated March 18, 2008, between GH Chelsea LLC (as successor by assignment to the original tenant) and Bonafide Estate, Inc.

SCHEDULE II

to

SECURITY AGREEMENT

JURISDICTION OF ORGANIZATION

A.    Grantor's: (i) legal name; (ii) type of entity (i.e., corporation, partnership, limited partnership, limited liability company); (iii) organizational identification number issued by Grantor's state of incorporation or organization or a statement that no such number has been issued; and (iv) state of Incorporation or Organization.

| Name of Entity | Type | Organizational Identification No. | Jurisdiction of Organization |
|---|---|---|---|
| Americas Retail Flagship Fund LLC | Limited Liability Company | 4898749 | Delaware |
| Gracious Home Holdings LLC | Limited Liability Company | 4903586 | Delaware |
| Gracious (IP) LLC | Limited Liability Company | 4903045 | Delaware |
| Gracious Home Payroll LLC | Limited Liability Company | 4912351 | Delaware |
| GH East Side LLC | Limited Liability Company | 4903051 | Delaware |
| GH West Side LLC | Limited Liability Company | 4903053 | Delaware |
| GH Chelsea LLC | Limited Liability Company | 4903059 | Delaware |

SCHEDULE III

Intellectual Property

See attached

Gracious (IP) LLC – Intellectual Property

<u>Trademarks</u>

**GRACIOUS HOME** (Registration No. 947,721)

**GRACIOUS HOME**
(Registration No. 3,807,720)

**GRACIOUS HOME** (Registration No. 3,264,838)

**GRACIOUS HOME**
(Registration No. 3,351,799)

**GRACIOUS HOME**
(Registration No. 3,408,659) for credit card services; and

GRACIOUS HOME
(Registration No. 3,828,911)

Americas Retail Flagship Fund LLC

Printed:    10/17/2014

**Trademark Report By Title**
**Search Criteria**

| | |
|---|---|
| Client ID | 0815975 |
| Status | ACTIVE |

**Display Options**

| | |
|---|---|
| Actions | Next Due |
| Goods | All |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|

## GRACIOUS HOME

| EUROPEAN UNION (CT | 0815975.00013 | 4/19/2000 | 001619774 | 4/26/2002 | 001619774 | REGISTERED | 42 |

| CURRENT DUE | ACTION |
|---|---|
| 12/14/2014 | POA |

| CLASS | DESCRIPTION |
|---|---|
| 42 | Retail gift, hardware, housewares and home furnishing store services. |

| UNITED STATES | 0815975.00002 | 4/1/1971 | 72/388,157 | 11/21/1972 | 947,721 | REGISTERED | 042 |

| CURRENT DUE | ACTION |
|---|---|
| 11/21/2021 | RENEWAL 1Y REMINDER |

| CLASS | DESCRIPTION |
|---|---|
| 042 | RETAIL GIFT, HARDWARE, HOUSEWARES AND HOME FURNISHING STORE SERVICES |

| UNITED STATES | 0815975.00003 | 8/29/2006 | 78/962,707 | 7/17/2007 | 3,264,838 | REGISTERED | 035 |

| CURRENT DUE | ACTION |
|---|---|
| 7/17/2016 | RENEWAL 1Y REMINDER |

| CLASS | DESCRIPTION |
|---|---|
| 035 | online retail store services in the field of retail gift, hardware, housewares and home furnishings |

| UNITED STATES | 0815975.00005 | 3/8/2007 | 77/125,552 | 12/11/2007 | 3,351,201 | REGISTERED | 009 |

| CURRENT DUE | ACTION |
|---|---|
| 12/11/2016 | RENEWAL 1Y REMINDER |

| CLASS | DESCRIPTION |
|---|---|
| 009 | tape measures |

## GRACIOUS HOME & Design

| UNITED STATES | 0815975.00010 | 4/11/2007 | 77/153,793 | 12/11/2007 | 3,351,799 | REGISTERED | 035 |

| CURRENT DUE | ACTION |
|---|---|
| 12/11/2016 | RENEWAL 1Y REMINDER |

| CLASS | DESCRIPTION |
|---|---|
| 035 | Retail store services in the field of gifts, hardware, housewares and home furnishings |

| UNITED STATES | 0815975.00008 | 8/25/2008 | 77/554,673 | 8/3/2010 | 3,828,911 | REGISTERED | 001, 003, 004, 008, 009, 011, 020, 021, 024, 035, 036 |

| CURRENT DUE | ACTION |
|---|---|
| 8/3/2016 | 8/15 FINAL DEADLINE |

CONFIDENTIAL
jarmenti
19-Jan-2015
12:55:34 PM
64-134.61.190
Joseph Armenti

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | F | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|

| CLASS | DESCRIPTION |
|---|---|
| 001 | Chemically-treated paper for the prevention of tarnishing |
| 003 | house mark for potpourri, bath soap, skin soap, bath salts, body cream, moisturizers, hand cream, skin lotions, hair and body wash, shampoo, sachets, perfume, cologne, body sprays, essential oils for use in the manufacture of scented products, and room fragrances, namely, room mists and potpourri oil refreshers; cleaning preparations, namely, floor tile cleaners and floor tile polishes |
| 004 | candles |
| 008 | hand tools, namely, screwdrivers and screwdriver bits |
| 009 | tape measurers |
| 011 | flashlights, lamps, lampshades and faucets |
| 020 | picture frames and decorative pillows; framed decorative mirrors |
| 021 | house mark for a full line of non-metal and non-precious metal housewares, namely, plates, cups, saucers, bowls, creamers, sugar bowls, teapots, coffee pots, serving platters, spoon rests, candlesticks; butter dishes, salt shakers, pepper shakers, egg cups, pitchers, soup tureens, canisters, mugs, flower pots, vanity and valet trays, wastepaper baskets, ceramic tissue box covers, cachepots, drinking glasses, namely, tumblers, soap dishes, toothbrush holders, skin and hand lotion dispensers for home use, jars, carafes, fitted picnic baskets and picnic baskets and sponges for household purposes |
| 024 | House mark for a full line of domestic textiles, namely, dinner napkins, cocktail napkins, placemats, tablecloths, shower curtains, bath towels, hand towels, bath sheets, washcloths, flat bed sheets, fitted bed sheets, pillowcases, pillow shams, duvet covers, dust ruffles, bed covers, bed spreads and comforters; ornamental items used for decorating, namely, textile tie backs |
| 035 | online retail and retail store services in the field of retail gift, hardware, house wares and home furnishings |
| 036 | Credit card services |

## GRACIOUS HOME EST. 1963 & Design



CONFIDENTIAL
iiamenti
19-Jan-2016
12:53:34 PM
64:134:69:190
Joseph Armenti

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 0815975.00009 | 8/25/2008 | 77/554,726 | 6/22/2010 | 3,807,720 | REGISTERED | 035 |

| CURRENT DUE | ACTION |
|---|---|
| 6/22/2016 | 8/15 FINAL DEADLINE |

| CLASS | DESCRIPTION |
|---|---|
| 035 | online retail and retail store services in the field of retail gift, hardware, house wares and home furnishings |

## LOOK NO FURTHER

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 0815975.00012 | 3/12/1997 | 75/256,102 | 4/21/1998 | 2,152,208 | REGISTERED | 035 |

| CURRENT DUE | ACTION |
|---|---|
| 4/21/2017 | RENEWAL 1Y REMINDER |

| CLASS | DESCRIPTION |
|---|---|
| 035 | retail store services in the field of hardware, housewares and home furnishings |

END OF REPORT                        TOTAL ITEMS SELECTED =                8

# EXHIBIT E

## FORBEARANCE AGREEMENT AND AMENDMENT TO
## LOAN AND SECURITY AGREEMENT

**FORBEARANCE AGREEMENT AND AMENDMENT TO LOAN AND SECURITY AGREEMENT** (this "Amendment"), dated as of November 7, 2016, is entered into by and between GRACIOUS HOME LLC, a limited liability company organized under the laws of Delaware (the "Borrower"), and SIGNATURE BANK, a national banking association (the "Lender").

### Recitals

**WHEREAS**, the Borrower and the Lender are parties to the Loan and Security Agreement, dated as of February 10, 2015 (as amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement");

**WHEREAS**, the Borrower acknowledges and agrees that the Events of Default listed on Exhibit A attached to this Amendment (the "Specified Defaults") have occurred and are continuing;

**WHEREAS**, the Borrower has requested that the Lender (a) forbear from exercising its rights and remedies in respect of the Specified Defaults, and (b) agree to certain amendments to the Loan Agreement as set forth herein; and

**WHEREAS**, the Borrower and the Lender wish to enter into this Amendment to (among other things) evidence and effectuate such forbearance and modify certain provisions of the Loan Agreement, in each case on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, in consideration of the premises, the promises and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### Agreement

1. **Recitals**. The foregoing recitals are true and correct and are hereby incorporated by this reference.

2. **Definitions**. All capitalized terms used herein, except as modified or defined in this Amendment, shall have the meaning given to such terms in the Loan Agreement.

3. **Acknowledgment of Obligations**.

    3.1    Borrower hereby acknowledges, confirms and agrees that as of November 7, 2016, Borrower owes the following principal amounts in respect of the loans or letters of credit made or issued under the Loan Documents: (i) Revolving Loans in the outstanding principal amount of $1,327,852.51 and (ii) Obligations in respect of Letters of Credit in the aggregate face amount equal to $475,000 (the "Existing Letters of Credit"), in each case without setoff, counterclaim or other defense. Borrower represents and warrants that as of the date hereof no Defaults

or Events of Default under the Loan Agreement exist other than the Specified Defaults. Borrower hereby acknowledges, confirms and agrees that the Lender has and shall continue to have valid, enforceable and perfected first priority liens upon and security interests in the Collateral heretofore granted to the Lender.

3.2     Borrower and each Guarantor agrees that all of the Obligations shall, if not sooner paid in accordance with the Loan Documents, be absolutely and unconditionally due and payable in full in cash by Borrower and each Guarantor to Lender on the Forbearance Termination Date.

4.     **Forbearance**.

4.1     Borrower hereby acknowledges and agrees that (a) each of the Specified Defaults has occurred and is continuing, (b) each of the Specified Default constitutes an Event of Default under the Loan Agreement and the other Loan Documents and (c) in the absence of this Amendment, the occurrence of the Specified Defaults (or any of them) entitle Lender to exercise all rights and remedies of the Lender under the Loan Agreement, the other Loan Documents, applicable law and otherwise, including, without limitation, their right to declare all Obligations to be immediately due and payable. The Lender has not waived, presently does not intend to waive and may never waive such Specified Defaults and nothing contained herein or the transactions contemplated hereby shall be deemed to constitute any such waiver.

4.2     In reliance upon the representations, warranties and covenants of Borrower contained herein, and subject to (a) the satisfaction by Borrower of the conditions to effectiveness set forth in Section 9 of the Amendment, and (b) the rights and remedies of the Lender set forth herein and in the Loan Documents, the Lender agrees to forbear from exercising its rights and remedies under the Loan Documents as a result of the occurrence and continuance of the Specified Defaults to the effect that the rights and benefits otherwise available to Borrower under the Loan Agreement and the other Loan Documents in the absence of the Specified Defaults shall continue, subject to the amendments and modifications contained herein, until the earlier of the following dates (the earlier of such dates being referred to herein as the "Forbearance Termination Date"): (i) January 31, 2017, and (ii) the date of the occurrence of any Event of Default other than the Specified Defaults.

4.3     Upon the Forbearance Termination Date, the agreement of the Lender to forbear with respect to the Specified Defaults pursuant to the terms and conditions contained herein shall automatically and without further action terminate and be of no force and effect, it being understood and agreed that the effect of such termination will be to permit the Lender to immediately exercise its rights and remedies under the Loan Documents, applicable law or otherwise without Lender providing any further notice to Borrower or any Guarantor.

4.4   At any time on or after the Forbearance Termination Date, the Lender may, at its option, terminate any provision of the Loan Agreement or any other credit or financial accommodation made by the Lender to Borrower pursuant to the Loan Agreement or the other Loan Documents. No termination of the Loan Agreement or any provisions thereof or any of the other Loan Documents shall relieve or discharge Borrower or any Guarantor or other Obligor in respect of the Obligations of their respective duties, covenants or obligations under the Loan Agreement or the other Loan Documents until all Obligations have been indefeasibly paid and satisfied in full in immediately available funds on terms and conditions acceptable to the Lender.

4.5   The Lender has not waived, is not by this Amendment waiving and has no intention of waiving, any Events of Default that have occurred or which may be continuing on the date hereof or any Events of Default which may occur after the date hereof (whether the same or similar to the Specified Defaults or otherwise), and, except as expressly set forth in Section 4.2 hereof, the Lender has not agreed to forbear with respect to any of its rights or remedies concerning any Events of Default (other than the Specified Defaults) which may have occurred or are continuing as of the date hereof or which may occur after the date hereof, regardless of whether Lender is aware or should be aware of the existence of any such Events of Default. Subject to Section 4.2 hereof, the Lender reserves the right, in its discretion, to exercise any or all of its rights and remedies under the Loan Agreement and the other Loan Documents as a result of any Events of Default which may be continuing on the date hereof or any Defaults or Event of Default which may occur after the date hereof, and the Lender has not waived any of such rights or remedies, and nothing in this Amendment, and no failure, delay or course of dealing on its part in exercising any such rights or remedies, shall be construed as a waiver of any such rights or remedies, all of which are expressly reserved and, by this Amendment, preserved. No single or partial exercise of any right of the Lender shall preclude any later exercise of such right or of any other right, and failure by the Lender to require strict performance of any provision of the Loan Documents shall not affect any right of the Lender to demand strict compliance and performance thereunder.

4.6   Notwithstanding anything to the contrary contained in Section 4.2 above or otherwise, the Lender's agreement to forbear from exercising its rights during the Forbearance Period does not and shall not extend or apply to the Lender's right to continue (i) to charge interest at the Default Rate as set forth in the Loan Agreement; (ii) to incur Extraordinary Expenses; and (iii) Borrower and each Guarantor hereby acknowledges and agrees that the Lender has had, and shall continue to have, the right to continue to charge the interest at the Default Rate and incur Extraordinary Expenses as set forth in the Loan Agreement.

4.7   Borrower and each Guarantor hereby acknowledges, confirms and agrees that notwithstanding anything in the Loan Agreement, other Loan Documents, or this Amendment to the contrary, Lender shall have no further obligation to make any additional Revolving Loans, or to provide any Letters of Credit, advances, or

other financial accommodations to Borrower other than as expressly set forth in the Budget and in accordance with the terms of this Amendment.

5. <u>Amendments</u>.

5.1    The definition of "Availability Reserve" appearing in Exhibit A of the Loan Agreement is hereby amended and restated in its entirety to read as follows:

""Availability Reserve" means a reserve in an amount as Lender may establish from time to time, in its sole discretion."

5.2    The definition of "Revolver Termination Date" appearing in Exhibit A to the Loan Agreement is hereby amended and restated in its entirety to read as follows:

" "Revolver Termination Date" means January 31, 2017."

5.3    Exhibit A to the Loan Agreement is hereby amended to include, in addition and not in limitation, the following new defined terms, added in appropriate alphabetical order:

""Permitted Discretion" means, with respect to any Person, a determination made in the exercise of such Person's commercially reasonable business judgment (from the perspective of a secured lender)."

5.4    Section 10.2.8 of the Loan Agreement is hereby amended and restated in its entirety to read as follows:

"10.2.8. <u>Restrictions on Payment of Certain Debt</u>. Make any payments (whether voluntary or mandatory, or a prepayment, redemption, retirement, defeasance or acquisition) with respect to any Subordinated Debt, except as expressly set forth in the Budget."

6.    **Additional Covenants**. In addition, and not in limitation of, any covenant or agreement set forth in any of the Loan Documents, Borrower hereby acknowledges, confirm and agrees:

6.1    <u>Financial Consultant</u>. Lender's counsel has retained RAS Management Advisors, LLC (the "Financial Consultant") to gather financial, operational and collateral-related information with respect to the Borrower, its assets, finances and operations. Borrower agrees that Borrower shall cooperate with Financial Consultant and make members of management and financial personnel available to the Financial Consultant to properly respond to inquiries and to information and documentation requests made by Financial Consultant and undertake other efforts required by Lender or the Financial Consultant.

6.2    <u>Chief Restructuring Officer</u>. On or before November 7, 2016, Borrower shall retain, on terms and conditions acceptable to Lender in its Permitted Discretion and at the sole cost and expense of Borrower, a Chief Restructuring Officer

acceptable to Lender in its Permitted Discretion (the "*CRO*") to, among other things, advise Borrower in connection with the operation of its business. The CRO shall (a) assume in all respects the management of the businesses and properties of Borrower; (b) be granted exclusive authority to authorize the expenditure of any funds by Borrower; (c) be granted exclusive authority to hire or terminate the employment of any employee of Borrower; and (d) assist Borrower in the preparation of and compliance with, on an ongoing basis, the Budget and compliance with the terms and conditions set forth in this Amendment, the Loan Agreement and other Loan Documents. The CRO shall report directly to the Board of Directors or Managing Member of Borrower and have the exclusive authority to retain and oversee a Person to liquidate the assets of Borrower in accordance with the Budget and on terms and conditions acceptable to Lender in its Permitted Discretion. Borrower shall continue the engagement of the CRO, on terms and conditions acceptable to Lender, until the earlier of (i) the date on which the Obligations are fully paid and satisfied, in cash, the Credit Agreement has been terminated and Lender has released its Lien upon the Collateral; or (ii) such earlier date on which Lender, in its sole discretion, has agreed in writing to the termination of such engagement. Borrower hereby agrees to deliver to Lender, or cause to be delivered to Lender, copies of all budgets, records, projections, financial information, reports and other information prepared, produced and/or delivered by or to the CRO with respect to the Collateral or the financial condition or operation of Borrower or the business of Borrower. Borrower hereby irrevocably releases the CRO from all confidentiality restrictions in connection with the CRO's communications with Lender and further irrevocably authorizes and instructs the CRO to promptly advise Lender of the occurrence of any Defaults or Events of Default and to promptly and fully respond to any inquiries of Lender in connection with the Borrower, its operations and finances and the Collateral. If the CRO resigns, Borrower shall immediately notify Lender and provide a copy of any notice of resignation immediately upon their receipt of such notice.  Any replacement or successor CRO shall be acceptable to Lender and shall be retained pursuant to a new retention agreement on terms and conditions acceptable to Lender within five (5) Business Days immediately following the notice of resignation of the resigning CRO. Failure to comply with the terms and conditions of this section shall constitute an Event of Default.

6.3   Budget.

(a) On or before November 8, 2016, Borrower shall provide to Lender a weekly line item budget, in form and content satisfactory to Lender (the "Budget"). Borrower shall report to Lender on the Tuesday of each week, for the immediately preceding week, the actual weekly results for each line item set forth on the Budget.   At no time on or after November 8, 2016 shall any actual results for any line item for any weekly period negatively deviate from the line item set forth on the Budget by more than 5%.  Borrower and each Guarantor acknowledge and agree that any deviation of the actual financial

results for any line item in the Budget of more than 5% from the projected results for such line item during any weekly period shall be a breach of this Amendment and an additional Event of Default under the Loan Agreement.

(b) Borrower and each Guarantor acknowledges and agrees that Lender shall not be responsible for, or have any liability or obligation to ensure the payment of, any costs and expenses set forth in the Budget or any other claims asserted or incurred in connection with the Borrower's business or any proceeding commenced by or against Borrower under any chapter of the Bankruptcy Code, and nothing in this Amendment or otherwise shall be construed to obligate Lender in any way, to pay, fund, or ensure that the Borrower has sufficient funds to pay any such costs and expenses.

(c) Permitted Indebtedness. Borrower and each Guarantor acknowledges and agrees that notwithstanding anything to the contrary set forth in this Amendment, the Loan Agreement, or any other Loan Document, so long as any Obligations remain outstanding, any indebtedness incurred by Borrower or any Guarantor on or after the Amendment Effective Date shall be limited to (i) the indebtedness set forth in the Budget; and (ii) any Obligations owed by Borrower or any Guarantor to Lender in accordance with this Amendment, the Loan Agreement or other Loan Documents.

(d) Notwithstanding anything set forth to the contrary in the Loan Agreement, the other Loan Documents, or otherwise, on and after the Amendment Effective Date all Loans made by Lender to Borrower and all Letters of Credit issued pursuant to the Loan Agreement, the other Loan Documents or otherwise, shall be used by Borrower only in accordance with the Budget. Borrower and Guarantors hereby acknowledge and agree that it shall be an additional Default and Event of Default if Borrower uses proceeds of any Revolving Loans or Letters of Credit extended by Lender after the Amendment Effective Date for any expense that is not set forth in the Budget or otherwise consented to by Lender in writing.

6.4   Bank Accounts.  On or before November 8, 2016, Borrower shall deliver to Lender a true and complete list of all bank accounts maintained by the Borrower or containing any funds of the Borrower, in form and substance satisfactory to Lender.   Without limiting the foregoing, on or before November 8, 2016, Borrower shall close its bank account maintained at Republic Bank and remit all of the funds on deposit in such bank account to Lender for application to the Obligations.

6.5   Peaceful Possession Letter. Borrower and each Guarantor shall deliver to Lender on or before the Amendment Effective Date a "peaceful possession letter" turning over to Lender all right title and interest of Borrower and the Guarantors in the Collateral. Lender shall hold the peaceful possession letter in escrow pending the

acknowledgement by Lender of an Event of Default other than the Specified Defaults.

6.6    Additional Financial Projections. Borrower and each Guarantor shall deliver to Lender on or before November 10, 2016 two liquidation budgets reviewed and approved by the CRO: one liquidation budget shall assume an out-of-court liquidation and a second liquidation budget shall assume a liquidation of each Borrower and Guarantor utilizing Chapter 11 of the Bankruptcy Code.

6.7    Liquidator. On or before November 8, 2016, Borrower and each Guarantor shall retain, on terms and conditions reasonably acceptable to Lender in its Permitted Discretion and at the sole cost and expense of Borrower a Person to conduct liquidation and "going out of business sales" of the assets of Borrower and each Guarantor (the "Liquidator"). If the Liquidator resigns, Borrower and Guarantors shall immediately notify Lender and provide a copy of any notice of resignation immediately upon the receipt of such notice by Borrower. Any replacement or successor Liquidator shall be acceptable to Lender and shall be retained pursuant to a new retention agreement on terms and conditions reasonably acceptable to Lender in its Permitted Discretion within five (5) Business Days immediately following the notice of resignation of the resigning Liquidator.

6.8    Additional Events of Default. Borrower acknowledges, confirms and agrees that Borrower's failure to timely comply with the covenants set forth in Section 6.1, 6.2, 6.3, 6.4, 6.5, 6.6, or 6.7 above shall constitute additional Events of Default under the Loan Agreement, and without limiting Lender's other rights and remedies, upon any failure by Borrower to timely comply with the dates set forth in Sections 6.2, 6.3, 6.4, 6.5, 6.6, or 6.7 above, Lender shall be entitled, in Lender's sole and absolute discretion and without further notice or consent from Borrower, to increase the Applicable Margin then in effect by one percent (1%) for each such violation.

6.9    Joinder of Gracious Partners. On or before November 18, 2016, Borrower and Guarantor shall cause execution and delivery of a Joinder Agreement and related agreements by Gracious Partners LLC, in form and content satisfactory to Lender.

7.    **Forbearance and Amendment Fee.** In addition to all other fees, charges, interest and expenses payable by Borrower and each Guarantor to Lender under the Loan Documents, and in consideration of the forbearance and amendments set forth herein, Borrower shall pay to Lender, or Lender, at its option, may charge the account of Borrower maintained by Lender, a forbearance and amendment fee in the amount of $10,000, which fee is fully earned and payable as of the date hereof.

8.    **Representations and Warranties and Covenants**. The terms and conditions, representations and warranties, and covenants set forth in the Loan Agreement and the other Loan Documents are hereby ratified and affirmed by Borrower, and Borrower hereby agrees that the such terms, conditions, and covenants are valid, true and correct as if made on the date hereof, except with respect to the Specified Defaults. Borrower

further represents and warrants to the Lender that (i) it has duly authorized the execution, delivery and performance of this Amendment and the other agreements, documents and instruments executed by the Borrower in connection herewith (together with this Amendment, the "Amendment Documents"), (ii) each Amendment Document is the valid and binding obligations of the Borrower, enforceable against it in accordance with their respective terms, (iii) the execution delivery and performance of each Amendment Document does not conflict with any agreement, contract, law or other restriction applicable to the Borrower, and (iv) no consents are required for the Borrower's execution, delivery and performance of each Amendment Document, other than those which have already been obtained.

9.    **Effectiveness**. This Amendment shall become effective upon the satisfaction of each of the following conditions, in each case in a manner reasonably satisfactory in form and substance to the Lender: This Amendment shall become effective on the date the following conditions are satisfied (the "Amendment Effective Date"): (a) receipt by Lender of an original of this Amendment, duly authorized, executed and delivered by Borrower and Lender; (b) [reserved]; (c) execution and delivery of a Domain Name Control Agreement by Borrower or Gracious (IP) LLC, as applicable, in form and content satisfactory to Lender; (d) receipt by Lender of a copy of an amendment to the Operating Agreement of Gracious Home Holdings LLC authorizing, without further approval of the Board of Directors of Gracious Home Holdings LLC, exercise of Lender's rights and remedies with respect to the membership interests pledged to Lender; (e) execution and delivery of a Subordination Agreement in favor of Lender by GH Management LLC with respect to the management fee payable by Borrower, on terms and conditions satisfactory to Lender.

10.   **Costs and Expenses**.  Without limiting the obligations of Borrower under the other Loan Documents, Borrower agrees to pay to the Lender, on demand by the Lender, the documented fees and disbursements incurred by the Lender, in connection with the preparation, negotiation, execution, delivery, administration, collection, enforcement and defense of the Loan Documents (including the Amendment Documents), the Obligations, the Lender's rights in the collateral and any agreements or documents prepared, negotiated, executed or delivered in connection with the transactions contemplated hereby and thereby, including, without limitation, the documented fees and disbursements of counsel to the Lender.

11.   **Release**. In order to induce the Lender to enter into this Amendment, the Borrower and each Guarantor acknowledges and agrees that: (i) neither Borrower nor any Guarantor has any claim or cause of action against the Lender or any of its directors, officers, employees, agents, consultants (including without limitation RAS Management Advisors LLC) or representatives; (ii) neither Borrower nor any Guarantor has any offset or compensation right, counterclaim, right of recoupment or any defense of any kind against any the Borrower's obligations, indebtedness or liabilities to the Lender; and (iii) the Lender has heretofore properly performed and satisfied in a timely manner all of its obligations to the Borrower and (to the extent applicable) each Guarantor. The Borrower and each Guarantor wish to eliminate any possibility that any past conditions, acts, omissions, events, circumstances or matters would impair or otherwise adversely affect

any of the Lender's rights, interests, contracts, collateral security or remedies. Therefore, the Borrower and each Guarantor unconditionally releases, waives and forever discharges (A) any and all liabilities, obligations, duties, promises or indebtedness of any kind of the Lender to the Borrower and (to the extent applicable) each Guarantor, except the obligations to be performed by the Lender on or after the date hereof as expressly stated in this Amendment, the Loan Agreement and the other Loan Documents, and (B) all claims, counterclaims, offsets, compensation rights, causes of action, right of recoupment, suits or defenses of any kind whatsoever (if any), whether arising at law or in equity, whether known or unknown, which the Borrower or any Guarantor might otherwise have against the Lender or any of its directors, officers, employees, agents, consultants (including without limitation RAS Management Advisors LLC) or representatives, in each case under clause (A) or (B), on account of any past or presently existing (as of the date hereof) condition, act, omission, event, contract, liability, obligation, indebtedness, claim, cause of action, defense, counterclaims, compensation rights, circumstance or matter of any kind.

12.    **Refinancing**. Nothing contained herein shall prevent or preclude the Borrower or any Guarantor from seeking or obtaining refinancing indebtedness intended to repay the Obligations in full on terms and conditions acceptable to Lender in its sole discretion.

13.    **Effect of this Amendment**. Except as expressly amended and modified by this Amendment, all provisions of the Loan Agreement and the other Loan Documents shall remain in full force and effect and are hereby ratified and confirmed, and all such provisions shall apply equally to the terms and conditions set forth herein. After this Amendment becomes effective, all references in the Loan Agreement to "this Agreement", "hereof", "herein" or words of similar effect referring to such Agreement shall be deemed to be references to the Loan Agreement as amended by this Amendment. This Amendment shall not be deemed to expressly or impliedly waive, amend or supplement any provision of the Loan Agreement other than as set forth herein. Each Amendment Document shall constitute a Loan Document.

14.    **Parties-in-interest; Loan Party Assignment**. This Amendment shall be binding upon and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the parties hereto; provided, that the Borrower shall neither assign nor transfer any of its rights or obligations.

15.    **Modifications**. This Amendment may not be modified, amended, waived, changed or terminated orally, but only by an agreement in writing signed by the party against whom the enforcement of the modification, amendment, waiver, change or termination is sought.

16.    **Counterparts; etc**. Each Amendment may be executed in any number of duplicate originals and each such duplicate original shall be deemed to constitute but one and the same instrument. Delivery of an executed counterpart of each Amendment Document by telefacsimile or other electronic method of transmission shall have the same force and effect as delivery of an original executed counterpart of such Amendment Document. Any party delivering an executed counterpart of such Amendment Document by

telefacsimile or other electronic method of transmission shall also deliver an original executed counterpart of such Amendment Document, but the failure to do so shall not affect the validity, enforceability, and binding effect of this Amendment.

17.   **Severability**. If any term, covenant or condition of this Amendment shall be held to be invalid, illegal or unenforceable in any respect, this Amendment shall be construed without such provision.

18.   **Governing Law**.  This Amendment shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, excluding those laws relating to the resolution of conflicts between laws of different jurisdictions.

## SIGNATURES BEGIN ON THE NEXT PAGE

10

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be executed as of the date and year first above written.

**BORROWER**

GRACIOUS HOME LLC

By: _____   DAVIN Mitchell
Name: _____   CHRM
Title: _____

**LENDER:**

SIGNATURE BANK

By: _____
Name: _____
Title: _____

Each of the undersigned, a Guarantor of the Obligations, has reviewed the foregoing Amendment and hereby, to the extent required, consented to the terms and provisions of the Amendment and the Borrower's execution and delivery thereof to Lender and further ratifies and reaffirms its guaranty in favor of Lender with respect to the Obligations and the Loan Documents, as amended hereby.

AMERICAS FLAGSHIP FUND LLC

By: _____
Name: _____
Title: _____

GRACIOUS HOME HOLDINGS LLC

By: _____   Davin Mitche
Name: _____   CHRM
Title: _____

4441406.15

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be executed as of the date and year first above written.

**BORROWER**

GRACIOUS HOME LLC

By: _____
Name: _____    DAVID Mitchell
Title: _____    CHRM

**LENDER:**

SIGNATURE BANK

By: _____
Name: SALVATORE IRIBETTI
Title: SVP - Manager of Special Assets

Each of the undersigned, a Guarantor of the Obligations, has reviewed the foregoing Amendment and hereby, to the extent required, consented to the terms and provisions of the Amendment and the Borrower's execution and delivery thereof to Lender and further ratifies and reaffirms its guaranty in favor of Lender with respect to the Obligations and the Loan Documents, as amended hereby.

AMERICAS FLAGSHIP FUND LLC

By: _____
Name: _____
Title: _____

GRACIOUS HOME HOLDINGS LLC

By: _____
Name: _____    David Mitche
Title: _____    CHRM

1441-406-15



**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be executed as of the date and year first above written.

**BORROWER**

**GRACIOUS HOME LLC**

By: _____
Name: _____
Title: _____

**LENDER:**

**SIGNATURE BANK**

By: _____
Name: _____
Title: _____

Each of the undersigned, a Guarantor of the Obligations, has reviewed the foregoing Amendment and hereby, to the extent required, consented to the terms and provisions of the Amendment and the Borrower's execution and delivery thereof to Lender and further ratifies and reaffirms its guaranty in favor of Lender with respect to the Obligations and the Loan Documents, as amended hereby.

**AMERICAS FLAGSHIP FUND LLC**

By: _____
Name: _____ Isibor Maxroch
Title: _____ General Partner

**GRACIOUS HOME HOLDINGS LLC**

By: _____
Name: _____
Title: _____

4441406.15

GRACIOUS HOME PAYROLL LLC

By: _____  Devin Mitchell
Name: _____
Title: _____

GH EAST SIDE LLC

By: _____  David Mitchell
Name: _____
Title: _____

GH WEST SIDE LLC

By: _____  Devin Mitchell
Name: _____
Title: _____

GH CHELSEA LLC

By: _____  Davin Mitchell
Name: _____
Title: _____

4441406.15

**ACKNOWLEDGED AND AGREED**:

GRACIOUS PARTNERS LLC

By: _____
Name: _____
Title: _____

**Exhibit A**
**to**
**Forbearance Agreement and Amendment to Loan Agreement**

**Specified Defaults**

(a)      Borrower's failure to maintain Consolidated EBITDA of not less than <$800,000> for the nine month period ending September 30, 2015 in violation of Section 10.2.24 of the Loan Agreement;

(b)      Borrower's failure to maintain a Fixed Charge Coverage Ratio of not less than 1.05:1.0 for the twelve month period ending December 31, 2015 in violation of Section 10.2.25 of the Loan Agreement; and

(c)      Borrower's failure to provide consolidated balance sheets for the Fiscal Year ending December 31, 2015 and related statements of income, cash flow and Equity Interest holder' equity for such Fiscal Year and the management letter relating thereto in violation of Section 10.1.2(a) of the Loan Agreement.

4441406.14

# EXHIBIT F

**GRACIOUS HOME, LLC**

**NOTE PURCHASE AGREEMENT**

**MAY 2, 2016**

{00034074v1 }

## NOTE PURCHASE AGREEMENT

**THIS NOTE PURCHASE AGREEMENT** ("Agreement") is made as of May 2, 2016, by and among Gracious Home, LLC, a Delaware limited liability company (the "Company"), and the lenders (each individually a "Lender," and collectively the "Lenders") named on the Schedule of Lenders attached hereto (the "Schedule of Lenders"). Capitalized terms not otherwise defined in this Agreement shall have the meanings ascribed to them in Section 1 below.

**WHEREAS,** each Lender intends to provide certain Consideration to the Company as described for each Lender on the Schedule of Lenders;

**WHEREAS,** the parties wish to provide for the sale and issuance of such Notes in return for the provision by the Lenders of the Consideration to the Company; and

**WHEREAS,** the parties intend for the Company to issue in return for the Consideration one or more Notes to purchase shares of the Company's Equity Securities.

**NOW, THEREFORE, THE PARTIES HEREBY AGREE AS FOLLOWS:**

1.    Definitions.

(a)    "Acquisition Price" shall mean the price per share obtained by dividing the equity value of $20,000,000 by the total number of Company Units outstanding at the time of an acquisition.

(b)    "Consideration" shall mean the amount of money paid by each Lender pursuant to this Agreement as shown on the Schedule of Lenders.

(c)    "Conversion Units" shall, for purposes of determining the type of Equity Securities issuable upon conversion of the Notes, mean the Equity Securities issued in the Next Equity Financing or in the instance of a conversion of the Notes upon the closing of a Corporate Transaction, Common Units.

(d)    "Conversion Price" shall equal the product of (1) 80% and (2) the lowest price paid per share for Equity Securities by the investors in the Next Equity Financing.

(e)    "Corporate Transaction" shall include (A) the closing of the sale, transfer or other disposition of all or substantially all of the Company's assets, (B) the consummation of the merger or consolidation of the Company with or into another entity (except a merger or consolidation in which the holders of capital Units of this Company immediately prior to such merger or consolidation continue to hold at least 50% of the voting power of the capital Units of this Company or the surviving or acquiring entity), (C) the closing of the transfer (whether by merger, consolidation or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons (other than an underwriter of the Company's securities), of this Company's securities if, after such closing, such person or group of affiliated persons would hold 50% or more of the outstanding voting Units of the Company (or the surviving or acquiring

entity) or (D) a liquidation, dissolution or winding up of the Company; provided, however, that a transaction shall not constitute a Corporate Transaction if its sole purpose is to change the state of the Company's formation or to create a holding company that will be owned in substantially the same proportions by the persons who held this Company's securities immediately prior to such transaction.

(f)    "Equity Securities" shall mean the Company's Common Units or Preferred Units or any securities conferring the right to purchase the Company's Common Units or Preferred Units or securities convertible into, or exchangeable for (with or without additional consideration), the Company's Common Units or Preferred Units, except any security granted, issued and/or sold by the Company to any director, officer, employee or consultant of the Company in such capacity for the primary purpose of soliciting or retaining their services.

(g)    "Majority Note Holders" shall mean the holders of a majority in interest of at least 50.1% of the aggregate principal amount of Notes.

(h)    "Next Equity Financing" shall mean the next sale (or series of related sales) by the Company of its Equity Securities following the date of this Agreement from which the Company receives gross proceeds of not less than $3,000,000 (excluding the aggregate amount of debt securities converted into Equity Securities upon conversion of the Notes pursuant to Section 2.2 below).

(i)    "Notes" shall mean the one or more promissory notes issued to each Lender pursuant to Section 2.1 below, the form of which is attached hereto as Exhibit A. The Notes are subordinate in right of payment to all current and future indebtedness to banks and other financial institutions.

2.    Amount and Terms of the Notes.

2.1    Issuance of Notes. In return for the Consideration paid by each Lender, the Company shall sell and issue to such Lender one or more Notes. Each Note shall have a principal balance equal to that portion of the Consideration paid by such Lender for the Note, as set forth in the Schedule of Lenders. Each Note shall be convertible into Conversion Units pursuant to Section 2.2 below.

2.2    Right to Convert Notes.

(a)    Next Equity Financing. The principal and unpaid accrued interest of each Note will be automatically converted into Conversion Units upon the closing of the Next Equity Financing. The number of Conversion Units to be issued upon such conversion shall be equal to the quotient obtained by dividing the outstanding principal and unpaid accrued interest on a Note to be converted, or portion thereof, on the date of conversion, by the Conversion Price. At least five (5) days prior to the closing of the Next Equity Financing, the Company shall notify the holder of each Note in writing of the terms under which the Equity Securities of the Company will be sold in such financing. The issuance of Conversion Units pursuant to the conversion of each Note shall be upon and subject to the same terms and conditions applicable to the Equity Securities sold in the Next Equity Financing.

(b)     _Corporate Transaction_. In the event of a Corporate Transaction prior to full payment of a Note or prior to the time when a Note may be converted (as provided herein), all outstanding principal and unpaid accrued interest due on such Note shall be converted effective immediately prior to the close of business on the date of the closing of the Corporate Transaction into that number of Conversion Units equal to the quotient obtained by dividing the outstanding principal and unpaid accrued interest on a Note to be converted, or portion thereof, on the date of conversion, by the Acquisition Price.

(c)     _No Fractional Shares_.  Upon the conversion of a Note into Conversion Units, in lieu of any fractional shares to which the holder of the Note would otherwise be entitled, the Company shall pay the Note holder cash equal to such fraction multiplied by the Conversion Price.

(d)     _Mechanics of Conversion_.  The Company shall not be required to issue or deliver the Conversion Units until the Note holder has surrendered the Note to the Company. Such conversion shall be made contingent upon the closing of the Next Equity Financing or Corporate Transaction.

(e)     _Effect of Conversion_.  Upon conversion of a Note, the Company shall be forever released from all liabilities and obligations under the Note.

3.     _Closing Mechanics_.

3.1     _Closing_.  The initial closing (the "Closing") of the purchase of the Notes in return for the Consideration paid by each Lender shall take place at the Company's offices on April 27, 2016, or at such other time and place as the Company and the Lenders purchasing a majority in interest of the aggregate principal amount of the Notes to be sold at the Closing agree upon orally or in writing. At the Closing, each Lender shall deliver the Consideration to the Company and the Company shall deliver to each Lender one or more executed Notes in return for the respective Consideration provided to the Company.

3.2     _Subsequent Closings_.  In any subsequent closing (each a "Subsequent Closing"), the Company may sell additional Notes until August 31, 2016 subject to the terms of this Agreement to any Lender as it shall select _provided_ that the aggregate amount of Consideration for all Notes does not exceed $3,500,000. Any subsequent purchasers of Notes shall become a party to, and shall be entitled to receive Notes in accordance with this Agreement. Each Subsequent Closing shall take place at such locations and at such times as shall be mutually agreed upon orally or in writing by the Company and such purchasers of additional Notes.

4.     _Representations and Warranties of the Company_.   In connection with the transactions provided for herein, the Company hereby represents and warrants to the Lenders that:

4.1     _Organization, Good Standing and Qualification_.  The Company is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted. The Company is duly qualified to transact business and is in good

standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on its business or properties.

4.2     Authorization.   Except for the authorization and issuance of the units issuable in connection with the Next Equity Financing, all corporate action has been taken on the part of the Company, its officers, directors and members necessary for the authorization, execution and delivery of this Agreement and the Notes. Except as may be limited by applicable bankruptcy, insolvency, reorganization, or similar laws relating to or affecting the enforcement of creditors' rights, the Company has taken all corporate action required to make all of the obligations of the Company reflected in the provisions of this Agreement and the Notes, the valid and enforceable obligations they purport to be.

4.3     Compliance with Other Instruments.   Neither the authorization, execution and delivery of this Agreement, nor the issuance and delivery of the Notes, will constitute or result in a material default or violation of any law or regulation applicable to the Company or any material term or provision of the Company's current Certificate of Formation or operating agreement or any material agreement or instrument by which it is bound or to which its properties or assets are subject.

4.4     Valid Issuance of Units.   The Conversion Units to be issued, sold and delivered upon conversion of the Notes will be duly and validly issued, fully paid and nonassessable and, based in part upon the representations and warranties of the Lenders in this Agreement, will be issued in compliance with all applicable federal and state securities laws.

4.5     Legal Proceedings.   There is no legal proceeding pending or threatened against the Company or any subsidiary or, to the knowledge of the Company, against any of its officers, directors or employees with respect to their business activities on behalf of the Company or any subsidiary, or to which the Company or any subsidiary is otherwise a party, before any governmental body; nor to the knowledge of the Company is there any reasonable basis for any such legal proceeding. Neither the Company nor any subsidiary is subject to any order, nor in breach or violation of any order. Neither the Company nor any subsidiary is engaged in any legal proceeding to recover monies due it or for damages sustained by it.

4.7     Use of Proceeds.   Any proceeds from the Notes will be used for general working capital and not for the retirement of any debt or other existing financial obligations of the Company.

5.     Representations and Warranties of the Lenders.   In connection with the transactions provided for herein, each Lender hereby represents and warrants to the Company that:

5.1     Authorization.   This Agreement constitutes such Lender's valid and legally binding obligation, enforceable in accordance with its terms, except as may be limited by (i) applicable bankruptcy, insolvency, reorganization, or similar laws relating to or affecting the enforcement of creditors' rights and (ii) laws relating to the availability of specific performance,

injunctive relief or other equitable remedies. Each Lender represents that it has full power and authority to enter into this Agreement.

5.2    <u>Purchase Entirely for Own Account</u>. Each Lender acknowledges that this Agreement is made with Lender in reliance upon such Lender's representation to the Company that the Notes, the Conversion Units, and any Common Units issuable upon conversion of the Conversion Units (collectively, the "Securities") will be acquired for investment for Lender's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that such Lender has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, each Lender further represents that such Lender does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Securities.

5.3    <u>Disclosure of Information</u>. Each Lender acknowledges that it has received all the information it considers necessary or appropriate for deciding whether to acquire the Securities. Each Lender further represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities.

5.4    <u>Investment Experience</u>. Each Lender is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself, can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Securities. If other than an individual, each Lender also represents it has not been organized solely for the purpose of acquiring the Securities.

5.5    <u>Accredited Investor</u>. Each Lender is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities and Exchange Commission (the "SEC"), as presently in effect.

5.6    <u>Restricted Securities</u>. Each Lender understands that the Securities are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the Securities Act of 1933 (the "Act") only in certain limited circumstances. Each Lender represents that it is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

5.7    <u>Further Limitations on Disposition</u>. Without in any way limiting the representations and warranties set forth above, each Lender further agrees not to make any disposition of all or any portion of the Securities unless and until the transferee has agreed in writing for the benefit of the Company to be bound by this Section 5, Section 6.11 and:

(a)    There is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(b)    (i) Lender has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition and (ii) if reasonably requested by the Company, Lender shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of such shares under the Act.  It is agreed that the Company will not require opinions of counsel for transactions made pursuant to Rule 144 except in extraordinary circumstances.

Lender shall not make any disposition of any Note, Conversion Units or Equity Securities to any of the Company's competitors as such is in good faith determined by the Company.

5.8    Legends.  It is understood that the Equity Securities may bear the following legend:

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.  THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SUCH ACT."

6.    Miscellaneous.

6.1    Successors and Assigns.  Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties, provided, however, that the Company may not assign its obligations under this Agreement without the written consent of the Majority Note Holders.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

6.2    Governing Law.  This Agreement and the Notes shall be governed by and construed under the laws of the State of Delaware as applied to agreements among Delaware residents, made and to be performed entirely within the State of Delaware.

6.3    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6.4    Titles and Subtitles.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

6.5    Notices.  All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed effectively given:  (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed electronic mail or facsimile if sent during

normal business hours of the recipient, if not so confirmed, then on the next business day, (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the respective parties at the following addresses (or at such other addresses as shall be specified by notice given in accordance with this Section 6.5):

If to the Company:

Gracious Home, LLC
158 West 27th Street, 12th Floor
New York, NY 10001
Attention: Chief Executive Officer

If to Lenders:

At the respective addresses shown on the signature pages hereto.

6.6    Finder's Fee. Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction. Lender agrees to indemnify, defend and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's fee (and the costs and expenses of defending against such liability or asserted liability) for which Lender or any of its officers, partners, employees or representatives is responsible. The Company agrees to indemnify, defend and hold harmless Lender from any liability for any commission or compensation in the nature of a finder's fee (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

6.7    Expenses. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

6.8    Entire Agreement; Amendments and Waivers. This Agreement, the Notes and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof. The Company's agreements with each of the Lenders are separate agreements, and the sales of the Notes to each of the Lenders are separate sales. Nonetheless, any term of this Agreement or the Notes may be amended and the observance of any term of this Agreement or the Notes may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the Majority Note Holders. Any waiver or amendment effected in accordance with this Section shall be binding upon each party to this Agreement and any holder of any Note purchased under this Agreement at the time outstanding and each future holder of all such Notes.

6.9    Effect of Amendment or Waiver. Each Lender acknowledges that by the operation of Section 6.9 hereof, the Majority Note Holders will have the right and power to

diminish or eliminate all rights of such Lender under this Agreement and each Note issued to such Lender.

      6.10   Severability. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

      6.11   "Market Stand-Off" Agreement. Each Lender hereby agrees that it will not, without the prior written consent of the managing underwriter, during the period commencing on the date of the final prospectus relating to the Company's initial offering of equity securities and ending on the date specified by the Company and the managing underwriter (such period not to exceed one hundred eighty (180) days) (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any shares of Common Units or any securities convertible into or exercisable or exchangeable for Common Units (whether such shares or any such securities are then owned by the Lender or are thereafter acquired), or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Units, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Common Units or other securities, in cash or otherwise. The foregoing provisions of this Section 6.11 shall apply only to the Company's initial offering of equity securities, shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, and shall only be applicable to the Lenders if all officers, directors and greater than two percent (2%) members of the Company enter into similar agreements. The underwriters in connection with the Company's Initial Offering are intended third-party beneficiaries of this Section 6.11 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. Each Lender further agrees to execute such agreements as may be reasonably requested by the underwriters in the Company's initial offering that are consistent with this Section 6.11 or that are necessary to give further effect thereto.

      In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to the registrable securities of each Lender (and the shares or securities of every other person subject to the foregoing restriction) until the end of such period. Notwithstanding the foregoing, if (i) during the last seventeen (17) days of the one hundred eighty (180)-day restricted period, the Company issues an earnings release or material news or a material event relating to the Company occurs; or (ii) prior to the expiration of the one hundred eighty (180)-day restricted period, the Company announces that it will release earnings results during the sixteen (16)-day period beginning on the last day of the one hundred eighty (180)-day period, the restrictions imposed by this Section 6.11 shall continue to apply until the expiration of the eighteen (18)-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event.

      Each Lender agrees that a legend reading substantially as follows shall be placed on all certificates representing all registrable securities of each Lender (and the shares or securities of every other person subject to the restriction contained in this Section 6.11):

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LOCK-UP PERIOD AFTER THE EFFECTIVE DATE OF THE ISSUER'S REGISTRATION STATEMENT FILED UNDER THE ACT, AS AMENDED, AS SET FORTH IN AN AGREEMENT BETWEEN THE COMPANY AND THE ORIGINAL HOLDER OF THESE SECURITIES, A COPY OF WHICH MAY BE OBTAINED AT THE ISSUER'S PRINCIPAL OFFICE. SUCH LOCK-UP PERIOD IS BINDING ON TRANSFEREES OF THESE SHARES.

6.12    Units Purchase Agreement. Each Lender understands and agrees that the conversion of the Notes into Conversion Units may require such Lender's execution of certain agreements in the form agreed to by investors in the Next Equity Financing relating to the purchase and sale of such securities as well as registration, co-sale, rights of first refusal, rights of first offer and voting rights, if any, relating to such securities and that the conversion of this Note into Conversion Units may be conditioned thereon.

6.13    Exculpation Among Lenders. Each Lender acknowledges that it is not relying upon any person, firm, corporation or members, other than the Company and its officers and directors in their capacities as such, in making its investment or decision to invest in the Company. Each Lender agrees that no other Lender nor the respective controlling persons, officers, directors, partners, agents, members or employees of any other Lender shall be liable for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the purchase and sale of the Notes .

6.14    Acknowledgement. In order to avoid doubt, it is acknowledged that each Lender shall be entitled to the benefit of all adjustments in the number of shares of Common Units of the Company issuable upon conversion of the Preferred Units of the Company or as a result of any splits, recapitalizations, combinations or other similar transaction affecting the Common Units or Preferred Units underlying the Conversion Units that occur prior to the conversion of the Notes.

6.15    Further Assurance. From time to time, the Company shall execute and deliver to the Lenders such additional documents and shall provide such additional information to the Lenders as any Lender may reasonably require to carry out the terms of this Agreement and the Notes and any agreements executed in connection herewith or therewith, or to be informed of the financial and business conditions and prospects of the Company.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**GRACIOUS HOME, LLC**

By:_____

   CEO

**LENDER:**

_____

Robert Crozier

{00034074v1 }

# EXHIBIT G

**SIGNATURE BANK**
565 Fifth Avenue
New York, New York 10017

May 10, 2016

**VIA FEDERAL EXPRESS**

Gracious Home LLC
158 West 27th Street
New York,  New York 10017

Re:   Notice of Events of Default and Reservation of Rights

Ms. Dorothy Mattison:

Reference is made to the Loan and Security Agreement, dated as of February 10, 2015 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), between GRACIOUS HOME LLC ("**Borrower**") and SIGNATURE BANK ("**Lender**").  Capitalized terms used and not defined herein shall have the respective meanings given them in the Loan Agreement.

As of the date hereof, the Borrower is in breach of certain terms and conditions of the Loan Agreement as a result of: (a) Borrower's failure to maintain Consolidated EBITDA of not less than <$800,000> for the nine month period ending September 30, 2015 in violation of Section 10.2.24 of the Loan Agreement; (b) Borrower's failure to maintain a Fixed Charge Coverage Ratio of not less than 1.05:1.0 for the twelve month period ending December 31, 2015 in violation of Section 10.2.25 of the Loan Agreement; and (c) Borrower's failure to provide consolidated balance sheets for the Fiscal Year ending December 31, 2015 and related statements of income, cash flow and Equity Interest holder' equity for such Fiscal Year and the management letter relating thereto in violation of Section 10.1.2(a) of the Loan Agreement and, as a result of the foregoing violations, Events of Default have occurred and are continuing under Section 11.1(c) of the Loan Agreement (collectively, the "**Specified Events of Default**").

As a result of such Specified Events of Default, effective May 1, 2016 all Obligations shall bear interest at the Default Rate.  Lender hereby expressly reserves any and all other rights and remedies of the Lender under the Loan Agreement, the other Loan Documents or applicable law arising as a result of the occurrence of the Specified Events of Default.

From and after the date hereof, the Lender may, in its sole and absolute discretion, continue to make Loans and/or issue Letters of Credit to Borrower.  Nothing contained herein, nor any action or inaction on the part of Lender, including without limitation, the making of any Loan or issuance of any Letter of Credit by the Lender, shall be deemed to be a waiver of any rights or remedies available to the Lender with respect to the Specified Events of Default, or any other Default or Event of Default that may exist under the Loan Agreement and other Loan Documents.

[Signature Page Follows]

4376859.1

Very truly yours,

**SIGNATURE BANK**

By: _____

Name: __Robert Wallace_____

Title: __Vice President_____

[Letter re: Notice of Events of Default and Reservation of Rights]

# EXHIBIT H

**SIGNATURE BANK**

1177 Ave of the Americas, 11the Floor
New York, New York 10036

June 3, 2016

**VIA EMAIL AND FEDERAL EXPRESS**

Gracious Home LLC
158 West 27th Street
New York, New York 10017

Re:   Reservation of Rights

Gentlemen:

      We refer to our letter to you dated May 10, 2016 pursuant to which we advised you of the existence of certain Events of Default, and our reservation of all rights and remedies arising as a result of such Events of Default under the loan and security agreements between us and under applicable law (the "Default Notice").

      We further refer to that certain draft Amendment to Loan and Security Agreement, dated, prepared and sent to you on May 26, 2016 (the "Draft Amendment").

      To date, we have received no acknowledgement from you regarding the Default Notice, nor have we received any communication from you whatsoever regarding the Draft Amendment, although your attorney promptly acknowledged that he had no legal comments to the Draft Amendment.

      As the days pass without any communication from you, we are increasingly concerned about, among other things, the continuing financial deterioration of Gracious Home and the preservation of the bank's collateral.

      We request that you contact the bank immediately to discuss the finances, prospects, plans and projections for Gracious Home.  In addition, we advise you that, commencing on Monday, June 6, 2016, we intend to increase our reserves under the loan agreement by at least $25,000 per week.  In addition, we expressly reserve any and all of our other rights and remedies under the loan documents and applicable law, including, without limitation, the right, in our sole discretion, to cease or limit the making of loans, advances and other financial accommodations to you.

Very truly yours,

**SIGNATURE BANK**

By: _____
Name:  Philip F. Carfora
Title: Vice President_____

4398983.1

# EXHIBIT I

SIGNATURE BANK

225 Broadhollow Road, Suite 106, Melville, New York 11747

August 15, 2016

**VIA EMAIL AND FEDERAL EXPRESS**

Gracious Home LLC
158 West 27th Street
New York, New York 10017

Re:   Reservation of Rights

Gentlemen:

      We have previously advised you of, and you have acknowledged, the existence and continuation of various events of default under the Loan and Security Agreement between us. We have offered you the opportunity to enter into a Forbearance Agreement, but you have advised us that it is premature to do so because you are presently in negotiations with your landlords, vendors and other creditors, and you are considering various options in connection with your financial restructuring. As an accommodation to you, we have thus far refrained from exercising our rights and remedies, and we continue to make advances to you, each in our sole discretion and only for so long as we elect to do so. We reserve all of our rights and remedies, including our right to cease making advances to you at any time and to exercise any right or remedy under the loan documents or at applicable law at any time.

      Without limiting any of our rights or remedies, we advise you of the following:

1.     You have provided us with a 13 Week Cash Flow projection which reflects weekly cash flow shortfalls. Signature Bank's receipt of this cash flow projection does not constitute an acceptance of the cash flow projection or an acknowledgment by Signature Bank of any information contained therein. In addition, and without limiting any of Signature Bank's rights and remedies, Signature Bank will not be making any advances to you to cover any weekly cash flow shortfalls set forth in the cash flow projection.

2.     We understand that you are in discussions with your various landlords to obtain material reductions in rent or, in the alternative, to forfeit possession of the leased premises to the landlords. On or before August 26, 2016, Signature Bank requires that you report to the bank on the resolution of these negotiations and the cost reductions obtained.

3.     We will continue to increase the weekly reserve to the borrowing base, with additional reserves in the amount of $50,000 each being established today, August 22, 2016 and August 29, 2016. Signature Bank reserves the right to establish any additional reserves in its sole discretion and without providing any further or other notice to you.

Very truly yours,

**SIGNATURE BANK**

By:
Name: Salvatore Trifiletti
Title: Senior Vice President, Manager of Special Assets

Error! Unknown document property name.

# EXHIBIT J

158 West 27th Street Owner, LLC
c/o George Comfort & Sons, Inc., Agent
200 Madison Avenue, 26th Floor
New York, NY 10016


September 12, 2016

<u>By Federal Express - Overnight Delivery</u>

Gracious Home LLC
158 West 27th Street
New York, New York 10001

<div align="center">

## NOTICE OF DEFAULT

</div>

Re:    Agreement of Lease, dated as of April 21, 2011 ("Lease"), between 158 WEST 27th STREET LLC ("Original Landlord"), as landlord, and GRACIOUS HOME LLC, as tenant ("Tenant"), which demises premises designated as the entire rentable portion of the 12th Floor, known as the Twelfth Floor Premises (the "Premises"), in the building commonly known as 158 West 27th Street, New York, New York 10001 (the "Building")

Dear Sir/Madam:

Reference is made to the Lease.

By Deed, dated December 17, 2014, 27ST STRATEGIC VENTURE LLC ("Strategic"), as successor-in-interest to Original Landlord, sold and conveyed certain real property, located at the street address known as 158-164 West 27th Street, New York, New York, together with the improvements thereon, including the Building, to 158 WEST 27TH STREET OWNER, LLC ("Successor Landlord"), and by Assignment and Assumption of Leases and Contracts ("Assignment"), dated December 17, 2014, Strategic assigned the Lease to Successor Landlord.

Successor Landlord hereby notifies you that you are **in default** of your obligations to pay the items of minimum rent and additional rent more particularly set forth on the statement of account annexed hereto as Exhibit "A," in the aggregate amount of <u>$69,663.98</u>.

Pursuant to Article 55(b) of the Lease, unless you cure your defaults by making full payment of <u>$69,663.98</u> on or before <u>September 21, 2016,</u> that being a day which is at least five (5) days after this Notice is given to you, Successor Landlord will terminate the Lease upon three (3) days' written notice to you, but you shall remain fully liable as provided in the Lease.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Article 18 and Article 88(c) of the Lease, you are also liable for all of Successor Landlord's damages, attorney's fees and

158 West 27th Street Owner, LLC

September 12, 2016
Gracious Home LLC
Page 2
NOTICE OF DEFAULT

expenses incurred by reason of your default set forth herein, including, without limitation, Successor Landlord's attorney's fees incurred in connection with any action or proceeding to evict you based on your default.

TAKE FURTHER NOTICE that the foregoing is without prejudice to Successor Landlord's rights and remedies under the Lease, at law and in equity, all of which are expressly hereby reserved.

Yours very truly,

158 West 27th Street Owner, LLC
By: 158 West 27th Street Venture, LLC, Member
By: GCS 158 West 27th Street LLC, Manager

By: _Peter S. Duncan_
Peter S. Duncan, Manager

158 West 27th Street Owner, LLC

September 12, 2016
Gracious Home LLC
Page 3
NOTICE OF DEFAULT

cc: <u>By Federal Express – Overnight Delivery</u>

Gracious Home LLC
158 West 27th Street
New York, New York 10001
Attention: Joel Kier

Gracious Home LLC
158 West 27th Street
New York, New York 10001
Attention: CFO

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036-6522
Attention: Marie Gibson, Esq.

Isidore Mayrock
375 Duck Pond Road
Locust Valley, New York 11560

<u>Direct Inquiries To:</u>

Sternbach, Lawlor & Rella LLP
Attorneys for Successor Landlord
274 Madison Avenue, Suite 1303
New York, New York 10016
Telephone: (212) 661-4040

CM Inquiry Report for Master Occupant: Gracious Home LLC        From 9/7/2014 to 9/7/2016
Sorted by Date for Open Charges.

| | | |
|---|---|---|
| Master Occupant ID:: | 1581200 | Balance Forward:: | 0.00 |
| Address Id:: | | Charges (Debit):: | 897,353.60 |
| Building ID: | | Receipts (Credit): | -761,672.78 |
| Lease ID: | | Prepaid:: | 0.00 |
| Income Category:: | All | Net: | 69,663.98 |
| Receipt Type Id: | All | Security Deposit: | 0.00 |
| Receipt Descriptor: | All | | |

| Cat | Date | BatchID | Building ID | Lease ID | Src | Description | Charges (Debit) | Receipts (Credit) | Receipt Type Id | Base Open Amt Invoice |
|---|---|---|---|---|---|---|---|---|---|---|
| ELS | 7/1/2016 | 82730 | 158 | 3060 | CH | 10991 kwh 05/16 - 06/15 | 3,493.66 | 0.00 | | 3,493.66 255932 |
| REF | 7/1/2016 | 82803 | 158 | 3060 | CH | AUTOCHRG @T12/31/2016 @R | 11,110.47 | 0.00 | | 11,110.47 255932 |
| RT | 7/1/2016 | 82803 | 158 | 3060 | CH | AUTOCHRG @T7/31/2016 | 37,151.26 | -33,008.42 | SD Apply | 4,142.84 255932 |
| SP | 7/1/2016 | 82803 | 158 | 3060 | CH | AUTOCHRG @T7/31/2016 | 100.00 | 0.00 | | 100.00 255932 |
| WT | 7/1/2016 | 82803 | 158 | 3060 | CH | AUTOCHRG @T7/31/2016 | 100.00 | 0.00 | | 100.00 255932 |
| LC | 7/15/2016 | 83451 | 158 | 3060 | CH | Late Charge For 07/16 | 408.45 | 0.00 | | 408.45 260638 |
| ELS | 8/1/2016 | 83110 | 158 | 3060 | CH | 13900 kwh 06/15 - 07/15 | 3,872.13 | 0.00 | | 3,872.13 257171 |
| RT | 8/1/2016 | 83161 | 158 | 3060 | CH | AUTOCHRG @T8/31/2016 | 37,151.26 | -33,008.42 | SD Apply | 4,142.84 257171 |
| SP | 8/1/2016 | 83161 | 158 | 3060 | CH | AUTOCHRG @T8/31/2016 | 100.00 | 0.00 | | 100.00 257171 |
| WT | 8/1/2016 | 83161 | 158 | 3060 | CH | AUTOCHRG @T8/31/2016 | 100.00 | 0.00 | | 100.00 257171 |
| LC | 8/16/2016 | 83439 | 158 | 3060 | CH | Late Charge For 8/16 | 519.55 | 0.00 | | 519.55 260638 |
| RT | 9/1/2016 | 83493 | 158 | 3060 | CH | AUTOCHRG @T9/30/2016 | 37,151.26 | 0.00 | | 37,151.26 260638 |
| SP | 9/1/2016 | 83493 | 158 | 3060 | CH | AUTOCHRG @T9/30/2016 | 100.00 | 0.00 | | 100.00 260638 |
| WT | 9/1/2016 | 83493 | 158 | 3060 | CH | AUTOCHRG @T9/30/2016 | 100.00 | 0.00 | | 100.00 260638 |
| ELS | 9/1/2016 | 83491 | 158 | 3060 | CH | Per'd 7/15/16-8/15/16 | 4,222.78 | 0.00 | | 4,222.78 260638 |
| | | | | | | | 135,680.82 | -66,016.84 | | |

# EXHIBIT K

**SIGNATURE BANK**

225 Broadhollow Road, Melville, New York  11747

November 1, 2016

**VIA FEDEX OVERNIGHT DELIVERY**
Gracious Home LLC
158 West 27th Street, 12th Floor
New York, New York 10001

**VIA FEDEX OVERNIGHT DELIVERY**
Americas Flagship Fund LLC
Gracious Home Holdings LLC
Gracious (IP) LLC
Gracious Home Payroll LLC
GH East Side LLC
GH West Side LLC
Gracious Partners LLC
GH Chelsea LLC
158 West 27th Street, 12th Floor
New York, New York 10001

RE:    **Demand for Payment and Turnover of Collateral**
       *Loan from Signature Bank to Gracious Home LLC, et al.*

Ladies and Gentlemen:

Reference is made to (i) that certain Loan and Security Agreement, dated February 10, 2015 (as amended, modified, or supplemented from time to time, the "Loan Agreement"), between Gracious Home LLC ("Borrower") and Signature Bank ("Lender") and the agreements, guaranties, documents and instruments executed and/or delivered in connection therewith or pursuant thereto (all of the foregoing, each as amended, modified or supplemented from time to time, together with the Loan Agreement, being collectively referred to as the "Loan Documents"); and (ii) that certain Guaranty Agreement dated February 10, 2015 (as amended, modified, or supplemented from time to time, the "Guaranty Agreement") by and among Americas Flagship Fund LLC, Gracious Home Holdings LLC, Gracious (IP) LLC, Gracious Home Payroll LLC, GH East Side LLC, GH West Side LLC, Gracious Partners LLC, and GH Chelsea LLC (each individually, a "Guarantor" and collectively Guarantors") and Lender. Capitalized terms used herein shall have the meanings ascribed thereto in the Loan Agreement unless specifically defined herein.

We have previously advised you of, and you have acknowledged, the existence and continuation of various events of default under the Loan Agreement. Please be advised that, pursuant to Section 11.2 of the Loan Agreement, Lender hereby declares all outstanding and unpaid Obligations owed by Borrower to Lender in connection with the Loan Agreement and

Error! Unknown document property name.

other Loan Documents to be immediately due and payable to Lender. Lender hereby makes demand upon each of the Borrower and each Guarantor for immediate (i) payment of all amounts owing to the Lender under or in respect of the Loan Agreement and the other Loan Documents, including without limitation the aggregate unpaid principal amount due and owing under the Loan Agreement, all of the interest accrued thereon and all other amounts owing to the Lender under the Loan Agreement and the other Loan Documents; and (ii) turnover of all Collateral in the possession, custody, or control of Borrower or any Guarantor. As of today's date, the principal outstanding in respect of the Obligations under the Loan Documents is $1,648,553.89, plus, Obligations in respect of Letters of Credit in the aggregate face amount equal to $475,000, plus all interest, fees, costs, expenses, and all other amounts accrued, accruing and/or chargeable to the Obligations in accordance with Loan Agreement and other Loan Documents.

The Lender also gives notice to the Borrower and each of the Guarantors that interest will continue to accrue on all amounts owing to the Lender by the Borrower under the Loan Agreement and the other Loan Documents at the Default Rate in accordance with Section 3.1.1(b) of the Loan Agreement, and that Borrower and Guarantors are liable for such interest and for all costs and expenses incurred or sustained by the Lender in collecting all such amounts due and payable to the Lender.

The Lender further gives notice to the Borrower and each of the Guarantors that the Lender intends to proceed to protect and to enforce its rights and remedies in respect of the Loan Documents. Any action by Lender to protect and to enforce its rights and remedies, including Lender's demand for the turnover of its Collateral as set forth above, shall in no event constitute a waiver or other impairment of any other rights or remedies which the Lender has under or in respect of the Loan Agreement, the other Loan Documents or any collateral, or arising by applicable law or otherwise, all of such rights and remedies being cumulative and not exclusive.

Any partial payment(s) which may be made on account of the Loan Agreement shall not operate to reinstate the Loan Agreement, nor shall the Lender's acceptance of any such payment(s) be deemed to constitute the Lender's consent to reinstate the Loan Agreement or the Lender's agreement to waive this demand for full payment of the obligations owing under the Loan Documents and turnover of the Collateral.

Please be advised that this letter supersedes any prior correspondence on this matter. If you have any questions regarding this correspondence, please contact the undersigned as soon as possible.

Very truly yours,

**SIGNATURE BANK**

By:_____

Name: Salvatore Trifiletti
Title: SVP-Manager of Special Assets

Cc: Ian Winters, Esq.